UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROBERT CREWE and ROBERT MAURICE, on behalf of themselves and all others similarly situated<br><br>Plaintiffs,<br><br>Against<br><br>RICH DAD EDUCATION, LLC, RICH GLOBAL, LLC, RICH DAD OPERATING CO., LLC, CASHFLOW TECHNOLOGIES, INC., TIGRENT INC., TIGRENT LEARNING INC. f/k/a WEALTH INTELLIGENCE ACADEMY, INC., TIGRENT BRANDS INC., CHRISTOPHER BRIGGS, an individual, SCOTT STEWART, an individual, MARC HRISKO, an individual, WAYNE MORGAN, an individual, ROBERT KIYOSAKI, an individual, and DOES 1 through 50, inclusive<br><br>Defendants. | CASE NO. 11-CIV-8301 (PAE) |

**PLAINTIFFS' MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

# TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT .................................................................................... 1

ARGUMENT ............................................................................................................... 2

I.     MAURICE HAS NO AGREEMENT TO ARBITRATE ANYTHING
WITH ANYONE ............................................................................................... 2

II.    THE ARBITRATION PROVISION IN CREWE'S STUDENT
AGREEMENT IS INVALID AND UNENFORCEABLE................................... 2

    A.    Legal Standard ...................................................................................... 3

    B.    The Arbitration Provision Is Invalid Because Crewe Never
Assented To Its Terms ........................................................................... 4

    C.    If The Court Finds That Crewe Agreed To Arbitration It Must
Decide Arbitrability Because Crewe Never Intended To Send That
Issue To An Arbitrator ........................................................................... 6

    D.    The Court Must Decide Enforceability Because It Is Literally
Impossible For An Arbitrator To Consider Crewe's Claims By The
Terms Of The Provision.......................................................................... 7

III.   CREWE HAS NO AGREEMENT TO ARBITRATE WITH RICH
GLOBAL, LLC, RICH DAD OPERATING CO., LLC, CASHFLOW
TECHNOLOGIES, INC., CHRISTOPHER BRIGGS, SCOTT
STEWART, MARC HRISKO, OR ROBERT KIYOSAKI (THE
"NONSIGNATORIES")..................................................................................... 8

    A.    The Issue Of Whether Nonsignatories Can Enforce RDE's
Arbitration Provision Is Decided By State Law, Which Permits
Nonsignatories To Compel Arbitration Only In Very Narrow
Circumstances ....................................................................................... 8

    B.    The Express Terms Of The Arbitration Agreement Do Not Permit
Enforcement By The Nonsignatories...................................................... 9

    C.    The Nonsignatory Defendants Cannot Enforce The Arbitration
Agreement Under Equitable Estoppel .................................................. 11

        1.    Equitable Estoppel Is Inappropriate Because Plaintiffs'
Complaint Brings Independent Claims For Each Defendant...................... 12

        2.    Plaintiffs' Complaint Properly Differentiates Between The
Parties, And Any Failure To Do So Is Due To Nonpublic
Information That Will Surface In Discovery ................................. 13

IV.   RDE'S PURPORTED ARBITRATION AGREMEENT IS
UNENFORCEABLE ....................................................................................... 14

    A.    The Arbitration Provision Is Impossible To Perform ........................... 15

        1.    The Arbitration Clause Requires Arbitration Administered
"Exclusively" By The NAF, But The NAF Has Been
Barred From Arbitrating New Consumer Disputes ..................... 15

        2.    The Parties Are Not Required To Agree To Any
Alternative Arbitral Forum Unless NAF "Ceases
Operations," Which Has Not Happened ...................................... 20

i

B. The Arbitration Agreement Is Unconscionable ...................................................... 21

   1. The Arbitration Provision Is Procedurally Unconscionable ...................... 21

      a. The Arbitration Provision Was Located In An Addendum That Defendants Did Not Provide To Crewe Until After He Initialed and Signed The Student Agreement .............................................................. 22

      b. Crewe Was Subjected To High-Pressure Sales Tactics ..................................................................................... 23

      c. Crewe Was Surprised To Learn Of The Purported Arbitration Agreement ......................................................... 24

      d. Crewe Lacked Meaningful Choice ................................... 24

      e. The Arbitration Provision Was Part Of A Contract Of Adhesion .................................................................... 25

   2. The Arbitration Provision Is Substantively Unconscionable ..................... 27

      a. The NAF Is Beholden To Corporate Interests And Unfit To Conduct Consumer Arbitrations .......................... 27

      b. The Excessive Fees And Costs Of Arbitrating Would Be Prohibitive ....................................................... 28

      c. The Arbitration Provision Includes Unfair Fee Shifting Provisions .......................................................... 29

      d. The Arbitration Provision Prohibits Consolidation, Requires Arbitration On An Individualized Basis, And Contains A Class-Action Waiver .............................. 30

      e. Interdependent Aspects Of The Arbitration Provision Should Not Be Severed ...................................... 30

V. PLAINTIFFS' COMPLAINT PROPERLY PLEADS JURISDICTION AND VENUE ......................................................................................................... 31

  A. Applicable Standards For Analyzing Personal Jurisdiction ............................... 31

  B. The Defendants Are Subject To Personal Jurisdiction In New York ..................... 32

   1. Defendants RDE, LLC, TI, TLI and Kiyosaki Are Subject To General Jurisdiction In New York Under The Solicitation-Plus Rule ................................................................. 32

   2. The Defendants Are Subject To Specific Jurisdiction Because Plaintiffs' Claims Arise From Their Activities In New York ................................................................................. 35

   3. The Jurisdictional Clauses in Maurice's Contracts Are Irrelevant To Establishing Personal Jurisdiction Over Defendants in New York ................................................................. 38

   4. At Minimum, Plaintiffs Have Made A "Sufficient Start" Toward Showing Personal Jurisdiction, Which Warrants Jurisdictional Discovery ........................................................... 38

  C. Venue Is Proper In This Court ................................................................. 39

1.  For Crewe, Venue Is Appropriate Because A Substantial Part Of The Events Or Omissions Giving Rise To His Claims Occurred In This Judicial District ...................................................... 39

2.  For Maurice, Venue Is Appropriate Because He Coordinated His Claims With Crewe's Claims For Judicial Efficiency and Consistency, And For The Convenience Of All Parties And Witnesses ................................................................ 39

D.  Alternatively, Upon A Finding Of Improper Venue, The Court Should Exercise Discretion To Transfer Maurice's Claims to the United States District Court for the Southern District of Florida ........................... 41

VI.  PLAINTIFFS' COMPLAINT STATES A CLAIM UNDER EACH CAUSE OF ACTION ............................................................................................. 41

A.  All of Maurice's Claims Are Timely ........................................................ 41

B.  Plaintiffs Sufficiently Plead Their Claims With Particularity ................. 43

C.  Plaintiffs Sufficiently Plead Their Breach Of Contract Claim ............... 44

D.  Plaintiffs Sufficient Plead Their Breach Of Implied Covenant Of Good Faith And Fair Dealing Claim ........................................................ 44

E.  Plaintiffs Sufficiently Plead Their FDUTPA Claim ............................... 45

F.  Plaintiffs Sufficiently Plead Their Unjust Enrichment Claim ................. 46

G.  Plaintiffs' Claims For Negligent Misrepresentation And Fraud Meet The Heightened Pleading Standard Of Rule 9(b) ........................... 46

H.  Plaintiffs Sufficiently Plead Their Claim Against Kiyosaki For Alter Ego / Veil Piercing ......................................................................... 49

I.  Leave To Amend .................................................................................... 50

CONCLUSION .............................................................................................................. 50

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Acosta v. Dist. Bd. of Trs. of Miami-Dade Cmty. Coll.*,
  905 So.2d 226 (Fla. Dist. Ct. App. 2005) ............................................................ 5

*Allojet PLC v. Vantage Assoc.*,
  No. 04-Civ-5223 (SAS), 2005 WL 612848 (S.D.N.Y. March 15, 2005) ................................ 33

*Arista Records, Inc. v. Sakfield Holding Co.*,
  314 F. Supp. 2d 27 (D.D.C. 2004) .................................................................. 34

*Arthur Andersen LLP v. Carlisle*,
  556 U.S. 624 (2009) ........................................................................... 8, 11

*AT&T Technologies, Inc. v. Commc'ns Workers of Am.*,
  475 U.S. (1986) ............................................................................... 6, 30

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*,
  305 F.3d 120 (2d Cir. 2002) ................................................................... 32, 36

*Barton v. Gilleland*,
  2005 WL 729174 (Tenn. Ct. App. March 30, 2005) ................................................... 43

*Bland ex rel. Coker v. Health Care & Ret. Corp. of Am.*,
  927 So.2d 252 (Fla. Dist. Ct. App. 2006) .......................................................... 26

*Brennan v. Bally Total Fitness*,
  198 F.Supp.2d 377 (S.D.N.Y. 2002) ................................................................. 23

*Brown v. ITT-Consumer Fin. Corp.*,
  211 F.3d 1217 (11th Cir. 2000) ................................................................... 18

*Burger King Corp. v. Rudzewicz*,
  471 U.S. 462 (1985) .......................................................................... 32, 36

*Caban v. J.P. Morgan Chase & Co.*,
  606 F.Supp.3d 1361 (S.D. Fla. 2009) ............................................................... 30

*Carideo v. Dell, Inc.*,
  No. C06–1772JLR, 2009 WL 3485933 (W.D.Wash. Oct. 26, 2009) ................................... 18, 19

*Carr v. Gateway, Inc.*,
  944 N.E.2d 327 .................................................................................... 19

*Chestnut Ridge Air, Ltd. v. 1260269 Ontario Inc.*,
  13 Misc.3d 807, 809, 827 N.Y.S.2d 461 (Sup. Ct., NY Co. 2006) .................................... 33

*Citadel Commerce Corp. v. Cook Sys.*,
  *LLC*, 2009 WL 1230067 (M.D. Fla. May 5, 2009) ................................................... 47

*Coleman Mgmt., Inc. v. Meyer*,
  304 S.W.3d 340 (Tenn. Ct. App. 2009) ................................................................. 43

*Cumberland & Ohio Co. of Texas, Inc. v. First Am. Nat'l Bank*,
  936 F.2d 846 (6th Cir. 1991) ................................................................................. 43

*Dale v. Comcast Corporation*,
  498 F.3d 1216 (11th Cir. 2007) ...................................................................... 24, 29

*Desiderio v. National Ass'n of Sec. Dealers, Inc.*,
  191 F.3d 198 (2d Cir. 1999) .................................................................................. 21

*Dialcom, LLC v. AT&T Corp.*,
  2008 WL 2581876 (N.Y. Sup. Ct. June 17, 2008) .................................................. 46

*Doctor's Assoc., Inc. v. Casarotto*,
  517 U.S. 681 (1996) ...................................................................................... 14, 21

*Dover Ltd.  v. A.B. Whatley, Inc.*,
  2006 WL 2987054 (S.D.N.Y. Oct. 18, 2006) ......................................................... 16

*EEOC v. Waffle House, Inc.*,
  534 U.S. 279 (2002) ................................................................................................ 3

*Ehlen Floor Covering, Inc. v. Lamb*,
  2010 WL 2813369 (M.D. Fla. July 14, 2010) .................................................... 4, 12

*First Options of Chicago, Inc. v. Kaplan*,
  514 U.S. 938 (1995) ............................................................................................ 2, 6

*Forman v. Guardian Life Ins. Co. of Am.*,
  76 A.D.3d 886 (N.Y. App. Div. 2010) ................................................................... 46

*Gainesville Health Care Ctr.. Inc. v. Weston*,
  857 So.2d 278 (Fla. Dist. Ct. App. 2003) ............................................................... 25

*Gator.com Corp. v. L.L. Bean, Inc.*,
  341 F.3d 1072 (9th Cir. 2003) ............................................................................... 33

*Gillman v. Chase Manhattan Bank, N.A.*,
  73 N.Y.2d 1 (1988) ............................................................................................... 21

*Gilmer v. Interstate/Johnson Lane Corp.*,
  500 U.S. 20 (1991) ......................................................................................... 23, 28

*Graham Oil v. Arco Prods. Co.*,
  43 F.3d 1244 (9th Cir. 1994) ................................................................................. 31

*Granite Rock Co. v. Int'l Bhd. of Teamsters*,
  130 S. Ct. 2847 (2010) ........................................................................................ 2, 3

*Greater N.Y. Corp. v. Cenvill Miami Beach Corp.*,
  620 So.2d 1068 (Fla. Dist. Ct. App. 1993) ............................................................... 5

*Green Tree Fin. Corp. v. Randolph*,
   531 U.S. 79 (2000) ................................................................... 28, 29, 30

*Gundlach v. Int'l Bus. Machines Corp.*,
   No. 11-CV-846 (CS), 2012 WL 1520919 (S.D.N.Y. May 1, 2012) ........................ 39

*In re American Express Merchants' Litig.*,
   634 F.3d 187 (2d Cir. 2011) ................................................................. 28

*In re Checking Account Overdraft Litigation*,
   734 F.Supp.2d 1279 (S.D. Fla. 2010) ....................................................... 30

*In re Gateway LX6810 Computer Prods. Litig.*,
   No. SACV 10-1563-JST (JEMx), 2011 U.S. Dist. LEXIS 84402
   (C.D. Cal. July 21, 2011) ............................................................... 19, 20

*In re Magnetic Audiotape Antitrust Litig.*,
   334 F.3d 204 (2d Cir. 2003) ................................................................. 32

*In re Salomon Inc. Shareholders' Derivative Litig.*,
   68 F.3d 554 (2d Cir. 1995) ............................................................... 16, 19

*Int'l Shoe Co. v. Washington*,
   326 U.S. 310 (1945) ..................................................................... 32, 36

*Lawson v. Life of the South Ins. Co.*,
   648 F.3d 1166 (11th Cir. 2011) ............................................................... 8

*Lozada v. Dale Baker Oldsmobile, Inc.*,
   91 F Supp.2d 1087 (W.D. Mich. 2000) ....................................................... 24

*ManorCare Health Serv., Inc. v. Stiehl*,
   22 So.3d 96 (Fla. Dist. Ct. App. 2009) ..................................................... 31

*Marine Midland Bank, N.A. v. Miller*,
   664 F.2d 899 (2d Cir. 1981) ................................................................. 32

*Mastrobuono v. Shearson Lehman Hutton, Inc.*,
   514 U.S. 52 (1995) .......................................................................... 2

*Mims v. Global Credit & Collection Co.*,
   803 F. Supp.2d 1349 (S.D. Fla. 2011) .............................................. 4, 11, 12, 13

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
   473 U.S. 614 (1985) ........................................................................ 28

*National Financial Services, LLC v. Mahan*,
   19 So.3d 1134 (Fla. Dist. Ct. App. 2009) ................................................... 25

*Newbro v. Freed*,
   337 F. Supp. 2d 428 (S.D.N.Y. 2004) ..................................................... 32, 36

