UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ROBERT CREWE and ROBERT
MAURICE, on behalf of themselves and
all others similarly situated

     Plaintiffs,

  Against

RICH DAD EDUCATION, LLC, RICH
GLOBAL, LLC, RICH DAD
OPERATING CO., LLC, CASHFLOW
TECHNOLOGIES, INC., TIGRENT INC.,
TIGRENT LEARNING INC. f/k/a
WEALTH INTELLIGENCE ACADEMY,
INC., TIGRENT BRANDS INC.,
CHRISTOPHER BRIGGS, an individual,
SCOTT STEWART, an individual, MARC
HRISKO, an individual, WAYNE
MORGAN, an individual, ROBERT
KIYOSAKI, an individual, and DOES 1
through 50, inclusive

     Defendants.

CASE NO. 11-CIV-8301 (PAE)


DECLARATION OF
ROBERT CREWE

---

I, Robert Crewe, declare as follows:

  1.  I am a plaintiff in this action and a citizen of the State of New York. I have personal knowledge of the facts herein and if called as a witness, I could and would testify competently thereto. Capitalized terms that are not defined herein have the meaning assigned in the First Amended Class Action Complaint.

  2.  On March 9, 2011, I attended a Rich Dad™ Education "FREE Stock Success" workshop in New York, New York (the "Free Workshop"). I attended the Free Workshop based on the false representations set forth in the March 7, 2011 Stock Success Workshop E-mail Ad that I received from defendants Kiyosaki and Rich Dad Education, LLC. *See* First Am. Compl. ¶¶ 68-69.

3.     The Free Workshop did not provide financial education as promised in the Stock Success Workshop E-mail Ad. Instead, the whole purpose of the Free Workshop was to sell a "Stock Success 3-day Training" class to me and everyone else in attendance (the "3-day Class").

4.     The Free Workshop instructor, Defendant Chris Briggs, used high-pressure sales tactics to induce audience members to enroll in the 3-day Class. Throughout the Free Workshop, Mr. Briggs aggressively solicited attendees to purchase the 3-day Class by making false representations about the purported training. Mr. Briggs also belittled attendees who would not enroll in the 3-day Class, and he created a sense of undue urgency for audience members to register while attending the Free Workshop.

5.     At the Free Workshop, Mr. Briggs's solicitations to purchase the 3-day Class lasted about two hours.

6.     On one hand, Mr. Briggs belittled everyone who did not purchase the 3-day Class by labeling them as afraid, fearful, greedy, ignorant, illiterate, not serious to learn, not ready to be financially free, and not willing to take action. On the other hand, Mr. Briggs praised everyone who enrolled in the 3-day Course by saying they were ready to take action, ready to be financially free, serious to learn, ready to invest in themselves, and ready to overcome their fear. Mr. Briggs also told the audience that graduating from school, getting a job, working hard and saving money was for "poor people," but attendees could escape that "rat race" by getting educated at the 3-day Class.

7.     During the Free Workshop, Mr. Briggs showed the audience charts and graphs concerning stock trades that were unfamiliar to me. The charts and graphs seemed complex, but Mr. Briggs did not explain them or take any questions from audience members about them. I did not understand what was being represented in the charts and graphs. Mr. Briggs told us that "illiteracy makes the simple seem complex" and we needed to attend the 3-day Class if we did not understand the charts and graphs.

8.     Mr. Briggs created a sense of undue urgency for the attendees to register for the 3-day Class before leaving the Free Workshop by making a "special offer" to all attendees at the

2

end of the seminar. Specifically, Mr. Briggs said, "If you register in this ballroom today for the 3-day training, it will cost only $199. That's about $400 of savings off the regular price. If you wait and order over the phone tomorrow, [the 3-day Class] will cost you $595." The "special offer" pressured the audience to adopt an "act now/think later" course of conduct favoring immediate enrollment to avoid a nearly 200% arbitrary mark-up for the same purported training.

9.     When Mr. Briggs first told the audience about the 3-day Class at the beginning of the Free Workshop, I originally planned on delaying enrollment so I could take some time to think it over. However, I registered for the 3-day Class at the Free Workshop based on the ensuing false and misleading statements that Mr. Briggs made about the purported training and based on the high-pressure sales tactics that he employed, which I described above.

10.    I also enrolled in the 3-day Class based on Mr. Briggs's statements that the Rich Dad courses offered unique, effective financial education that students could not find elsewhere—not even in Ivy League universities. During the Free Workshop, Mr. Briggs also told the audience that "[Rich Dad is] the only company left to learn from." Using sarcasm, he then said, "Good luck learning this [material] yourself." Based on these statements, I felt like I did not have any meaningful choice but to enroll in the 3-day Class if I wanted the financial training being promised.

11.    At the end of the Free Workshop, Mr. Briggs told all of the attendees to "stand up right now and get registered for the 3-day training in the back of the room." There was a long registration kiosk in the back of the ballroom. I stood up with 30 to 40 other attendees, and we all walked to the back of the room together to enroll in the 3-day Class at the same time.