*Niagara Mohawk Power Corp. v. Freed*,
   265 A.2d 938 (N.Y. App. Div. 1999) ........................................................ 47

*Oleg Cassini, Inc. v. Serta, Inc.*,
   No. 11-Civ.-8751 (PAE), 2012 WL 844284 (S.D.N.Y. Mar. 13, 2012)................................... 42

*Orkin Exterminating Co. v. Petsch*,
   872 So. 2d 259 (Fla. Dist. Ct. App. 2004) ................................................................. 21

*Paladino v. Avnet Comp. Tech., Inc.*,
   134 F.3d 1054 (11th Cir. 1998) ............................................................................. 31

*Palm Beach Motor Cars Ltd., Inc. v. Jeffries*,
   885 So.2d 990 (Fla. Dist. Ct. App. 2004) ................................................................. 23

*Powertel, Inc. v. Bexley*,
   743 So.2d 570 (Fla. Dist. Ct. App. 1999) ..................................................... 14, 25, 27

*Pramer, S.C.A. v. Abaplus Int'l Corp.*,
   76 A.D.3d 89 (N.Y. App. Div. 2010) ....................................................................... 47

*Prieto v. Healthcare and Ret. Corp. of Am.*,
   919 So.2d 531 (Fla. Dist. Ct. App. 2005) ............................................................ 25, 26

*Ragone v. Atl. Video at the Manhattan Ctr.*,
   595 F.3d 115 (2d Cir. 2010)................................................................................. 11

*Reddam v. KPMG LLP*,
   457 F.3d 1054 (9th Cir. 2006) .............................................................................. 18

*Regency Island Dunes, Inc. v. Foley & Assoc. Constr. Co., Inc.*,
   697 So.2d 217 (Fla. Dist. Ct. App. 1997) .................................................................. 2

*Romano ex. rel. Romano v. Manor Care, Inc.*,
   861 So.2d 59 (Fla. Dist. Ct. App. 2003) .............................................................. 22, 26

*Ronzani v. Sanofi S.A.*,
   899 F.2d 195, 198 (2d Cir. N.Y. 1990) ................................................................... 51

*SA-PG Sun City Center, LLC v. Kennedy*,
   79 So.3d 916 (Fla. Dist. Ct. App. 2012) ................................................................. 25

*Seville Indus. Machinery Corp. v. Southmost Mach. Corp.*,
   742 F.2d 786 (3d Cir. 1984) ................................................................................. 48

*Shibata, M.D. v. Lim*,
   133 F. Supp.2d 1311 (M.D. Fla. 2000) .................................................................... 47

*Shottenstein v. Shottenstein*,
   No. 04-Civ.5851, 2004 WL 2534155 (S.D.N.Y. Nov. 8, 2004) ....................................... 33

*Singleton v. Grade A Mkt, Inc.*,
   607 F.Supp. 2d 333 (D.Conn. 2009) ....................................................................... 28

*Stewart Agency, Inc. v. Robinson*,
   855 So.2d 726 (Fla. Dist. Ct. App. 2003) ................................................................ 27

*Sutherland v. Ernst & Young LLP*,
  768 F.Supp.2d 547 (S.D.N.Y. 2011)................................................................................29

*Tampa HCP, LLC v. Bachor*,
  72 So.3d 323 (Fla. Dist. Ct. App. 2011) .......................................................................26

*Tartell v. Chera*,
  668 So.2d 1105 (Fla. Dist. Ct. App. 1996) .....................................................................2

*Topps Co. v. Gerrit J. Verburg Co.*,
  961 F. Supp. 88, 90 (S.D.N.Y.1997)..............................................................................36

*Triple E Development Co. v. Floridagold Citrus Corp.*,
  51 So.2d 435 (Fla. 1951).................................................................................................16

*Triple I: International Investments Inc. v. Fielding*,
  290 Fed. Appx. 229 (11th Cir. 2008).............................................................................12

*Truly Nolen, Inc. v. Atlas Moving & Storage Warehouses, Inc.*,
  125 So.2d 903 (Fla. Dist. Ct. App. 1961) .......................................................................5

*United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*,
  363 U.S. 574 (1960)..........................................................................................................6

*USA United Holdings, Inc. v. Tse-Peo, Inc.*,
  886 N.Y.S.2d 69 (Table), 2009 WL 1099462 (Sup. Ct. April 23, 2009) ......................50

*Vance v. Schulder*,
  547 S.W.2d 927 (Tenn. 1977).........................................................................................43

*Variable Annuity Life Ins. Co. (VALIC) v. Dull*,
  2009 WL 3064750 (S.D. Fla. Sept. 22, 2009) .................................................................4

*Wilkerson v. Ekelem*,
  2004 WL 578600 (Tenn. Ct. App. March 24, 2004) ......................................................43

*Williams v. Walker-Thomas Furniture Co.*,
  350 F.2d 445 (D.C. Cir. 1965) .......................................................................................26

*Woebse v. Health Care and Ret. Corp. of Am.*,
  977 So.2d 630 (Fla. Dist. App. Ct. 2008) ......................................................................22

*World Rentals and Sales, LLC v. Volve Construction Equipment Rents, Inc.*,
  517 F.3d 1240 (11th Cir. 2008) ......................................................................................13

**STATUTES**

28 U.S.C. § 1406(a) ............................................................................................................40

9 U.S.C. § 2......................................................................................................................14

9 U.S.C. § 3........................................................................................................................4

9 U.S.C. § 5......................................................................................................................19

N.Y. C.P.L.R. § 301 ................................................................................................ 33

N.Y. C.P.L.R. § 302 ............................................................................................ 33, 36

Tenn. Code Ann. § 28-3-109(a)(3) ........................................................................ 41

**RULES**

Fed. R. Civ. P. 12(b)(6) ............................................................................................ 1

Fed. R. Civ. P. 15(a) .............................................................................................. 49

Fed. R. Civ. P.  9(b) ............................................................................................... 47

## PRELIMINARY STATEMENT

Defendants seek to enforce an arbitration provision that part of a physically separate addendum of non-negotiable Terms and Conditions to Plaintiff Crewe's Student Agreement. *See* First Amended Class Action Complaint (Complaint). ¶¶ 36-38. Defendants argue for enforcement despite failing to have disclosed or provided the arbitration provision to Plaintiff Crewe before he signed the Student Agreement. Moreover, Defendants argue for enforcement although it is impossible to apply the arbitration provision as written. This is because National Arbitration Forum ("NAF"), the designated exclusive arbitration forum, has been barred from administering consumer arbitrations in the wake of a law enforcement action concerning its deceptive business practices and conflicts of interest relating to consumer arbitrations. *See id.* ¶¶ 40-41. To add insult to injury, all named Defendants, even non-signatories and non-parties to Crewe's Student Agreement, try to hide behind the separate arbitration provision to slam the courthouse door on Plaintiff Crewe's claims, which are worth only $199.

The arbitration provision in this case presents a textbook example of a contract provision that is invalid for lack of mutual assent and unenforceable because it is impossible to perform and unconscionable.

Maurice's claims arise from the same sales scam that gave rise to Crewe's claims—Defendants' misleading three-tiered sales pitch where by customers are sold increasingly expensive financial training using high-pressure tactics and false promises about the programs' ability to produce quick results. *See id.* ¶ 8. Maurice's claims are worth $42,291.08, and Maurice has no agreement to arbitrate anything with anyone. *See id.* ¶¶ 3, 47-50. As such, Defendants resort to a shotgun approach, arguing for dismissal pursuant to improper venue, Fed. R. Civ. P. 12(b)(2), Fed. R. Civ. P. 12(b)(6), and the applicable statutes of limitations.

However, Maurice brought his related claims in this Court for the convenience of the parties and witnesses and to promote judicial efficiency and consistency in deference to Crewe's first-filed action.  The evidence submitted herewith establishes the propriety of exercising general and specific personal jurisdiction in New York over the Defendants.  All of Plaintiffs' claims were brought in timely fashion and were properly pled.

## ARGUMENT

## I.  MAURICE HAS NO AGREEMENT TO ARBITRATE ANYTHING WITH ANYONE

Maurice's claims are not arbitrable because he never signed an arbitration agreement with any of the Defendants.  It is well-established that "arbitration is strictly a matter of consent" and "a court may submit to arbitration 'only those disputes. . . that the parties have agreed to submit.'"  *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 130 S. Ct. 2847, 2857-59 (2010) (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995)).  "One who has not agreed, expressly or implicitly, to be bound by an arbitration agreement cannot be compelled to arbitrate."  *Regency Island Dunes, Inc. v. Foley & Assoc. Constr. Co., Inc.*, 697 So.2d 217, 218 (Fla. Dist. Ct. App. 1997) (citing *Tartell v. Chera*, 668 So.2d 1105, 1106 (Fla. Dist. Ct. App. 1996)); *see also Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 57 (1995) ("[T]he FAA's proarbitration policy does not operate without regard to the wishes of the contract parties.").  Maurice never manifested any intent to arbitrate his claims against the Defendants. And none of the contracts that he signed included an arbitration agreement.  Therefore, none of his claims are arbitrable.

## II.  THE ARBITRATION PROVISION IN CREWE'S STUDENT AGREEMENT IS INVALID AND UNENFORCEABLE

The arbitration provision in Crewe's Student Agreement is invalid because he never assented to it.  Defendants hid the arbitration provision in a separate addendum that was never offered for signature and never provided to Crewe before signature.  Defendants pressured

2

Crewe to sign the Student Agreement without giving him time to read its terms.  Even if he was able to read the Student Agreement during the one-minute sign up process (which is impossible), Crewe would not have been alerted to the existence of an arbitration agreement.  Plaintiff Crewe was surprised to learn there was a separate addendum to the student agreement and even more surprised it contained an arbitration provision.  Crewe never assented to the arbitration provision.  Therefore, there was no meeting of the minds concerning arbitration, and the arbitration provision is invalid as a matter of contract formation.

In the alternative, if the contract is valid, the Court must decide the issue of arbitrability.  This issue is inappropriate for arbitration because there is a well-recognized presumption against arbitrating arbitrability, and the Student Agreement is silent on the issue.  Furthermore, the Court must find that the arbitration provision is unenforceable because it is impossible to perform.  Following the text of the arbitration provision, no forum other than the Court that can hear Plaintiff Crewe's claims.

### A.   <u>Legal Standard</u>

Before referring a case to arbitration, a Court must decide gateway issues like the contract's validity, arbitrability, and enforceability.  Because arbitration is a matter of consent, not coercion, courts must ensure the arbitration agreement is validly formed and legally enforceable.  *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 130 S. Ct. at 2857-58 ("[O]ur precedents hold that courts should order arbitration of a dispute only where the court is satisfied that neither the formation of the parties' arbitration agreement nor (absent a valid provision specifically committing such disputes to an arbitrator) its enforceability or applicability to the dispute is in issue.  Where a party contests either or both matters, 'the court' must resolve the disagreement."); see also *EEOC v. Waffle House, Inc*., 534 U.S. 279, 294 (2002).  The FAA directs that only "upon being satisfied that the issue involved in such suit or proceeding is

referable to arbitration" may a court stay the proceedings.  9 U.S.C. § 3 (2006).  As a matter of practice, courts routinely decide these issues before ruling whether to refer a case to arbitration. See, e.g., *Ehlen Floor Covering, Inc. v. Lamb*, 2010 WL 2813369, at *2-5 (M.D. Fla. July 14, 2010); *Mims v. Global Credit & Collection Co*., 803 F. Supp.2d 1349, 1354-58 (S.D. Fla. 2011); *Variable Annuity Life Ins. Co. (VALIC) v. Dull*, 2009 WL 3064750, at *4 (S.D. Fla. Sept. 22, 2009).  Here also the Court must decide these gateway issues.

### B.   The Arbitration Provision Is Invalid Because Crewe Never Assented To Its Terms

The arbitration provision is invalid as a matter of contract formation.  Plaintiff Crewe never assented to its terms because it was hidden in a separate addendum, which was never offered for signature.  In fact, Plaintiff Crewe did not know the addendum even existed when he executed the Student Agreement.  Defendants failed to alert Crewe to the addendum or provide it to him before pressuring him into signing the Student Agreement without reading its terms.

Crewe signed the Student Agreement at the end of a Rich Dad™ Education "FREE Stock Success" workshop on March 9, 2011.  Declaration of Robert Crewe, ¶¶ 2, 10.  When the workshop ended, he waited in line with 30 to 40 other attendees to enroll in a paid seminar.  *Id.* ¶¶ 11, 12.  He heard a staffer say loudly, "Please keep the lines moving."  *Id.* Crewe was rushed through the sign up process, which lasted one minute.  *Id*. 22.  At the front of the line, a staffer handed him a one-page document and asked for payment.  *Id.* ¶ 16.  The document had two areas pre-circled in pen, and the staffer instructed Crewe to write his initials within the two circles.  *Id.* Crewe did not expect to sign anything, so he was surprised at this.  *Id.* ¶ 15.  Unknown to Crewe, one of the circles stated, "YES.  I received the Terms and Conditions of this agreement."  *Id.* ¶ 20.  Similarly unknown to Crewe, the other circle stated, "Read the Agreement and the accompanying Terms and Conditions in their entirety before signing."  *Id.* ¶ 21.  He was not

4

aware there were additional terms to the Student Agreement because the staffer did not provide the addendum or alert him to its existence before signing or initializing. *Id.* ¶ 20-23. The staffer knew these statements were false when she instructed Crewe to initial the document, but Crewe was not aware he was about to initial a false document because he did not have an opportunity to read it. *Id.* ¶ 20. Crewe felt rushed by the line behind him and the staffers urging everyone to keep moving. *Id.* ¶ 15. He signed without reading the documents, which would have been impossible in the one minute process. *Id.* ¶ 20, 22. The staffer never asked if he had questions, never explained he was signing a contract, and never urged him to read the Student Agreement. *Id.* ¶ 17. Furthermore, the staffer never explained there were additional terms hidden in an addendum or that it contained an arbitration provision. *Id.* ¶¶ 17-19. Even if Plaintiff Crewe had read the Student Agreement, it makes no express mention of an arbitration provision. *Id.* ¶ 18. After signing, the staffer handed Crewe a bag full of Rich Dad materials from behind her kiosk. *Id.* ¶ 19. The arbitration clause was located in one of many folders of documents included in the bag. *Id.*

It is well-established that "a meeting of the minds of the parties on all essential elements is a prerequisite to the existence of an enforceable contract." *Acosta v. Dist. Bd. of Trs. of Miami-Dade Cmty. Coll.*, 905 So.2d 226, 228 (Fla. Dist. Ct. App. 2005) (quoting *Greater N.Y. Corp. v. Cenvill Miami Beach Corp.*, 620 So.2d 1068, 1070 (Fla. Dist. Ct. App. 1993)). "The rule is generally recognized that for the parties to have a contract, there must be reciprocal assent to certain and definite propositions." *Truly Nolen, Inc. v. Atlas Moving & Storage Warehouses, Inc.*, 125 So.2d 903, 905 (Fla. Dist. Ct. App. 1961). Here, the parties did not mutually assent to the secret arbitration provision. The arbitration provision was hidden in an addendum that was slipped into a bag of course materials locked behind the staffer's registration kiosk at the time that Crewe signed the Student Agreement. Crewe Decl. ¶¶ 19-23. The Student Agreement made

no mention of an arbitration provision, and Plaintiff Crewe was given one minute to complete the sign up process and review the contract—an impossible task. *Id.* ¶¶ 18, 20, 22.  Furthermore, Crewe had no idea the addendum even existed. *Id.* ¶¶ 20-23.  Therefore, the arbitration provision is invalid because Crewe never assented.