12.    Several lines of attendees formed at the registration kiosk. I stood in the middle of one of the lines and waited to register. There were numerous staffers behind the registration kiosk who were registering attendees. The lines moved quickly. At least one Rich Dad staffer urged the attendees in line in a loud voice to "Please keep the lines moving."

13.    After several minutes of waiting on line, it was my turn to register for the 3-day Class. I was immediately confronted with a one-page, single-spaced, non-negotiable form

3

Student Agreement to sign. Two areas on the Student Agreement had been pre-circled in pen where I was supposed to write my initials.

14.    The Student Agreement does not expressly state that it includes an arbitration provision. The arbitration provision is hidden in a separate document that contains additional Terms and Conditions to the Student Agreement.

15.    I was surprised that I had to sign anything in order to enroll in the 3-day Class because no one had mentioned any type of agreement or contract to me prior to being confronted with one at the registration kiosk. I had to sign the Student Agreement right there on line because the Free Workshop was ending and I wanted to receive the "special offer" discount that Mr. Briggs mentioned just minutes earlier. Moreover, I felt pressured to sign the Student Agreement as quickly as possible because other attendees were waiting to enroll on line behind me, and the Rich Dad staffers were trying to move the lines along quickly. Under the circumstances, I felt rushed during the enrollment/signing process.

16.    My enrollment process lasted about one minute, which was the same time it took everyone else on line to enroll in the 3-day Class. During that time, a Rich Dad staffer handed me the one-page Student Agreement which already had two spots circled in pen where I was told to write my initials. I was also told to complete the identifying information at the top of the Student Agreement and to sign at the bottom. The staffer then asked me what form of payment I would be using, and I handed her a credit card. She processed payment on my credit card immediately, and I began filling in the information on the Student Agreement. As instructed by the staffer, I filled in the identifying information at the top of the Student Agreement, initialed the circled areas, and signed at the bottom. I then handed the completed, signed Student Agreement back to the staffer.

17.    The Rich Dad staffer never explained to me that the Student Agreement was a legally binding contract, and she never urged me to read the Agreement before signing it. The Rich Dad staffer never told me that there was a separate document that contained additional terms and conditions to the Student Agreement, nor was I aware of that when I signed the

4

Student Agreement.   She also failed to ask me if I had any questions about the Student Agreement before or after I signed.

18.     The Rich Dad staffer also failed to offer or provide me with the separate Terms and Conditions before I signed the Student Agreement. The separate Terms and Conditions is a double-sided, single-spaced document that spans four pages in total including the cover page. The separate Terms and Conditions is the only document that expressly contains the hidden arbitration provision under the heading "CHOICE OF LAW/DISPUTE RESOLUTION." The separate Terms and Conditions are never offered to new registrants for signature or initialing.

19.     The separate Terms and Conditions was one of many documents placed in a folder that was inside a bag of Rich Dad materials that the Rich Dad staffer handed to me from behind the registration kiosk after I had paid and signed the Student Agreement (the "Stock Success take-home kit").  The Rich Dad staffers had dozens of the Stock Success take-home kits behind the registration kiosk that day.  I saw other attendees who enrolled in the 3-day Class receive their Stock Success take-home kits at the same time during the enrollment process and in the same manner that I received my take-home kit.

20.     The Rich Dad staffer instructed me to initial the circled portion of the Student Agreement that states, "YES. I received the Terms and Conditions of this agreement," despite her knowledge that I had not yet received a copy of the Terms and Conditions. I followed the instructions of the Rich Dad staffer even though this statement was false when I wrote my initials.  I did not know that I was initialing a false statement because I did not have an opportunity to read the Student Agreement before completing and signing it.

21.     Despite knowing that I had not yet received a copy of the Terms and Conditions, the Rich Dad staffer also instructed me to initial the circled portion of the Student Agreement in the acknowledgment and disclosure section that states, "Read the Agreement and the accompanying Terms and Conditions in their entirety before signing. You are entitled to a copy of the Agreement and Terms of Conditions."  I followed the instructions of the Rich Dad staffer

5

and wrote my initials even though she had not yet provided me with copy of the separate Terms and Conditions that I was entitled to according to the Student Agreement.

22.     As stated above, my entire enrollment processed lasted about one minute long, which is the same time it took the other registrants to enroll.  It would be impossible for me, a college graduate, to read the Student Agreement and the separate Terms and Conditions in one minute.

23.     I did not know that the Student Agreement was subject to an arbitration provision when I signed it, and I was surprised to learn about the arbitration provision and its various terms, which are overly harsh and one-sided against me.  I would not have signed the Student Agreement if I knew about the arbitration provision beforehand.

24.     On the day I signed the Student Agreement, I did not have any experience with analyzing or understanding the rights and obligations of parties who enter into commercial form contracts like the Student Agreement.

I declare under the penalty of perjury under the law of the State of New York that the foregoing is true and correct.  Executed on May 7, 2012 at New York, New York.

Robert Crewe

6