### C.   If The Court Finds That Crewe Agreed To Arbitration It Must Decide Arbitrability Because Crewe Never Intended To Send That Issue To An Arbitrator

The Court, not an arbitrator, must decide arbitrability.  There is a presumption *against* arbitrating the issue of arbitrability in all jurisdictions.  In *First Options*, the Supreme Court set a bright-line rule: "Courts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so."  *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (citations omitted); *see also AT&T Technologies, Inc. v. Commc'ns Workers of Am.*, 475 U.S. at 649 (1986) ("[T]he question of arbitrability. . . is undeniably an issue for judicial determination.  Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator."); *see also United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 583 (1960) ("Where the assertion by the claimant is that the parties excluded from court determination not merely the decision of the merits of the grievance but also the question of its arbitrability, vesting power to make both decisions in the arbitrator, the claimant must bear the burden of a clear demonstration of that purpose.").

In *First Options*, the Supreme Court recognized that "the law treats silence or ambiguity about the question '*who* (primarily) should decide arbitrability' differently from the way it treats silence or ambiguity about the question '*whether* a particular merits-related dispute is arbitrable. . . .'"  514 U.S. at 944.  The rationale is that the issue of arbitrating arbitrability is arcane to most

consumers, and it could force unwilling consumers to arbitrate claims they reasonably expected a court to decide. *Id.* at 944-45.

The Tigrent Defendants argue the Delegation Provision "could not have been clearer" that Crewe intended to arbitrate arbitrability. Tigrent MTD at 20-21. This is wrong. In fact, the Delegation Provision is silent as to arbitrability. Had Defendants intended arbitrators to decide the issue of arbitrability, the Delegation Provision could have included such a provision. It did not. The language of the contract provides no evidence of intent to overcome the presumption against arbitrating the issue of arbitrability, much less clear and unmistakable intent. Therefore, a court is the only forum that can decide whether Plaintiff Crewe's claims are arbitrable.

### D.   The Court Must Decide Enforceability Because It Is Literally Impossible For An Arbitrator To Consider Crewe's Claims By The Terms Of The Provision

As a practical matter, the Court *must* decide the gateway issue of enforceability because it is impossible for an arbitrator to consider Crewe's claims as written. This Court must decide the issue of impossibility.

The agreement chooses NAF exclusively to arbitrate disputes. Declaration of James E. May, Exh. 1. However, Crewe cannot arbitrate his claims with NAF because the Minnesota Attorney General barred NAF from conducting consumer arbitrations in July 2009. Compl. ¶ 40., Marchese Decl. Exh. A. Furthermore, the arbitration agreement only permits substituting another arbitrator "if NAF "ceases operations." May Decl. Exh. 1. ("We will agree on another binding arbitration forum if NAF ceases operations."). But this is impossible because the NAF did not cease operations — the NAF continues to operate in other areas of dispute resolution. Compl. ¶¶ 40-41, Marchese Decl. Exh. C. In fact, the NAF not ceased operations since Plaintiff Crewe signed the Student Agreement on March 9, 2011. Marchese Decl. Exh. C. According to the terms of the arbitration provision, the Court is the only forum that can decide the issues of the arbitration agreement's enforceability.

III.   **CREWE HAS NO AGREEMENT TO ARBITRATE WITH RICH GLOBAL, LLC, RICH DAD OPERATING CO., LLC, CASHFLOW TECHNOLOGIES, INC., CHRISTOPHER BRIGGS, SCOTT STEWART, MARC HRISKO, OR ROBERT KIYOSAKI (THE "NONSIGNATORIES")**

The arbitration agreement purports to encompass Crewe's claims against Rich Dad™ Education, LLC as well as its "parent entity, subsidiaries, affiliates, [and] agents."  May Decl. Exh. 1; Tigrent MTD at 15.  Accordingly, Plaintiff Crewe never entered into any agreement with Rich Global, LLC, Rich Dad Operating Co., LLC, Cashflow Technologies, Inc., Christopher Briggs, Scott Stewart, Marc Hrisko, or Robert Kiyosaki.  The claims against the Defendants are not arbitrable.

However, Defendants contend these parties can enforce the arbitration agreement as nonsignatories.  The RD Defendants argue that "Crewe's claims against the RD Defendants are subject to arbitration."  RD MTD at 13-14.  Similarly, the Tigrent Defendants contend that Defendants Briggs and Stewart can enforce the arbitration agreement because "Crewe's arbitration clause applies not just to RDE but to all of the Tigrent Defendants and to Briggs and Stewart."  Tigrent MTD at 15.  This is wrong.  The express terms of the agreement do not support Defendants' contentions that it can be enforced by these nonsignatories.  Defendants' equitable estoppel argument fails as well.

In sum, Defendants want the best of both worlds.  They want to distance themselves from Rich Dad™ Education, LLC to escape liability, while simultaneously benefiting from enforcement of the arbitration provision as nonsignatories. This position is untenable.

A.   **The Issue Of Whether Nonsignatories Can Enforce RDE's Arbitration Provision Is Decided By State Law, Which Permits Nonsignatories To Compel Arbitration Only In Very Narrow Circumstances**

The Supreme Court held that state law shall determine whether nonsignatories can enforce arbitration agreements.  *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630-32 (2009); *see also Lawson v. Life of the South Ins. Co.*, 648 F.3d 1166, 1170-71 (11th Cir. 2011) (applying

8

*Carlisle* in the Eleventh Circuit and overruling all inconsistent earlier decisions).  Here, Florida

law will apply because the contract was deemed to have been executed in Florida.  Compl. ¶¶ 37,

48, 50 ("The Terms and Conditions contain a choice of law clause favoring Florida State law.");

May Decl. Exh. 1 ("The Agreement and these Terms and Condition shall be deemed to have

been made in the State of Florida."); Tigrent MTD at 7, 12 ("[T]he parties favored Florida law as

governing contractual interpretation.").

### B.   The Express Terms Of The Arbitration Agreement Do Not Permit Enforcement By The Nonsignatories

The RD Defendants contend the arbitration agreement includes Crewe's disputes with

Robert Kiyosaki, Rich Global, LLC, Rich Dad™ Operating Co., LLC, and Cashflow

Technologies, LLC.  Rich Dad MTD at 14-15.  This is wrong.  Neither Plaintiffs nor Defendants

contend that Kiyosaki or any of the RD Defendants are parent entities, subsidiaries, licensees,

successors, or assigns of Rich Dad™ Education, LLC.

Kiyosaki and the RD Defendants are not affiliates of Rich Dad™ Education, LLC.  As

defined in Tigrent's brief, the word "affiliate" means "[a] corporation that is related to another

corporation by shareholdings or other means of control; a subsidiary, parent or sibling

corporation."  Tigrent MTD at 15; *Black's Law Dictionary* 63 (8th ed. 2004).  Under the Tigrent

Defendants' definition, Defendant Kiyosaki is not an affiliate because he is a natural person.

Additionally, Plaintiffs never alleged the RD Defendants were affiliates of Rich Dad™

Education, LLC, per Tigrent's definition.[1]  Furthermore, Tigrent's corporate website identifies

Tigrent Learning Inc., Tigrent eLearning Inc., and Rich Dad™ Education, LLC as its corporate

---

[1] As the RD Defendants correctly note, Plaintiffs' complaint does make allegations that Rich Dad Education was affiliated with the other Defendants.  Compl. ¶¶ 29, 31; RD MTD at 14.  However, "affiliate" was used in a general sense to mean the Defendants were connected by a common fraudulent scheme.  Merriam-Webster, *available at* http://www.merriam-webster.com/dictionary/affiliated (defining "affiliated" to mean "closely associated with another typically in a dependent or subordinate position <the university and its affiliated medical school>").  It was not used in the technical sense to allege that all Defendants had shareholdings or other means of control in Rich Dad™ Education, LLC.

"affiliates," but it merely states that Tigrent "entered into an agreement in 2006 with Rich Global, LLC to provide Rich Dad™ Education training courses. . . ." Marchese Decl. Exh. D. In fact, the RD Defendants concede that Plaintiffs' Complaint "contains no allegation suggesting that Kiyosaki or any of the other RD Defendants has a controlling interest in [the Tigrent Defendants]. . . The Amended Complaint does not—*and cannot*—allege that any of [the RD Defendants] has a controlling ownership interest, either directly or indirectly, in Rich Dad™ Education, LLC or Tigrent Learning Inc.. . . ." RD MTD at 2, 10, 14 (emphasis added).

Kiyosaki and the RD Defendants are not agents, either. The RD Defendants cite to language in Plaintiffs' complaint that alleges "each Defendant. . . acted in concert and association with, with the knowledge and approval of, and/or as the agent of each other within the course and scope of the agency." Compl. ¶ 31; RD MTD at 14. This passing reference cannot establish an agency relationship for arbitration purposes, especially considering that the most valid textual interpretation is simply the RD Defendants operated with the knowledge and approval of Tigrent Defendants. The RD Defendants themselves even argue that Plaintiffs "do[] not (*and cannot*) plead any facts establishing. . . agency." RD MTD at 14 (emphasis added).

The Tigrent Defendants also argue that the same language in Plaintiffs' Complaint establishes an agency relationship for arbitration purposes. Tigrent MTD at 16. This is wrong. Like the RD Defendants, the Tigrent Defendants concede that Plaintiffs' Complaint does not provide a "factual basis for claiming all defendants are agents." *Id.* Arbitration of Crewe's claims against the Defendants Stewart, Briggs, and the RD Defendants is inappropriate, as they are not parent entities, subsidiaries, licensees, successors, assigns, affiliates, or agents of Rich Dad™ Education, LLC.

### C.   The Nonsignatory Defendants Cannot Enforce The Arbitration Agreement Under Equitable Estoppel

Defendants argue that Crewe is estopped from litigating his claims under the doctrine of equitable estoppel because he "pleads intertwined factual issues" that estops him from avoiding arbitration.  Tigrent MTD at 16; RD MTD at 15-17.  This is wrong.  The RD Defendants rely upon *Ragone v. Atl. Video at the Manhattan Ctr.*, 595 F.3d 115, 126-27 (2d Cir. 2010) for a two-part test: "whether the issues the non-signatories seek to arbitrate are intertwined with claims asserted against a party to the arbitration agreement, and whether the relationship among the parties. . . 'justifies a conclusion that the party which agreed to arbitrate with another entity should be estopped from denying an obligation to arbitrate a similar claim."  RD MTD at 15 (quoting *Ragone*, 595 F.3d at 127).  However, the issue of whether nonsignatories can enforce an arbitration agreement is determined under state law, and Florida law applies because the contract is deemed to have been executed in Florida.  *See supra* III.A; *Arthur Andersen LLP*, 556 U.S. at 624 (holding that state law determines whether nonsignatories can enforce agreements to arbitrate); May Decl. Exh. 1 ("The Agreement and these Terms and Condition shall be deemed to have been made in the State of Florida."); Tigrent MTD at 7, 12 ("[T]he parties favored Florida law as governing contractual interpretation.").

The Eleventh Circuit has expressly rejected text cited by the RD Defendants.  *Mims v. Global Credit Collection Corp.*, 803 F. Supp.2d at 1357-58 (rejecting the test from *Ragone*, the court writes that equitable estoppel "[d]oes not mean" that (i) the issues are intertwined with an arbitration agreement and (ii) the relationship between the parties justifies estoppel) (citing *Ragone*, 595 F.3d at 127).  Instead, the Eleventh Circuit applies equitable estoppel in two circumstances.  First, equitable estoppel is applied when each of a nonsignatory's claims "must rely upon the terms of a written agreement," "presumes the existence" of the written agreement,

or "arise[s] out of and relate[s] to the written agreement." *Id.* (citations omitted). Second, equitable estoppel is applied "when the signatory [to the contract containing the arbitration clause] raises allegations of. . . substantially interdependent and concerted misconduct" by the nonsignatory and one or more signatories. *Id.* (citations omitted). Here, Crewe's claims resist equitable estoppel because Plaintiffs do not assert contractual claims against any party other than Rich Dad™ Education, LLC and Tigrent Learning Inc., and Plaintiffs' complaint properly differentiates between the Defendants. Compl. ¶ 159.

### 1.   Equitable Estoppel Is Inappropriate Because Plaintiffs' Complaint Brings Independent Claims For Each Defendant

Crewe's non-contractual claims resist equitable estoppel under *Mims* because they do not "rely upon the terms" of his Student Agreement, presume the existence of his Student Agreement, or arise out of and relate to the Student Agreement. *Id.*; *Mims v. Global Credit Collection Corp.*, 803 F. Supp.2d at 1357-58. In applying this prong, Florida courts will apply equitable estoppel if the signatory plaintiff brings *contractual* claims against nonsignatory defendants. In *Triple I: International Investments Inc. v. Fielding*, 290 Fed. Appx. 229 (11th Cir. 2008), after an escrow payment was lost in Nigeria, Triple I filed counterclaims against its escrow agent and ten other counterclaim defendants. *Id.* at 230-31. Triple I alleged all defendants had conspired in a common scheme to defraud. *Id.* Triple I relied upon a contract with an arbitration clause against Fielding, but it relied upon contracts without arbitration clauses against the other defendants. *Id.* The court declined to apply estoppel to the defendants who were nonsignatories to the contract with Fielding, finding that these claims were brought on independent grounds and were not subject to arbitration under Fielding's contract. *Id.* at 232. Likewise, in *Ehlen Floor Covering, Inc. v. Lamb*, Case No. 07-Civ-666 (DNF), 2010 WL 2813369, at *1, both signatories and nonsignatories to an arbitration agreement sued the administrator of their ERISA plan for breach of fiduciary duty, negligence, violation of

FDUTPA, and misrepresentation.  *Id.* at *4.  The court declined to apply equitable estoppel to the nonsignatories' claims, finding that their claims have an independent basis that "do not sufficiently rely upon the Agreement" with an arbitration clause.  *Id.* at *5.  *See also World Rentals and Sales, LLC v. Volve Construction Equipment Rents, Inc.*, 517 F.3d 1240, 1248 (11th Cir. 2008) (declining to apply equitable estoppel to a counterclaim, where the counterclaim does not allege breach of a contract with an arbitration provision).

Here, the Court should not apply equitable estoppel because Crewe's non-contractual claims do not rely upon the terms of the Student Agreement, do not presume the existence of the Student Agreement, and do not arise out of or relate to the Student Agreement.  *Mims v. Global Credit Collection Corp.*, 803 F. Supp.2d at 1357-58.  In fact, Plaintiffs do not allege that Kiyosaki, the RD Defendants, Defendant Stewart, or Defendant Briggs ever breached the Student Agreement.  *Id.* at ¶¶ 158-172.  Plaintiff Crewe only brought Count 2 (Breach of Contract) and Count 3 (Breach of Implied Covenant of Good Faith and Fair Dealing) against Rich Dad™ Education, LLC and Tigrent Learning Inc.  *Id.*  The Court should follow Eleventh Circuit precedent and decline to apply equitable estoppel where the plaintiff only brought non-contractual claims against nonsignatories.

> **2.      Plaintiffs' Complaint Properly Differentiates Between The Parties, And Any Failure To Do So Is Due To Nonpublic Information That Will Surface In Discovery**

Crewe's non-contractual claims resist estoppel under *Mims* because Plaintiffs' Complaint properly differentiates between the parties.  *Mims v. Global Credit Collection Corp.*, 803 F. Supp.2d at 1357-58.  However, the RD Defendants argue that Plaintiffs make "the same claims, asserted at once against all defendants" and "conflate[] all the defendants and contains no meaningful allegation distinguishing among them."  RD MTD at 15-16.  The Tigrent Defendants argue that "Crewe's disputes with RDE are factually intertwined with the disputes he has with

the other" Defendants.  Tigrent MTD at 16.  This is wrong.  In fact, Plaintiffs' Complaint

properly attributes conduct to each Defendant, to the extent the information is available at this

early stage in the case.

For example, Plaintiffs' Complaint describes the background of Defendant Kiyosaki and

explains how he created the Rich Dad empire.  Compl. ¶¶ 51-55.  It alleges Kiyosaki has

ownership and membership interests in Cashflow Technologies, Inc., Rich Dad™ Operating

Company, LLC, Rich Global, LLC, Tigrent Inc., and Rich Dad™ Education, LLC.  *Id.*  It

identifies Rich Dad™ Education, LLC as the counterparty to Plaintiff Maurice's Student

Agreement.  *Id.* ¶ 47.  It identifies Tigrent Learning Inc., its parent, subsidiary, and affiliates as

the counterparty to Maurice's Advanced Training Agreement.  *Id. ¶ 49*.  It identifies Rich Dad™

Education, LLC as the counterparty to Crewe's Student Agreement.  *Id.* ¶¶ 96, 98.  It identifies

Defendants Stewart and Briggs as Tigrent's unqualified trainers.  *Id.*  ¶¶ 72-79.  And it describes

when, why, and how Kiyosaki partnered with the Tigrent Defendants.  *Id.*  ¶¶ 56-57.  Each step

of the way, Plaintiffs' Complaint explains the role of each Defendant in their common fraudulent

scheme.

## IV.   RDE'S PURPORTED ARBITRATION AGREEMENT IS UNENFORCEABLE

Section 2 of the FAA states that an arbitration clause can be invalidated on such grounds

as exist "at law or in equity for the revocation of a contract."  9 U.S.C. § 2.  An arbitration clause

may be defeated by any defense existing under the state law of contracts.  *Powertel, Inc. v.*

*Bexley*, 743 So.2d 570, 574 (Fla. Dist. Ct. App. 1999).  "[G]enerally applicable contract

defenses, such as fraud, duress or unconscionability, may be applied to invalidate arbitration

agreements without contravening [the Federal Arbitration Act]."  *Doctor's Assoc., Inc. v.*

*Casarotto*, 517 U.S. 681, 687 (1996).  Here, the purported arbitration provision should be

invalidated because it is impossible to perform and because it is procedurally and substantively unconscionable.

> **A.**    **The Arbitration Provision Is Impossible To Perform**

Tigrent Defendants argue that the "Court must… compel Crewe to arbitrate, and not litigate, any disputes because it is undisputed that Crewe's arbitration agreement is a valid arbitration agreement."  Tigrent MTD at 15.  This is wrong.  Crewe's purported arbitration provision is not valid because, among other reasons, it is impossible to perform because a material term of the provision requires arbitration administered exclusively by the NAF, which has been barred from participating in the arbitration of consumer disputes.  Moreover, the NAF has not ceased operations, so the conditional requirement for the parties to agree on another arbitration forum has not been triggered.  Therefore, the arbitration provision is impossible to perform and should be invalidated.

> **1.**    **The Arbitration Clause Requires Arbitration Administered "Exclusively" By The NAF, But The NAF Has Been Barred From Arbitrating New Consumer Disputes**

In relevant part, the arbitration provision in the separate Terms and Conditions to Crewe's Student Agreement reads, "[w]e agree that any Dispute (as defined below) between us shall be resolved exclusively and finally by binding arbitration under the Federal Arbitration Act administered by the National Arbitration Forum (NAF) under the Code of Procedure in effect when the claim is filed… [s]uch arbitration shall be conducted under NAF rules, except as otherwise provided below.  We will agree on another binding arbitration forum if NAF ceases operations."  May Decl. Exh. 1.

The NAF has been barred from administering consumer disputes since July 24, 2009, when it was required to completely divest any business related to the arbitration of consumer disputes pursuant to a July 17, 2009 Consent Judgment entered into with the Attorney General of

the State of Minnesota.  Marchese Decl. Exh. A. ("The purpose of the Consent Judgment is to require the complete divesture by the NAF Entities of any business related to the arbitration of consumer disputes").[2]  Under these circumstances, the designated exclusive arbitrator is patently unavailable, and therefore a material term of the provision can no longer be performed.

As noted above, the arbitration provision requires the parties to agree on another arbitration forum "if NAF ceases operations." Id.  However, this condition has not been satisfied because NAF continues to operate and has not ceased the same type of operations it was involved in when Crewe entered into his Student Agreement on March 9, 2011.  Marchese Decl. Exh. C.

Defendants state, "pursuant to the FAA and to Florida and New York statutory law, substitute arbitral panels are to be appointed when a designated forum becomes unavailable." Tigrent MTD at 17.  This is wrong.  In fact, in cases when the sole designated arbitration forum is unavailable, the Second Circuit and the Southern District of New York have indicated that the language of § 5 of the FAA should be read literally to hold that the arbitration clause is unenforceable.  *See In re Salomon Inc. Shareholders' Derivative Litig.*, 68 F.3d 554, 561 (2d Cir. 1995); *see also Dover Ltd.  v. A.B. Whatley, Inc.*, 2006 WL 2987054, at *7 (S.D.N.Y. Oct. 18, 2006) (holding that where the **exclusive** arbitral forum ceases to be viable, party seeking arbitration cannot override parties' contractual intent and require plaintiffs to arbitrate elsewhere).  Here, the agreement requires that any dispute be resolved "**exclusively** and finally by binding arbitration under the Federal Administration Act administered by the National Arbitration Forum."  Compl. ¶ 39; May Decl. Exh. 1 (emphasis added).  However, the NAF cannot administer the arbitration for Crewe's dispute.  Marchese Decl. Exh. A.

---

[2] On July 14, 2009, the Minnesota Attorney general filed a lawsuit against the NAF alleging deceptive practices, conflicts of interest and unfair business practices in connection with the administration of consumer arbitrations. Marchese Decl. Exh. B.

Under Florida law, contracts must be read in their entirety to determine the intent of the parties. *Triple E Development Co. v. Floridagold Citrus Corp.,* 51 So.2d 435,438 (Fla. 1951) ("This Court, from time to time, has approved certain rules to be observed in the construction of contracts and among them are the following: (1) the contract should be considered as a whole in determining the intention of parties to the instrument…."). When read as a whole, the terms of the arbitration provision clearly and unambiguously require the NAF to be the exclusive binding arbitration forum and require that any arbitration be conducted under NAF rules. May Decl. Exh. 1. First, the word "exclusively" modifies the phrase "administered by the National Arbitration Forum (NAF)." Second, the terms of the arbitration clause mandate that "such arbitration **shall** be conducted under NAF rules…." This requirement further indicates that the choice of the NAF as the exclusive arbitration forum is a material term. Third, if NAF was still administering consumer disputes, Crewe would have no grounds to challenge the NAF as the exclusive arbitration forum based solely on the text of the provision. Fourth, the fact that RDE, LLC inserted conditional alternative arbitration forum selection language in a very limited circumstance does not diminish the importance of selecting NAF as the exclusive arbitration forum in every other circumstance. Therefore, when the arbitration clause is read as a whole, it is clear and unmistakable that the choice of NAF as the arbitration forum is a "material term."[3] Thus, Defendants cannot override the parties' purported contractual intent and require Crewe to arbitrate elsewhere while the NAF still operates.

---

[3] Moreover, it is of no moment to materiality that the NAF was already barred from administering consumer arbitrations when Crewe signed his Student Agreement. The materiality of a contract term must be determined from the parties' intent as manifested in the language of the contract. The existence of the Consent Judgment does not change the parties' intent. If the designation of the NAF was material before the Consent Judgment, then it would remain so after the Consent Judgment was signed. Moreover, the Terms and Conditions are part of RDE, LLC's standard form contract. RDE, LLC could have changed the terms of the arbitration provision at any time. However, it chose to continue using the NAF provision even after the NAF was barred from handling consumer arbitrations.

In fact, as Defendants acknowledge, substitute arbitral panels are to be appointed when a designated forum becomes unavailable only if the choice of forum is an "ancillary logistical concern" in the agreement. *Id.* (quoting *Brown v. ITT-Consumer Fin. Corp.*, 211 F.3d 1217, 1222 (11th Cir. 2000). Here, the clause stating that the NAF is the exclusive forum to arbitrate any disputes indicates that the choice of forum is integral to the agreement. *See Reddam v. KPMG LLP*, 457 F.3d 1054, 1061 (9th Cir. 2006) (distinguishing between the prior case in which the arbitration agreement specified only NASD rules and not NASD as a forum, and a situation in which "the parties have expressly stated" the forum is exclusive). All of the case law cited by Defendants in support of their proposition that courts must appoint substitute arbitrators in similar cases is either inapposite or non-binding.[4]

Moreover, some courts have held that appointing a substitute arbitrator for a similar arbitration clause would contradict the parties' contractual intent. In *Carideo v. Dell, Inc.,* No. C06–1772JLR, 2009 WL 3485933 (W.D.Wash. Oct. 26, 2009), plaintiff who had bought an allegedly defective Dell computer brought suit against Dell. Dell moved to compel arbitration, pursuant to the arbitration provision that designated the NAF as the arbitral forum. Applying the Ninth Circuit's decision in *Reddam,* the court held that the parties' selection of the NAF was integral to the arbitration agreement, and concluded that appointing a substitute arbitrator would be a wholesale revision of the arbitration agreement. *Carideo,* 2009 WL 3485933 at *6.

---

[4] *New Port Richey Med. Investors v. Stern*, 14 So. 3d 1084, 1087 (Fla. Dist. Ct. App. 2009) (party opposing arbitration presented no evidence that the choice of forum for arbitration proceedings was integral to the arbitration agreement); *Zandman v. Nissenbaum*, 53 A.D.2d 837, 838 (N.Y. App. Div. 1976) (arbitration agreement provided for resolution of disputes by arbitration under the rules of a particular forum but did not require that that forum be the exclusive arbiter); *Jones v. GGNSC Pierre LLC*, 684 F. Supp. 2d 1161, 1163 (D.S.D. 2010) (contract provision specified arbitration "in accordance with the [NAF] Code of Procedure" but did not require that arbitration be exclusively administered by the NAF); *Mori v. East Side Lenders, LLC*, No. 1:11-CV-01324, 2011 U.S. Dist. LEXIS 68176 (N.D. Ill. June 24, 2011) (court applied Delaware law, which expressly allows appointment of arbitrator when otherwise agreed upon method fails for any reason).

Defendants also argue, "FAA Section 5 provides that a court shall designate a substitute arbitrator 'if for any reason there shall be a lapse in the naming of an arbitrator.'"  Tigrent MTD at 17 (quoting 9 U.S.C. § 5).  That is irrelevant.  "Lapse" in this context has been read to refer to a mechanical breakdown in the arbitrator selection process such as a lapse in time in the naming of an arbitrator or in the filling of a vacancy on a panel of arbitrators.  *In re Salomon Inc. Shareholders' Derivative Litig.*, 68 F.3d 554, 560 (2d Cir. 1995).  Here, there has not been a lapse in the naming of an arbitrator.  The purported agreement specifically names the NAF as the exclusive arbiter of any disputes, and the limited condition that requires the parties to agree on another arbitration forum has not occurred.  Compl. ¶ 39; May Decl. Exh. 1.  The "lapse" issue is a red herring.

Defendants argue, "NAF is expressly not integral to Crewe's arbitration clause, which contains alternative forum language that states: 'We will agree on another binding arbitration forum if NAF ceases operations."  Tigrent MTD at 18.  This is wrong.  In fact, NAF unavailability has been found to render arbitration agreements unenforceable under similar circumstances.  *See Carr v. Gateway, Inc.*, 944 N.E.2d 327, 336-37 (holding that selection of a particular arbitration forum [the NAF] was an integral part of the arbitration provision in the contract, such that unavailability of the forum invalidated the provision); *Carideo v. Dell*, 2009 WL 3485933, at *4-5 (holding that parties' selection of NAF as arbitrator is integral to the arbitration clause based on provision that disputes "shall be resolved exclusively and finally by binding arbitration administered by the [NAF] under its Code of Procedure then in effect…. ").

Defendants rely primarily on *In re Gateway LX6810 Computer Prods. Litig.* to oppose Plaintiffs' impossibility argument.  Tigrent MTD at 19, No. SACV 10-1563-JST (JEMx), 2011 U.S. Dist. LEXIS 84402, at *2 (C.D. Cal. July 21, 2011).  However, the *Gateway* order was issued by the United States District Court for the Central District of California, and is not

19

controlling.  *Id.*  Further, the order cites no case law to support the court's findings about

plaintiffs' impossibility arguments.  Finally, the court engages in circular reasoning involving

Section 5 of the FAA to arrive at its conclusory (and in Plaintiffs' opinion, incorrect) finding that

the alternative forum language in the arbitration agreement at issue was evidence that "the

decision regarding who would be the arbitrator was an ancillary logistical concern."  *Id.* at *3.  In

sum, *In re Gateway* is non-binding, unsupported, poorly reasoned, and wrongly decided.

  2.  **The Parties Are Not Required To Agree To Any Alternative Arbitral**
      **Forum Unless NAF "Ceases Operations," Which Has Not Happened**

    The  arbitration provision states in part, "[w]e will agree on another binding arbitration

forum if NAF ceases operations."  May Decl. Exh. 1.  This is an extremely limited conditional

circumstance.  The dictionary definition of "cease" is "to come to an end."  Merriam-Webster

Online Dictionary.  2012.  http://www.merriam-webster.com (9 May 2012).  The definition of

"operation" is "the performance of a practical work or of something involving the practical

application of principles or processes."  *Id.*  In fact, the NAF's performance of practical work has

not come to an end - it remains operative and its operational status is the same as it was on the

date that Crewe signed the Student Agreement.[5]  The NAF continues to arbitrate various non-

consumer disputes.  Marchese Decl. Exh. C.  Defendants chose to use the narrow, circumstantial

language "if NAF ceases arbitration" instead of broader language such as "if NAF is unable to

administer an arbitration under the Agreement for any reason."  Defendants knew how to write

conditional clauses more broadly to include a wider set of circumstances.  For example, in the

Terms and Conditions, Defendants wrote, "[i]n the event of **any change** made by us in date

and/or location, you have the right to reschedule your attendance to any other then scheduled

comparable educational training of your choice."  May Decl. Exh. 1 (emphasis added).  The

---

[5] Notably, the phrase "if NAF ceases operations" contemplates only future changes to operations from the date of
contract formation.  Thus, even if the Court find that NAF ceased operations prior to March 9, 2011, the condition
triggering a new agreement on an alternative arbitration forum is still not satisfied.

actual conditional language in the arbitration clause is extremely limited in scope, and remains unsatisfied.

### B.   The Arbitration Agreement Is Unconscionable

"Generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements." *Doctor's Ass'n., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996).  The Second Circuit has held that "a contract or clause is unconscionable when there is an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *Desiderio v. National Ass'n of Sec. Dealers, Inc.*, 191 F.3d 198, 207 (2d Cir. 1999); *see also Gillman v. Chase Manhattan Bank, N.A.*, 73 N.Y.2d 1, 10 (1988) (holding that a contract is unconscionable when it is "so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be unenforceable [sic] according to its literal terms").

Defendants are correct in stating that under either Florida or New York law, a plaintiff seeking to show unenforceability due to unconscionability must typically demonstrate both procedural and substantive unconscionability.  Tigrent MTD at 21.  However, Defendants also claim that Crewe cannot demonstrate either.  Id.  That is wrong.  Crewe's arbitration provision should be invalidated because the facts demonstrate that it is both procedurally and substantively unconscionable.

### 1.   The Arbitration Provision Is Procedurally Unconscionable

Defendants state, "Crewe was not subjected to procedural unconscionability in entering into the contract with RDE."  Tigrent MTD at 21.  This is wrong.  "Procedural unconscionability relates to the manner in which a contract was made and involves such issues as the parties' relative bargaining power and their ability to know and understand the disputed contract terms." *Orkin Exterminating Co. v. Petsch*, 872 So. 2d 259, 265 (Fla. Dist. Ct. App. 2004).  Here, the

contract between Crewe and Defendants was made in a manner that is procedurally unconscionable:  the arbitration provision was hidden in a separate Terms and Condition document that was never offered for signature; the Terms and Conditions containing the text of the arbitration provision were not made available until after Crewe signed and initialed the Student Agreement indicating that he already received and  agreed to the Terms and Conditions; Crewe was subject to high pressure sales tactics to enter into the contract and was rushed through the signing of the Student Agreement; Crewe was surprised to learn of the existence of the arbitration provision; Crewe lacked any meaningful choice in that he could not have obtained the unique financial education as represented by Defendants from some other source; and the arbitration provision was part of a contract of adhesion.

### a. The Arbitration Provision Was Located In An Addendum That Defendants Did Not Provide To Crewe Until After He Initialed and Signed The Student Agreement

When Crewe was presented with the Student Agreement he was not given an opportunity to read the Agreement or the separate Terms and Conditions referenced therein.  Rather, he was merely directed by a RD staffer where to initial and sign.  Crewe Decl. ¶¶ 13-18.  One of the items that the RD staffer directed Crewe to initial was an acknowledgement of receipt of the Terms and Conditions of the Student Agreement, despite the fact that the Terms and Conditions had not been made available to Crewe at that point.  Id. ¶¶ 20-21.  In fact, the Terms and Conditions which contained the purported agreement were located in a separate document, which was never offered for signature, and which he was not given access to until **after** he had entered into the Student Agreement and paid the $199 registration fee for the 3-Day Course.  Id. ¶¶ 14. The existence and importance of the arbitration provision were never explained to Crewe.  Id. ¶ 23.  Florida courts have found arbitration agreements to be procedurally unconscionable under similar circumstances.  *See Woebse v. Health Care and Ret. Corp. of Am.*, 977 So.2d 630, 634

(Fla. Dist. App. Ct. 2008) (finding procedural unconscionability where plaintiff was not given opportunity to read full contract but merely directed where to sign); *Romano ex. rel. Romano v. Manor Care, Inc.*, 861 So.2d 59, 63 (Fla. Dist. Ct. App. 2003) (finding procedural unconscionability where arbitration agreement was presented to plaintiff as "simply another document to be signed [as part of contract]").  Particularly apposite is *Palm Beach Motor Cars Ltd., Inc. v. Jeffries*, 885 So.2d 990, 992-93 (Fla. Dist. Ct. App. 2004) (finding contract containing an arbitration agreement to be procedurally unconscionable where salespeople did not call attention to arbitration provision and text containing provision itself was not initialed by party seeking to avoid arbitration).

### b.   Crewe Was Subjected To High-Pressure Sales Tactics

Crewe was subjected to high-pressure sales tactics before he signed the Student Agreement.  For example, Defendant Briggs created an undue sense of urgency during the wrap-up of the Free Workshop, and indicated that if Crewe signed up immediately he would save nearly $400 off the regular price of the 3-Day Seminar.  Crewe Decl. ¶ 8.  Further, Crewe was rushed during the signing process, which was lasted just one minute, and RD staffers charged his credit card before he had finished filling out the Student Agreement. Id. ¶ 15-16. Throughout the registration process, RD staffers loudly urged people to keep the registration lines moving.  Id. ¶ 12.  Under the circumstances, it would have been impossible to read the Student Agreement or the Terms and Conditions (if they had been provided).  Id.  High pressure tactics like these are a factor in finding contracts to be procedurally unconscionable.  *Brennan v. Bally Total Fitness*, 198 F.Supp.2d 377, 382 (S.D.N.Y. 2002) ("to determine whether a contract was validly formed, a court should focus on evidence of high pressure or deceptive tactics…."); *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 33 (1991) (holding that inequality in bargaining power coupled with high pressure tactics may be sufficient to show lack of meaningful choice).

### c. Crewe Was Surprised To Learn Of The Purported Arbitration Agreement

Courts have found procedural unconscionability where copies of paperwork containing arbitration clauses were not furnished until after the agreement became effective.  *See Lozada v. Dale Baker Oldsmobile, Inc.*, 91 F Supp.2d 1087, 1100 (W.D. Mich. 2000).  Here, Crewe was likely to be and was in fact surprised to learn of the purported arbitration agreement.  The arbitration provision was not provided to Crewe before he initialed and signed the Student Agreement; indeed, there was no express reference to any arbitration provision on the Student Agreement.  The Agreement merely stated, "THE ACCOMPANYING TERMS AND CONDITIONS CONTAIN A DISPUTE RESOLUTION CLAUSE.  PLEASE SEE SECTION ENTITLED CHOICE OF LAW/DISPUTE RESOLUTION."  Crewe Decl. ¶ 18; May Decl. Exh. 1.  The words "arbitration" or "arbitrate" do not appear anywhere on any document that Crewe signed.  May Decl. Exh. 1.  No one made any attempt to explain the significance of the arbitration provision to Crewe, and he did not understand that he was waiving his constitutional rights by signing the Student Agreement.  Crewe Decl. ¶¶ 17, 23.  Under these circumstances, Crewe's failure to read the arbitration provision is entirely reasonable – it was not even available for his inspection.  Crewe Decl. ¶ 19.

### d. Crewe Lacked Meaningful Choice

Defendants state, "Crewe had a meaningful choice about whether to enter into the contract."  Tigrent MTD at 21.  This is wrong.  Here, Crewe had no meaningful choice because he believed Defendant Briggs when he said that he would be unable to obtain the unique financial education that Defendants provide anywhere else.  Crewe Decl. ¶ 9, 10.  During the Free Workshop, Defendant Briggs told the audience (including Crewe) that the RD courses offered unique, practical financial education that was not available anywhere else, and that "[Rich Dad is] the only company left to learn from."  Crewe Decl. ¶ 10.  Much of the RD

advertising reinforces the message that only RD can provide consumers with meaningful financial education.  *See* Compl. Exh. B.

Further, under Florida law, courts determining whether there was an absence of meaningful choice on the part of the complaining party may consider "whether the complaining party had a realistic opportunity to bargain regarding the terms of the contract, or whether the terms were merely presented on a 'take-it-or-leave-it' basis."  *SA-PG Sun City Center, LLC v. Kennedy*, 79 So.3d 916, 919 (Fla. Dist. Ct. App. 2012) (quoting *Gainesville Health Care Ctr., Inc. v. Weston*, 857 So.2d 278, 284 (Fla. Dist. Ct. App. 2003).  Lack of meaningful choice is a strong indicator of procedural unconscionability.  *See Prieto v. Healthcare and Ret. Corp. of Am.*, 919 So.2d 531, 533 (Fla. Dist. Ct. App. 2005).  The Student Agreement is a "take it or leave it" document, with a provision that "[f]ield personnel do not have the authority to change the terms of the Agreement or the Terms and Conditions, except as expressly authorized herein." May Decl. Exh. 1.  Therefore, Crewe had no realistic opportunity to bargain regarding the terms of the contract.

### e. The Arbitration Provision Was Part Of A Contract Of Adhesion

Under Florida law, an adhesion contract is defined as a "'standardized contract form offered to consumers of goods and services on essentially a 'take it or leave it' basis without affording [the] consumer [a] realistic opportunity to bargain and under such conditions that [the] consumer cannot obtain [the] desire product or services except by acquiescing in the form contract."  *Powertel, Inc. v. Bexley*, 742 So.2d 570, 574 (Fla. Dist. Ct. App. 1999).  "The fact that a contract is one of adhesion is a strong indicator that the contract is procedurally unconscionable because it suggests an absence of 'meaningful choice.'"  *Gainesville Health Care Center, Inc. v. Weston*, 857 So.2d 278, 285 (quoting *Powertel*, 743 So.2d at 574).  Florida law recognizes that even a well-defined arbitration agreement may be procedurally unconscionable if contained

within a contract of adhesion. *National Financial Services, LLC v. Mahan*, 19 So.3d 1134, 1136 (Fla. Dist. Ct. App. 2009). Florida courts have found arbitration agreements contained within contracts of adhesion to be procedurally unconscionable where, as here, the importance of the arbitration provision was not explained to complainant. *Romano ex. rel. Romano v. Manor Care, Inc.*, 861 So.2d 59, 63 (Fla. Dist. Ct. App. 2003); *Prieto v. Healthcare and Ret. Corp. of Am.*, 919 So.2d 531, 533 (Fla. Dist. Ct. App. 2005). Here, Crewe was offered a form contract, drafted by Defendants, for services on an entirely "take it or leave it" basis. Crewe Decl. ¶ 16. He was afforded one minute to carefully read and consider the contract and he was rushed through a line of consumers and subjected to pressure from sales people to sign and pay as quickly as possible. Crewe Decl. ¶ 12, 16. No attempt was made to explain the terms of the contract as they might relate to Crewe's rights. Id. ¶ 16, 17.

Defendants state that Crewe was granted an express cancellation right but chose not to exercise that right and therefore cannot now claim procedural unconscionability. Tigrent MTD at 22 (citing *Bland ex rel. Coker v. Health Care & Ret. Corp. of Am.*, 927 So.2d 252 (Fla. Dist. Ct. App. 2006). This is wrong. First, unconscionability is determined as of the time of contract formation. *Tampa HCP, LLC v. Bachor*, 72 So.3d 323, 327 (Fla. Dist. Ct. App. 2011) (citing *Williams v. Walker-Thomas Furniture Co.*, 350 F.2d 445, 449 (D.C. Cir. 1965)). Unlike in *Bland* (which has been abrogated), where complainant did not cancel agreement during revocation period after opportunity to review and ask questions about the contract, and after complainant was told that refusal to sign would not prevent her from receiving the contracted-for services, Crewe had no opportunity to ask questions about the contract, and he understood that if he did not sign the contract he would not be able to attend the 3-Day Course. Compl. ¶ 101. And at the time of signing of the Student Agreement, Crewe did not have a chance to evaluate the contracted-for services within the cancellation period. *Id.* Finally, Crewe alleges that he also

did not exercise the cancellation right because he was subject to continuing misrepresentations after signing.  *See* Compl. ¶¶ 99-101.

### 2.      The Arbitration Provision Is Substantively Unconscionable

Under Florida law, "[s]ubstantive unconscionability focuses on the actual agreement and whether the terms are reasonable and fair."  *Stewart Agency, Inc. v.* Robinson, 855 So.2d 726, 728 (Fla. Dist. Ct. App. 2003) (quoting *Powertel, Inc. v. Bexley*, 743 So.2d 570, 574 (Fla. Dist. Ct. App. 1999)).  Here, the purported arbitration agreement is neither reasonable or fair because the designated forum for arbitration (the NAF) has been found to be beholden to corporate interests and unfit to conduct consumer arbitrations, because the excessive fees and costs of arbitrating would be prohibitive, given Crewe's $199 out-of-pocket damages, because the purported arbitration agreement includes unfair fee shifting provisions, because the purported arbitration agreement prohibits consolidation, requires arbitration on an individualized basis, and contains a class-action waiver, and because interdependent aspects of the purported arbitration clause should not be severed.

### a.      The NAF Is Beholden To Corporate Interests And Unfit To Conduct Consumer Arbitrations

On July 14, 2009, the State of Minnesota, through its Attorney General, Lori Swanson, filed a complaint against NAF for deceptive practices and conflicts of interest.  Marchese Decl. Exh. B.

On July 17, 2009, NAF and the State of Minnesota agreed to a consent judgment which required "the complete divestiture by [NAF] of any business related to the arbitration of consumer disputes" and which prohibited the NAF from, among other activities, "[i]n any manner participat[ing] in any new [c]onsumer [a]rbitration."  Marchese Decl. Exh. A.  Therefore, being unfit to conduct consumer arbitrations, the NAF is unavailable to in any manner participate in an arbitration as delineated in the Terms and Conditions.

Further, "[w]hen parties designate a specific arbitral forum, such designation has wide-ranging substantive implications that may affect, *inter alia*, the arbitrator selection process, the law, procedures, and rules that govern the arbitration, the enforcement of the arbitral award, and the cost of arbitration." *Singleton v. Grade A Mkt, Inc.*, 607 F.Supp. 2d 333, 340 (D.Conn. 2009).   Thus it is relevant to consider Defendants' intent in specifying the NAF as the exclusive forum for dispute arbitration.

### b.    The Excessive Fees And Costs Of Arbitrating Would Be Prohibitive

If a party proves that arbitration would be prohibitively expensive, it can invalidate an arbitration agreement.  An agreement requiring mandatory arbitration of state or federal statutory claims is enforceable only "so long as the prospective litigant effectively may vindicate [his or her] statutory cause of action in the arbitral forum." *Green Tree Fin. Corp. v. Randolph*, 531 U.S. 79, 90 (2000).  *See also Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 28 (1991) (same); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 (1985) (same).  *Green Tree* recognized that "large arbitration costs could preclude a litigant … from effectively vindicating her federal statutory rights in the arbitral forum."  531 U.S. at 90.  Under *Green Tree*, where "a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs."  *Id.* at 92.

The Second Circuit recently applied *Green Tree* in *In re American Express Merchants' Litig.*, 634 F.3d 187 (2d Cir. 2011) ("*Amex II*").  Holding that "the cost of plaintiffs' individually arbitrating their dispute with Amex would be prohibitive, effectively depriving plaintiffs of the statutory protections of the antitrust laws."  *Id.* at 197.

Other courts have similarly applied *Green Tree* to invalidate arbitration agreements that would impose excessive costs.  *See, e.g.*, *Dale v. Comcast Corporation*, 498 F.3d 1216, 1224

(11th Cir. 2007) (applying *Green Tree* to invalidate arbitration agreement where "the cost to an individual plaintiff of vindicating the claim when compared to the plaintiff's potential recovery" was too great); *Shankle v. B-G Maint., Inc.,* 163 F.3d 1230, 1235 (10th Cir. 1999) (holding unenforceable an arbitral fee-splitting provision that would cost an employee between $1,875 and $5,000 to resolve his statutory claims); *Sutherland v. Ernst & Young LLP*, 768 F.Supp.2d 547, 551 (S.D.N.Y. 2011) (invalidating arbitration agreement where plaintiff's "maximum potential recovery would be too meager" to justify arbitration costs and expert fees required for individual prosecution); *In re Checking Account Overdraft Litigation*, 734 F.Supp.2d 1279, 1289 (S.D. Fla. 2010) (invalidating arbitration agreement because "[c]ompared to the potential recovery, the costs of engaging in arbitration [and expert fees] … is too great to justify individual actions by consumers"); *Caban v. J.P. Morgan Chase & Co.*, 606 F.Supp.3d 1361, 1371 (S.D. Fla. 2009) (invalidating arbitration agreement where plaintiff's "potential recovery is too small to justify the costs" of arbitration).

Here, where Crewe's out-of-pocket damages are relatively small and the arbitration provision limits recovered out-of-pocket damages, the costs of engaging in arbitration are too great to justify an individual action when compared to the potential recovery and thus the fees and the cost of arbitrating are prohibitively expensive in violation of *Green Tree*.[6] Therefore, the purported arbitration agreement should be found substantively unconscionable.

    **c.**    **The Arbitration Provision Includes Unfair Fee Shifting Provisions**

Because the costs that Crewe is seeking to recoup total less than $200, a provision that shifts arbitration and litigation fees and costs to him should he not prevail is an unfair deterrent

---

[6] The Supreme Court's recent decision in *AT&T Mobility LLC v. Concepcion*, 131 S.Ct. 1740 (2011) does not address the *Green Tree* rule.  Nor does it address whether excessive or unique arbitral costs would prevent a litigant from effectively vindicating statutory rights.  These issues were not presented in *Concepcion*.

and powerful disincentive to his seeking to vindicate his rights.  *See* discussion re: the prohibitive

costs of arbitrating, *supra*.

> **d.**     **The Arbitration Provision Prohibits Consolidation, Requires Arbitration On An Individualized Basis, And Contains A Class-Action Waiver**

The clauses in the arbitration provision that prohibit consolidation, require arbitration on

an individualized basis, and require Crewe to waive his rights to bring a class action all function

as unfair deterrents that make it economically irrational for Crewe to vindicate his $199 claim.

*See* discussion re: the prohibitive costs of arbitrating, *supra*.

> **e.**     **Interdependent Aspects Of The Arbitration Provision Should Not Be Severed**

Defendants state, "any supposedly unconscionable provision could be severed without

disrupting the arbitration agreement."  Tigrent MTD at 24.  This is wrong.  Here, the clauses

mandating that the NAF be the exclusive arbiter of all disputes and that any arbitration follow

NAF rules are integral to the purported agreement and interdependent with the other terms.

Florida law recognizes that a limitation in an arbitration agreement may be so interrelated

and interdependent that it cannot be severed.  *ManorCare Health Serv., Inc. v. Stiehl*, 22 So.3d

96, 100 (Fla. Dist. Ct. App. 2009).  Further, courts have held that all parts of an arbitration clause

are interdependent and that offending parts should not be severed, but the whole clause thrown

out. *Paladino v. Avnet Comp. Tech., Inc.*, 134 F.3d 1054, 1058 (11th Cir. 1998) (citing *Graham

Oil v. Arco Prods. Co.*, 43 F.3d 1244, 1248-49 (9th Cir. 1994) (*cert. denied* 516 U.S. 907

(1995))) ("[T]he presence of an unlawful provision in an arbitration agreement may serve to taint

the entire arbitration agreement, rendering the agreement completely unenforceable, not just

subject to judicial reformation.").  Therefore, the severability clause cannot save the arbitration

provision.

## V.   PLAINTIFFS' COMPLAINT PROPERLY PLEADS JURISDICTION AND VENUE

### A.   Applicable Standards For Analyzing Personal Jurisdiction

Defendants' motions to dismiss urge dismissal of Plaintiffs' Complaint pursuant to Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction.  *See* Tigrent Notice of Motion at 1; Tigrent MTD at 24-30; RD Notice of Motion at 1-2; RD MTD at 20-23.  On a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(2), plaintiffs bear the burden of demonstrating that jurisdiction exists over defendants.  *See In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003).  Prior to discovery, a plaintiff may defeat a motion to dismiss for lack of personal jurisdiction by making a *prima facie* showing of jurisdiction based on the pleadings or his own affidavits and supporting materials.  *See id.*; *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981).

District courts have considerable procedural leeway when deciding pretrial motions to dismiss for lack of personal jurisdiction.  *See id.*  A court may determine the motion on the basis of affidavits alone, or it may permit discovery in aid of the motion, or it may conduct an evidentiary hearing on the merits of the motion.  *See id.*

Personal jurisdiction hinges on one basic notion: whether maintaining an action against a nonresident defendant offends "traditional notions of fair play and substantial justice" in light of defendants' "minimum contacts" with the forum state.  *See Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945); *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477-478 (1985). Generally, the two limitations on a court's power to exercise personal jurisdiction over nonresident defendants are the applicable state's long-arm statute and constitutional principles of due process.  A federal court sitting in diversity must look to the law of the state in which it sits to ascertain whether it may exercise personal jurisdiction over a foreign defendant.  *See Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 124 (2d Cir. 2002).

Ordinarily, if jurisdiction is proper under New York's long-arm statute, N.Y. C.P.L.R. § 302 (2012) ("Section 302"), constitutional due process considerations will be satisfied because Section 302 does not reach as far as the constitution permits.  *See Newbro v. Freed*, 337 F. Supp. 2d 428, 434 (S.D.N.Y. 2004).

      **B.**    **The Defendants Are Subject To Personal Jurisdiction In New York**

          **1.**    **Defendants RDE, LLC, TI, TLI and Kiyosaki Are Subject To General Jurisdiction In New York Under The Solicitation-Plus Rule**

Under New York law, a foreign corporation is subject to general jurisdiction if it is "doing business" in New York.  N.Y. C.P.L.R. § 301 (2012) ("Section 301").  For purposes of Section 301, a defendant is "doing business" in New York if it has engaged in such a continuous and systematic course of activities in New York that it can be deemed present in New York.  *See* N.Y. C.P.L.R. § 301.  Under the solicitation-plus rule, "In addition to the traditional indicia of 'doing business' in New York . . . jurisdiction over a foreign corporation exists where it solicits business in New York and engages in some other continuous activity."  *Chestnut Ridge Air, Ltd. v. 1260269 Ontario Inc.*, 13 Misc.3d 807, 809, 827 N.Y.S.2d 461, 464 (Sup. Ct., NY Co. 2006) (finding general jurisdiction over Canadian aircraft refinisher where it performed work on average from seven projects from New York customers annually and it obtained at least 4% of its revenue from those customers); *see Allojet PLC v. Vantage Assoc.*, No. 04-Civ-5223 (SAS), 2005 WL 612848, at *6 (S.D.N.Y. March 15, 2005) (once substantial solicitation is shown, "very little more is necessary to a conclusion of doing business").  In the jurisdictional context, the central question concerning solicitation is "whether the defendant behaved in such a way as to encourage others to spend money, or otherwise act, in a manner that would benefit defendant." *Chestnut Ridge Air, Ltd.*, 13 Misc.3d at 809, 827 N.Y.S.2d at 464.

Numerous courts, including this one, have considered and granted general jurisdiction on the basis of interactive websites that provide benefits to non-forum defendants.  *See, e.g.,*

*Shottenstein v. Shottenstein*, No. 04-Civ.5851, 2004 WL 2534155, at *11 (S.D.N.Y. Nov. 8, 2004) ("At this early stage in the proceedings, Sarah has adequately pled that there is general jurisdiction over M/I Homes due to its interactive website advertising plus substantial sales to New York residents."); *Gator.com Corp. v. L.L. Bean, Inc.*, 341 F.3d 1072, 1078 (9th Cir. 2003), *en banc hearing granted*, 366 F.3d 789, 789 (9th Cir. 2004), *and appeal dismissed*, No. 02-Civ-15035, 2005 WL 351228, at *6 (9th Cir. 2005) ("[W]e find that there is general jurisdiction in light of L.L. Bean's extensive marketing and sales in California, its extensive contacts with California vendors, and the fact that, as alleged by Gator, its website is clearly and deliberately structured to operate as a sophisticated virtual store in California.") (citations omitted); *Arista Records, Inc. v. Sakfield Holding Co.*, 314 F. Supp. 2d 27, 35 (D.D.C. 2004) (holding that a defendant's electronic transactions with forum residents were "sufficient to support a finding of continuous and systematic contacts with the District of Columbia" and general jurisdiction over the defendant).

Defendants Rich Dad™ Education, LLC, Tigrent Inc., and Tigrent Learning Inc. each maintain interactive websites that allow them to generate substantial revenue and other benefits in New York.[7]  Robert Kiyosaki's image or signature is displayed prominently on each company's website for marketing and promotional purposes.  See Marchese Decl., Exhs. D, E, F. The websites for Rich Dad™ Education, LLC, Tigrent Inc., and Tigrent Learning Inc. include interactive user features such as on-line blogs and enrollment for training classes.[8]  *See id.*, Exh. D, F, G.  Rich Dad ™ Education, LLC's website also allows users to sign up for a monthly e-Newsletter and webinars.  *See id.*, Exh. F.  Notably, the home page of the Rich Dad ™ Education, LLC website lists four New York locations for upcoming training classes—

---

[7] *See http://www.richdadeducation.com/; http://www.richdadstock.com/index.aspx; http://www.tigrent.com/richdad.html;* and http://www.tigrentlearning.com/ (last visited on May 9, 2012).

[8] Rich Dad training courses have been sold since 2006 in the United States.  *See id.*, Exh. D.

Hauppauge, New York, Ronkonkoma and White Plains.  *See id.*  Tigrent Learning Inc.'s website

offers on-line classes and live classes taught in New York, New York.  *See id.*, Exh. G.  Finally,

the TI website includes links to the Rich Dad™ Education, LLC, Tigrent Inc., and Tigrent

Learning Inc. websites and provides information about the Rich Dad courses.  *See id.*, Exh. D.

In its unaudited third quarter 2011 financial results, TI reported more than $60 million

received from course and product sales for the nine months ending September 30, 2011.  See

Marchese Decl., Exh. H.  Rich Dad™ Education, LLC, Tigrent Inc., and Tigrent Learning Inc.

are privately held companies that do not publically report their financials.  As such, Plaintiffs are

unaware of their sales revenues at this early stage in the litigation.[9]

That said, in addition to engaging in substantial online solicitation into New York,

Defendants Rich Dad™ Education, LLC, Tigrent Inc., Tigrent Learning Inc., and Kiyosaki each

have other continuous and systematic contacts with New York that constitute doing business in

New York.  Rich Dad™ Education, LLC, Tigrent Inc., and Tigrent Learning Inc. have all

conducted or contracted with "students" to conduct Rich Dad™ Education workshops, 3-day

Training classes and live seminars in New York.  *See* May Decl. Exh. 1; Marchese Decl. Exh. I;

Tigrent MTD  at 15.   As such, each of these Defendants has also used real property in New York

to conduct those classes.  *See, e.g.,* Compl. ¶ 79 ("Plaintiff Crewe attended Defendants' Stock

Success 3-day Training at the Marriott Downtown Hotel in New York, New York.).

Defendant Kiyosaki also has hosted live seminars in New York and has filmed at least

one live promotional clip in connection with the Rich Dad™ Education seminars in Times

Square, New York City.  *See* Marchese Decl. Exhs. F, I.

---

[9] Based on the allegations of the First Amended Class Action Complaint, Plaintiffs can estimate that Defendants generated at least $414,795 in sales from March 9, 2011 to April 2, 2011 based solely on the enrollments from the free workshop and 3-day Training attended by Mr. Crewe.  This calculation is based on 35 enrollees paying $199 each for the 3-day Training, *see* Compl. ¶ 88-89, and 17 enrollees paying $23,990 each for the "Platinum" training package, *see* Compl. 126, Exh. D.

Finally, Defendants Rich Dad™ Education, LLC and Kiyosaki have engaged in e-mail, newspaper and print advertising directed into New York in connection with the Rich Dad™ Education seminars. *See* Marchese Decl. Exh. J; Compl. ¶¶ 58, 60, 68, Exh. B. Therefore, Defendants Rich Dad™ Education, LLC, Tigrent Inc., Tigrent Learning Inc., and Kiyosaki can be deemed to be "doing business" in New York for purposes of exercising general personal jurisdiction.

### 2.    The Defendants Are Subject To Specific Jurisdiction Because Plaintiffs' Claims Arise From Their Activities In New York

New York's Long-Arm Statute, N.Y.C.P.L.R. § 302 (2012) ("Section 302") defines conduct that qualifies as the basis for specific jurisdiction in New York. *See Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 124-27 (2d Cir. 2002). If a defendant's conduct comports with Section 302 is satisfied, the Court must then ensure personal jurisdiction comports with constitutional due process requirements. *Newbro v. Freed*, 337 F. Supp. 2d 428, 434 (S.D.N.Y. 2004) ("Ordinarily. . . if jurisdiction is proper under the CPLR, due process will be satisfied because CPLR § 302 does not reach as far as the constitution permits.") (quoting *Topps Co. v. Gerrit J. Verburg Co.*, 961 F. Supp. 88, 90 (S.D.N.Y.1997)). The first due process test, the "minimum contacts" test, examines whether "the defendant 'purposefully availed' itself of the privilege of doing business in the forum and could foresee being 'haled into court' there." *Bank Brussels Lambert*, 305 F.3d at 127 (citations omitted); *accord Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472-76 (1985). The second test examines whether personal jurisdiction "comports with 'traditional notions of fair play and substantial justice'—that is, whether it is reasonable under the circumstances of the particular case." *Id.* at 129 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

Defendants RDE, Briggs, and Stewart are clearly subject to specific jurisdiction. Their activities satisfy Section 302(a)(1) and (a)(2) because they conducted Rich Dad seminars in New

York.  N.Y. C.P.L.R. § 302 (2012); Compl. ¶¶ 79, 81-82, 96.  Their activities also satisfy the "minimum contacts" test because Defendants availed themselves of the privilege of doing business in New York, and they should reasonably foresee being haled into court here.  *Id.*  And it is reasonable that these Defendants could be liable in New York for a seminar they hosted in-state.  *Id.*

Defendants TI, TLI, and TBI are subject to specific jurisdiction because they are parties and beneficiaries to Crewe's Student Agreement.  The Student Agreement encompasses affiliates of RDE, and these Defendants identify themselves as affiliates of RDE.  May Decl. Exh. 1; Tigrent MTD at 15.  Furthermore, TI, TLI, and TBI marketed Rich Dad services in New York, sent promotional e-mails to New York residents, organized Rich Dad seminars in New York, and solicited New York residents on their websites.  Compl. ¶¶ 56-71, 99-115.  These activities meet Section 302(a)(1)'s standard for "transacting business. . . to supply goods or services in the state," and it meets Section 302(a)(3)'s standard for committing tortious acts outside the state, where one regularly solicits business in state or derives substantial revenue in state.  N.Y. C.P.L.R. § 302 (2012).  Their activities also meet the minimum contacts test because the Defendants availed themselves the privilege of conducting business in New York and should reasonably foresee being haled into court here.  And it is reasonable Defendants would be liable in New York for these activities.

The RD Defendants are subject to specific jurisdiction because they engaged in a common scheme of fraud.  The RD Defendants acted in concert and association with, and with the knowledge and approval of the Tigrent Defendants.  Compl. ¶ 32.  The RD Defendants partnered with the Tigrent Defendants to devise and falsely market the Rich Dad Education courses and services through an aggressive three-tier sales scam.  Compl. ¶¶ 56-57.  Like TI, TLI, and TBI, their activities meet Section 302(a)(1)'s standard for transacting business to

36

supply services in state, and they meet Section 302(a)(3)'s standard for committing tortious acts outside the state.  N.Y. C.P.L.R. § 302 (2012).  Like TI, TLI, and TBI, finding specific jurisdiction based on their activities comports with due process requirements.

Kiyosaki is subject to specific jurisdiction because he is personally responsible for Defendants' scam.  Compl. ¶ 51.  He is the guiding force behind the Rich Dad Education workshops, and he played a prominent role in originating content for the courses.  *Id.*  He created the Rich Dad empire, partnered his corporations with the Tigrent Defendants, and conspired with them to devise and falsely market the Rich Dad courses and services.  *Id.* ¶¶ 51-62.  He maintains control over the Rich Dad corporations and brand, and he is omnipresent in the participation of its business operations.  *Id.*  His name, image, philosophy, and message appears on the Tigrent Defendants' websites, promotional emails for the Rich Dad courses, marketing brochures, and print advertisements.  *Id.*  He personally shot a promotional video in New York City to advertise in-state Rich Dad seminars.  Marchese Decl. Exhs. F, I.  These activities meet Section 302(a)(1)'s standard for transacting business to supply services in state, they meet Section 302(a)(2)'s standard for tortious acts in state, and they meet Section 302(a)(3)'s standard for committing tortious acts outside the state.  N.Y. C.P.L.R. § 302 (2012).  His conduct in New York meets the minimum contacts test, and it would be reasonable to subject him to jurisdiction in New York.

Defendants are subject to specific jurisdiction under Maurice's claims for the same reasons they are subject to specific jurisdiction under Plaintiff Crewe.  Plaintiff Maurice was victimized by the same up-sell scam as Plaintiff Crewe.  Compl. ¶¶ 3, 11, 13, 47-50, 76, 90-95, 104-10, 119-21, 128-37, 141-47.  The scam was the same, the promotional materials were similar, and the corporate actors were identical.  *Id.*

### 3.      The Jurisdictional Clauses in Maurice's Contracts Are Irrelevant To Establishing Personal Jurisdiction Over Defendants in New York

Only one sentence in the "Jurisdiction" section of Maurice's Student Agreement relates to jurisdiction.  That sentence reads, "Student consents to jurisdiction in the State of Florida and expressly waives any jurisdiction privileges which may be asserted in connection with this Agreement."  This language has no effect on whether Maurice can bring his claims in New York and establish personal jurisdiction over Defendants in New York.  Similarly, nothing in the "Choice of Law/Jurisdiction/Venue" section of Maurice's Advanced Training Student Agreement affects whether Maurice can establish personal jurisdiction against Defendants in New York.

### 4.      At Minimum, Plaintiffs Have Made A "Sufficient Start" Toward Showing Personal Jurisdiction, Which Warrants Jurisdictional Discovery

Plaintiffs have made a "sufficient start" at showing the appropriate exercise of personal jurisdiction over Defendants.  Therefore, Plaintiffs request the opportunity to serve limited jurisdictional discovery concerning any Defendants over which the Court may find that Plaintiffs have not yet carried their burden of making a *prima facie* case of personal jurisdiction.  *See Gundlach v. Int'l Bus. Machines Corp.*, No. 11-CV-846 (CS), 2012 WL 1520919, at *11 (S.D.N.Y. May 1, 2012) (granting jurisdictional discovery as to defendant IBM Japan in light of plaintiff's sufficient start at demonstrating personal jurisdiction).  Jurisdictional discovery is particularly appropriate where, as here, the bulk of the relevant information is nonpublic and within Defendants' knowledge or possession.  *See id.*

### C.   Venue Is Proper In This Court

This Court is the appropriate venue for both Plaintiffs' claims.  Crewe's claims

arise solely from events or omissions that occurred in New York County in this judicial district.

Venue for Maurice's claims is also appropriate in this Court because Maurice's claims overlap

with and are substantially similar to Crewe's claims.  Therefore, Maurice joined the First

Amended Class Action Complaint for the convenience of the parties and witnesses and to

promote judicial efficiency and consistency by avoiding duplicative litigation in multiple

districts.

**1.   For Crewe, Venue Is Appropriate Because A Substantial Part Of The Events Or Omissions Giving Rise To His Claims Occurred In This Judicial District**

Aside from arguing to enforce the arbitration clause in the Student Agreement, neither of

the pending motions to dismiss challenge Crewe's choice of venue in this Court.  Venue in this

Court is proper for Crewe's claims because his claims arose from events or omissions that

occurred almost entirely in this judicial district.

**2.   For Maurice, Venue Is Appropriate Because He Coordinated His Claims With Crewe's Claims For Judicial Efficiency and Consistency, And For The Convenience Of All Parties And Witnesses**

Both pending motions to dismiss argue that venue in this Court is improper for Maurice's

claims because of the forum selection clauses in the Student Agreement and the Advanced

Training Student Agreement that Maurice signed.  Tigrent MTD at 25-26; RD MTD at 19.  This

is wrong.  Venue in this Court is appropriate because Maurice coordinated his claims with

Crewe's overlapping first-filed claims for judicial efficiency and consistency, and for the

convenience of all parties and witnesses.  Had Maurice brought his claims in a separate,

subsequently filed lawsuit in Florida, his competing action would have been subject to transfer

under the first-filed rule.

On November 16, 2011, Crewe filed the original Class Action Complaint in this action. (Dkt. 1).  Subsequent to the filing of the original Class Action Complaint in this Court, Maurice retained Interim Class Counsel to assert claims that overlapped with and were substantially similar to Crewe's first-filed claims. Maurice's claims arose from the same controversy and substantially similar facts as Crewe's claims. Maurice's claims for relief, and the relief he sought, were identical to those already alleged by Crewe.  Moreover, Maurice's claims implicated the same corporate defendants as well as substantially all of the same witnesses implicated in the original Class Action Complaint.  Due to the overlap and substantial similarities with Crewe's first-filed claims, Crewe and Maurice coordinated their claims in a single First Amended Class Action Complaint, which was filed in this docket on March 7, 2012. (Dkt. 20).

Since this Court is an appropriate forum for the claims alleged in the original Class Action Complaint, Maurice consciously joined the First Amended Class Action Complaint to protect the parties and witnesses from litigating the same issues in multiple venues and to promote judicial efficiency by avoiding unnecessarily duplicative litigation.  Had Maurice subsequently filed an overlapping, separate lawsuit against Defendants in Florida, his second-filed case would have required the parties and the judicial system to expend precious resources unnecessarily, and it would create the risk of inconsistent results from multiple judicial districts. Moreover, had Maurice subsequently filed a separate lawsuit in Florida, his later-filed suit would be subject to transfer pursuant to the first-filed rule.  *See Oleg Cassini, Inc. v. Serta, Inc.*, No. 11-Civ.-8751 (PAE), 2012 WL 844284, at *3 (S.D.N.Y. Mar. 13, 2012) (dismissing later-filed trademark infringement claim in favor of first-filed "mirror image" Illinois declaratory judgment action under the first-filed doctrine).

**D.**   **Alternatively, Upon A Finding Of Improper Venue, The Court Should Exercise Discretion To Transfer Maurice's Claims to the United States District Court for the Southern District of Florida**

The Student Agreement and the Advanced Training Student Agreement that Maurice signed each contain a forum selection clause stating that all actions brought thereunder must be brought in the state or federal courts serving Lee, Palm Beach or Broward Counties in the state of Florida.  Pursuant to 28 U.S.C. § 1406(a), a district court in which is filed a case laying venue in the wrong district may "in the interest of justice, transfer such case to any district or division in which it could have been brought."  28 U.S.C. § 1406(a).  The jurisdiction of the United States District Court for the Southern District of Florida includes Broward and Palm Beach counties. Therefore, the United States District Court for the Southern District of Florida is a proper venue for Maurice's claims within the meaning of the forum selection clauses.  Based on the allegations in the Complaint and on all of the facts and circumstances presented, Maurice respectfully requests that, upon any finding of improper venue in this Court, Your Honor exercises discretion in the interest of justice to transfer his action to the United States District Court for the Southern District of Florida.

**VI.   PLAINTIFFS' COMPLAINT STATES A CLAIM UNDER EACH CAUSE OF ACTION**

**A.   All of Maurice's Claims Are Timely**

The Tigrent Defendants argue that all of Maurice's claims (other than FDUTPA) are time-barred.  See Tigrent MTD at 33-35. This is wrong.  Plaintiff Maurice's non-FDUTPA claims are timely because they are subject to a six year statute of limitations period.  The Tigrent Defendants correctly state that the timeliness of state law claims in diversity cases is governed by the conflict-of-laws rules of the forum state.  Id. at 33.  They also correctly state that New York provides for a six year limitations period for Maurice's non-FDUTPA claims.  *Id.* at 33-34.  And they are correct that Maurice's claims accrued in Tennessee.  *Id.* at 34.

However, the Tigrent Defendants contend that Tennessee provides a three year limitations period for Maurice's contract claims. *Id.* This is wrong. In fact, there is overwhelming authority that Tennessee courts will apply a six year limitations period for contract claims not provided for by statute. Tenn. Code Ann. § 28-3-109(a)(3) (2012); *see, e.g., Coleman Mgmt., Inc. v. Meyer*, 304 S.W.3d 340, 348 (Tenn. Ct. App. 2009); *Barton v. Gilleland*, 2005 WL 729174, at *14 (Tenn. Ct. App. March 30, 2005); *Wilkerson v. Ekelem*, 2004 WL 578600, at *6 (Tenn. Ct. App. March 24, 2004). The cases Tigrent cites are rare exceptions where defendants' fraudulent acts injured personal property. In *Vance v. Schulder*, 547 S.W.2d 927 (Tenn. 1977), directors in a corporation deceived the plaintiff into selling his shares to a third party for less than what was actually offered, causing injury to the value of his shares at the time of sale. In *Cumberland & Ohio Co. of Texas, Inc. v. First Am. Nat'l Bank*, 936 F.2d 846 (6th Cir. 1991), a company's dispute with the defendant bank's line of credit forced it to liquidate assets at fire sale rates, causing injury to the value of the assets at the time of sale. The Sixth Circuit explains, "In both *Vance* and [*Cumberland*], a seller contended that he did not receive as much for his stock or assets as he would have absent the defendants' alleged wrongdoing." *Id.* at 849. Neither of these cases is applicable here. This is a straightforward contract case.   Thus the applicable limitations period is six years.

The Tigrent Defendants also contend the limitations period is three years because the "gravamen" of the Complaint is that Maurice "felt deceived by defendants and suffered economic injury." Tigrent MTD at 34-35. This is wrong. In Tennessee, it is true that the gravamen of an action controls the limitations period, instead of the action's designation as tort or contract. *Id.* at 34. However, the gravamen of Plaintiffs' Complaint is a breach of contract. Plaintiffs' claims are substantially similar, and the Tigrent Defendants concede that the claims "center around an RDE contract." Tigrent MTD at 28. Furthermore, the "Nature of the Action"

section of Plaintiffs' Complaint explains, "Defendants breached their contracts with Plaintiffs by not providing the training or education they contracted to provide and that Plaintiffs paid for." Compl. ¶ 11. The word "contract" appears fifteen times in Plaintiffs' Complaint and the word "agreement" appears 62 times. Compl. ¶¶ 1-201. And, the vast majority of the parties' briefing focuses on contract provisions in the student agreements. Therefore, the applicable limitations period is six years in this action in contract, and all of Maurice's claims are timely.

### B.   Plaintiffs Sufficiently Plead Their Claims With Particularity

The RD Defendants contend that Plaintiffs failed to properly plead *any* claims because of impermissible group pleading. RD MTD at 24-25. This is wrong.[10] At a minimum, Plaintiffs' Complaint alleges how Defendant Kiyosaki created the Rich Dad™ empire and partnered with Tigrent Inc. in 2006. Compl. ¶¶ 51-55, 56. It identifies Kiyosaki's corporations and alleges he has ownership and membership interests in CASHFLOW Technologies, Inc., Rich Dad™ Operating Company, LLC, Rich Global, LLC, Tigrent Inc., and Rich Dad™ Education, LLC. *Id.* It identifies Rich Dad™ Education, LLC as the counterparty to Plaintiffs' Student Agreements. *Id.* ¶ 47, 96, 98. It identifies Tigrent Learning Inc., its parent, subsidiary, and affiliates as the counterparty to Maurice's Advanced Training Agreement. *Id. ¶ 49.* It identifies Defendants' unqualified trainers. *Id.* ¶¶ 72-79. It alleges the specific misrepresentations of each instructor Defendant. Id. ¶¶ 80-95, 116-137. It alleges which Defendants sent and signed misleading e-mail ads and other promotional materials. Id. ¶¶ 61, 68, 144. And it describes when, why, and how Kiyosaki partnered with the Tigrent Defendants. *Id.* ¶¶ 56-57. Thus, Plaintiffs' Complaint alleges in detail the role of each Defendant in their common fraudulent scheme.

---

[10] Plaintiffs also address this point in the context of equitable estoppel (*see supra* III.C.2). It alleges that a contract was formed between Tigrent Inc. and Rich Global, LLC to provide Rich Dad ™ Education, LLC training courses. Id. at 28.

Similarly, the Tigent Defendants contend that Plaintiffs' claims against Tigent Inc. and Tigent Brands Inc. are factually deficient because the Complaint pleads nothing about them. Tigent MTD at 33.  This is wrong.  In fact, Plaintiffs' Complaint states that Maurice's Advanced Training Agreement "is a legally binding form contract between Maurice, Tigent Learning Inc., its parent, subsidiary, and affiliates."  Compl. ¶ 49.  In their brief, the Tigent Defendants identify Tigent Inc. as a parent entity, Tigent Learning Inc. and Tigent Brands Inc. as sibling corporations, and Tigent Inc., Tigent Learning Inc., Tigent Brands Inc., and Rich Dad™ Education, LLC as affiliates.[11]  Tigent MTD at 15.  The Tigent Inc. website also identifies Tigent Learning Inc. and Rich Dad™ Education, LLC as its affiliates.  Marchese Decl. Exh. D.  Therefore, the Complaint alleges, among other things, that Maurice entered into a contract with Tigent Inc., Tigent Brands Inc., Tigent Learning Inc., and Rich Dad™ Education, LLC.  Accordingly, any contractual or quasi-contractual pleading against "all Defendants" on behalf of Maurice properly includes Tigent Inc. and Tigent Brands Inc.

Thus, the Complaint properly pleads specific details as to each Defendant.  If necessary, Plaintiffs respectfully request leave to re-plead with greater particularity.

### C.   Plaintiffs Sufficiently Plead Their Breach Of Contract Claim

Neither the Tigent Defendants nor the RD Defendants challenge Plaintiffs' pleading of their breach of contract claims.

### D.   Plaintiffs Sufficient Plead Their Breach Of Implied Covenant Of Good Faith And Fair Dealing Claim

The Tigent Defendants contend that Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing should be dismissed because it is "'redundant' in that it arises from the same allegation underlying the express breach of contract claim."  Tigent MTD at 31.  This

---

[11] Again, the Rich Dad Defendants are not affiliates of Rich Dad Education, LLC.  *See supra* III.B.  However, the Tigent Defendants readily admit, and Plaintiffs agree, that Tigent Inc., Tigent Learning Inc., Tigent Brands Inc., and Rich Dad™ Education, LLC are affiliates.  Tigent MTD at 15.

is wrong.  In fact, courts have recognized these claims can coexist.  *See, e.g., Dialcom, LLC v. AT&T Corp.*, 2008 WL 2581876, at *9 (N.Y. Sup. Ct. June 17, 2008); *Forman v. Guardian Life Ins. Co. of Am.*, 76 A.D.3d 886, 888 (N.Y. App. Div. 2010).  In particular, the *Dialcom* court found an implied covenant claim can be maintained, "even though it arises from the same underlying transaction and occurrences," if it deprived the plaintiff of the fruits of the contract. 2008 WL 2581876, at *9.  Plaintiffs' Complaint alleges exactly that.  It alleges RDE, LLC breached its duty of good faith and fair dealing by intentionally, purposefully, and/or negligently failing to provide the financial training it promised, and failing to properly monitor or intervene to prevent fraudulent conduct by its instructors.  Compl. ¶¶ 168-69.  It alleges RDE, LLC's conduct frustrated the agreed purpose of the parties in carrying out the Student Agreement and disappointed the reasonable expectations of Plaintiffs, thereby depriving them of the benefits of their bargain.  Compl. ¶¶ 170-72.  Thus, Plaintiffs' breach of implied covenant claim should survive.

## E.    Plaintiffs Sufficiently Plead Their FDUTPA Claim

The Tigrent Defendants and the RD Defendants contend that the Court should dismiss Plaintiffs' FDUTPA claim because "no violative conduct is alleged to have occurred in Florida." Tigrent MTD at 31; RD MTD at 23.  This is wrong.  In fact, Plaintiffs' contracts have a Choice of Law clause that stipulates they were deemed executed in Florida.  Compl. ¶¶ 37, 48, 50; May Decl. Exh. 1 ("The Agreement and these Terms and Condition shall be deemed to have been made in the State of Florida.").  Furthermore, Tigrent Defendants concede that the parties favored Florida law.  Tigrent MTD at 7, 12 ("[T]he parties favored Florida law as governing contractual interpretation.").  Finally, the Complaint alleges that RDE, LLC, Tigrent Inc., and Tigrent Learning Inc., all having principle places of business in Florida, sent misleading e-mail

ads to Plaintiffs. Id. ¶¶ 68-71, 111-115.  FDUTPA applies because the violative conduct

occurred in Florida.

### F.   Plaintiffs Sufficiently Plead Their Unjust Enrichment Claim

The Defendants contend Maurice's unjust enrichment claim should be dismissed as to all

Tigrent Defendants, and Crewe's unjust enrichment claim should be dismissed as to RDE, LLC

because of the existence of an express contact.  Tigrent MTD at 31-32; Rich Dad MTD at 23.

This is wrong.  In fact, both New York and Florida courts recognize that an unjust enrichment

claim is not mutually exclusive of a breach of contract claim.  *See, e.g., Pramer, S.C.A. v.*

*Abaplus Int'l Corp.*, 76 A.D.3d 89, 100 (N.Y. App. Div. 2010); *Niagara Mohawk Power Corp. v.*

*Freed*, 265 A.2d 938, 939 (N.Y. App. Div. 1999); *Citadel Commerce Corp. v. Cook Sys., LLC*,

2009 WL 1230067 (M.D. Fla. May 5, 2009); *Shibata, M.D. v. Lim*, 133 F. Supp.2d 1311, 1320

(M.D. Fla. 2000).  In particular, the *Shibata* court found that, "[A] plaintiff cannot recover under

both unjust enrichment and breach of contract.  However, both the Federal Rules of Civil

Procedure and Florida law permit a party to allege, in the alternative, recovery under an express

contract and seek equitable relief under the theory of unjust enrichment.  To the extent that Dr.

Shibata pleads unjust enrichment as an alternative to his breach of contract claim, such a claim

should not be dismissed at this time."  133 F. Supp.2d at 1320.  Plaintiffs' Complaint follows

*Shibata* and pleads unjust enrichment as an alternative to a breach of contract claim.  Compl. ¶¶

180-84.  Thus, Plaintiffs' unjust enrichment claim should be sustained.

### G.   Plaintiffs' Claims For Negligent Misrepresentation And Fraud Meet The Heightened Pleading Standard Of Rule 9(b)

The purpose of Rule 9(b) is to "place the defendant[ ] on notice of the precise misconduct

with which [it] is charged, and to safeguard defendants against spurious charges of immoral and

fraudulent behavior."  *Seville Indus. Machinery Corp. v. Southmost Mach. Corp.*, 742 F.2d 786,

791 (3d Cir. 1984), *cert. denied*, 469 U.S. 1211, (1985).

The allegations in the Complaint provide all of the essential factual background that would accompany the first paragraph of any newspaper story – that is, the "who, what, when, where, and how" of the events at issue. These factual allegations are sufficiently precise to allow Defendants to understand the nature of the allegations of fraud, and to permit them to frame a responsive pleading:

> **Who:** The Complaint specifically identifies describes Robert Kiyosaki, his network of corporations, their relationship with the Tigrent Defendants, and the names of the course trainers. Complaint ¶¶ 51-57, 82-89.

> **What:** The Complaint specifically identifies Defendants' scheme to sell personal finance seminars to unwary "students" through an aggressive sales scam, where attendees are encouraged to spend up to tens of thousands of dollars and encumber themselves with crippling debt to buy useless additional seminars that do not provide attendees with the promised financial education. *Id.* ¶¶ 1-11, 56-67.

> **Where:** Crewe attended his "FREE Stock Success" workshop and "Stock Success 3-day Training program" in New York, New York. Plaintiff Maurice attended his "Learn to be Rich Training" workshop, "3-day Learn to be Rich Training Academy," and Rich U. courses in Nashville, Tennessee. *Id.* ¶¶ 12, 13.

> **When:** Crewe attended his "FREE Stock Success" workshop on March 9, 2011 and the "Stock Success 3-day Training program" from March 31 – April 2, 2011. Maurice attended his "Learn to be Rich Training" workshop on February 28, 2008. He attended the "3-day Learn to be Rich Training Academy" from March 28 to March 30, 2008,and he attended Rich U. on April 26 and 27, 2008. *Id.* ¶¶ 12, 13, 117, 141.

> **How:** "The purpose of the 3-day Classes is not to educate, but to enroll attendees in the Advanced Classes and coaching services. . . Defendants' courses are marketed to novice investors with little or no investing experience. This facilitates Defendants' up-sell of the paid courses through the three-tier structure described above. In addition, Defendants' up-sell of the paid courses is based on predatory sales tactics and false and misleading marketing statements via email, unqualified trainers, in promotional materials, etc. . . ." *Id.* ¶¶ 65-67, passim.

The Tigrent Defendants contend that Plaintiffs' claims for negligent misrepresentation and fraud fail to meet the heightened pleading standards of Fed. R. Civ. P. Rule 9(b) because Plaintiffs failed to identify "any supposed omissions or misrepresentations and the way in which they allegedly caused damage." Tigrent MTD at 32. This is wrong. In fact, Plaintiffs allege that

Defendants misrepresented facts about "the expertise of the trainers and mentors; the true nature and subject matter of the Free Workshops, 3-day Classes and Advanced Classes; and the financial efficacy of the Free Workshops, 3-day Classes and Advanced Classes." *Id.* ¶ 188. These omissions "were intended to induce and actually induced" Plaintiffs to purchase 3-day Classes and Advanced Classes, causing damage. *Id.* ¶ 189. In connection with these allegations, Plaintiffs identify Defendants' e-mail advertisements, among other things. *Id.* ¶ 68-70. Crewe relied on an email advertisement to attend the "Stock Success Workshop," where he was exposed to further misrepresentations by Defendant Briggs. *Id.* ¶ 68, 74-75, 81-89. Based on Defendant Briggs' misrepresentations, he chose to enroll in Defendants' 3-day Stock Success 3-day Training. *Id.* ¶ 78-79. Based on misrepresentations in Defendants' Training Packet, he chose to waive his cancellation right. *Id.*

Similarly, Maurice relied on an e-mail advertisement to attend the Tigrent Defendants' "Learn to be Rich Training," where he was exposed to misrepresentations by the Tigrent Defendants' trainers. *Id.* ¶ 76, 90-92. Maurice chose not to exercise his cancellation right after reviewing Defendants' promotional letter, pamphlet, and booklet. *Id.* ¶¶ 103-10. Based on these representations, Maurice attended Defendants' 3-day Learn to be Rich Training Academy, where he was exposed to misrepresentations by Defendant Hrisko. *Id.* ¶¶ 120-33. Based on Defendant Hrisko's representations, Maurice registered for Defendants' Advanced Training classes. *Id.* ¶ 134. Based on representations at the Advanced Training classes, Maurice enrolled in personal coaching services. *Id.* ¶ 145.

The RD Defendants contend that the statements attributed to Defendant Kiyosaki are insufficient to meet the heightened pleading standard because Plaintiffs were not injured by attending the two-hour free seminar in reliance on Kiyosaki's statements, and Plaintiffs have failed to state how Kiyosaki misrepresented an existing or past fact. RD MTD at 26-27. This is

wrong.  In their Complaint, Plaintiffs specifically identify false and misleading print advertisements with Kiyosaki's image, Kiyosaki's promotional "Personal Notes," brochures with Kiyosaki's image and philosophy, and e-mail reminders signed by Kiyosaki.  *Id.* ¶¶ 58-61, 68. These misrepresentations "were intended to induce and actually induced" Plaintiffs to attend Defendants' seminars, where they were exposed to further misrepresentations that induced them to purchase 3-day Classes and Advanced Classes.  *Id.* ¶ 74-95, 99-137, 141-47, 189.  In this regard, and for the reasons discussed above, Plaintiffs properly meet Rule 9(b)'s standard of heightened pleading.

### H. Plaintiffs Sufficiently Plead Their Claim Against Kiyosaki For Alter Ego / Veil Piercing

Defendants state "[c]ount 8 ("Alter Ego/Evil [sic] Piercing), asserted against Mr. Kiyosaki alone, fails to state a claim because the doctrine of piercing the corporate veil under New York law 'does not constitute a cause of action independent of that against the corporation….").  RD MTD at 28.  That is wrong.  In fact, "[v]eil piercing is a fact laden claim that is not well suited for resolution upon a motion to dismiss.  Before dismissal can be granted, a plaintiff is entitled to obtain necessary discovery to ascertain whether there are grounds to pierce the corporate veil.  A complaint which seeks to pierce the corporate veil should be upheld unless it can be said that it is totally devoid of solid nonconclusory allegations."  *USA United Holdings, Inc. v. Tse-Peo, Inc.*, 886 N.Y.S.2d 69 (Table), 2009 WL 1099462, at *10 (Sup. Ct. April 23, 2009) (internal citations omitted).   Here, Crewe has alleged that Kiyosaki dominates and controls the corporate Defendants to such an extent that their independence is a sham, that there is such a unity of interest and ownership between Kiyosaki and the corporate Defendants that their interdependence is non-existent, and that he uses the corporate Defendants to fraudulently promote the Free Workshops, 3 Day Classes and Advanced Classes.  Compl. ¶ 198, 199.  These allegations are based on facts outlined in the Complaint.  See Compl. ¶ 51-62.  Plaintiffs will

require discovery to further explore the extent to which there are grounds to pierce the corporate veil.

Therefore, the Court should deny the RD MTD as to the veil piercing claim and allow Plaintiffs an opportunity for discovery.

## I.   <u>Leave To Amend</u>

Should the Court find dismissal of any claims warranted, Plaintiffs seek leave to amend the Complaint. "Fed. R. Civ. P. 15(a) requires that leave to amend shall be freely given when justice so requires." *Ronzani v. Sanofi S.A.*, 899 F.2d 195, 198 (2d Cir. N.Y. 1990) (internal quotations and alterations omitted).

## <u>CONCLUSION</u>

For the reasons set forth above, Plaintiffs respectfully request that the Court deny Defendants' Motions to Dismiss in their entireties.


Dated:  May 9, 2012

Respectfully submitted,

BURSOR & FISHER, P.A.

By:   <u>      /s/ Joseph I. Marchese      </u>
Joseph I. Marchese

Joseph I. Marchese (JM1976)
369 Lexington Ave, 10th Floor
New York, NY 10017-6506
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
Email: jmarchese@bursor.com

*Attorneys for Plaintiffs*