UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                                                        :

ROBERT CREWE and ROBERT MAURICE, on behalf of :
themselves and all others similarly situated,           :

                                                        :

                        Plaintiffs,           :

                                                        :                     11 Civ. 8301 (PAE)

                   -v-                         :

                                                        :                 <u>OPINION AND ORDER</u>

RICH DAD EDUCATION, LLC, RICH GLOBAL, LLC, :
RICH DAD OPERATING CO., LLC, CASHFLOW       :
TECHNOLOGIES, INC., TIGRENT INC., TIGRENT   :
LEARNING INC. f/k/a WEALTH INTELLIGENCE   :
ACADEMY, INC., TIGRENT BRANDS INC.,        :
ROBERT KIYOSAKI, an individual, MARC HRISKO, an :
individual, CHRISTOPHER BRIGGS, an individual,  :
SCOTT STEWART, an individual, WAYNE MORGAN, :
an individual, and DOES # 1-50, inclusive,        :

                                                        :

                               Defendants.        :

                                                        :

------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

        Robert Crewe and Robert Maurice, the plaintiffs in this putative class action, bring

various state law claims against corporate defendants Rich Dad Education, LLC ("RDE"), Rich

Dad Operating Co., LLC ("RDO"), Rich Global, LLC ("RG"), Cashflow Technologies, Inc.,

Tigrent Inc. ("TI"), Tigrent Learning Inc. ("TLI"), and Tigrent Brands Inc. ("TBI"), and

individual defendants Robert Kiyosaki, Christopher Briggs, Scott Stewart, Marc Hrisko, Wayne

Morgan, and John Does 1 through 50 (collectively, "defendants").  In essence, plaintiffs allege

that they paid for and attended different stages of a "stock success training program" sponsored

and/or conducted by defendants, which did not provide the actual training or education that had

been promised, but instead had the sole purpose to "up-sell 'students' into additional useless but

1

more-expensive coursework."  Amended Complaint ("Compl.") ¶ 2.  Plaintiffs' state law claims include breach of contract, fraud, and violations of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), FLA. STAT. § 501.201, *et seq.*

Defendants move to dismiss on numerous grounds.  For the reasons stated in the following, the Court (1) dismisses Crewe's lawsuit, based on a binding arbitration clause in his written contract with RDE; and (2) dismisses Maurice's claims, based on the binding forum-selection clause in his contract with RDE, in which he agreed to bring any action arising under the agreement in designated state or federal courts in Florida.

## I.    Background[1]

### A.  The Parties

Plaintiff Crewe is a resident of the Bronx, New York.  Compl. ¶ 12.  Plaintiff Maurice is a resident of Georgia.  *Id.* ¶ 13.

Defendants RDE and RG are Wyoming limited liability companies with principal places of business in Cape Coral, Florida, and Jackson, Wyoming, respectively.  *Id.* ¶¶ 14–15. Defendant RDO is a Nevada limited liability corporation with a principal place of business in Minden, Nevada.  *Id.* ¶ 16.  Defendant CF is a Nevada corporation with a principal place of business in Scottsdale, Arizona.  *Id.* ¶ 17.  Defendants TI and TLI are, respectively a Colorado corporation and a Florida corporation, both with principal places of business in Cape Coral, Florida.  *Id.* ¶¶ 18, 19.  Defendant TBI is a Florida corporation with a principal place of business

---

[1] Because this case is currently before the Court on a motion to dismiss, the Court takes all facts in the Amended Complaint as true.  The facts set forth herein are drawn from the Amended Complaint (Dkt. 20) and the attachments thereto, and from documents referenced in the Complaint, including the plaintiffs' respective contracts with RDE, which are properly considered on a motion to dismiss.  Those documents are attached to the Declaration of James E. May (Dkt. 33) ("May Decl.").

in Cape Coral, Florida.  *Id.* ¶ 20.  Defendant Briggs is a citizen of Florida.  *Id.* ¶ 21.  Defendant

Hrisko is a citizen of Virginia.  *Id.* ¶ 23.  Defendant Kiyosaki is a citizen and resident of Arizona.

*Id.* ¶ 24.  Defendant Morgan is a citizen of Texas.  *Id.* ¶ 25.

### B.  Crewe's Experience

On March 7, 2011, Crewe received a standardized email from defendants.  Compl. ¶ 68.

The email advertised a free Stock Success Workshop.  The email promised that workshop

attendees would "discover how to 'Manage Your Own Money' and 'Protect Your Profits &

Reduce Your Risk.'"  *Id.*  The email also promised that "This 2-hour workshop can teach you

how you can trade better – safer – smarter . . . *even if you've never bought or sold stock before!*"

*Id.* ¶ 68 (emphasis in original).

Relying on those representations, Crewe decided to attend a free Stock Success

Workshop.  He did so, on March 9, 2011, in New York City.  *Id.* ¶ 69.  The workshop was

sponsored by defendants.  *Id.*  The workshop was led by defendant Briggs, who was identified as

a trainer.  Briggs introduced himself as a "professional 'swing trader' and a 'market expert'";

Briggs, however, did not disclose his specific credentials during the workshop, and Crewe

alleges that, in fact, Briggs lacks any relevant qualifications.  *Id.* ¶ 75.

During the workshop, Briggs did not teach Crewe or the other attendees any "wealth

building techniques."  Instead, Briggs broadly discussed "assets and liabilities," identifying

"ignorance" as the chief liability and "education as the chief asset," and he repeatedly pitched

attendees to enhance their "education" by enrolling in defendants' three-day Rich Dad Education

Stock Success training program later that month.  *Id.* ¶¶ 82–83.  At various points, Briggs told

attendees that they would "be able to make $1,000 consistently trading stock," and that the three-

day training program was "where we teach you your financial education."  *Id.* ¶ 86.  Briggs also

told attendees that if they signed up for the three-day training program that day, it would cost

only $199, but if they waited until the following day, the training would cost $595.  *Id.* ¶ 88.

Also during the workshop, defendants gave Crewe promotional materials relating to the

three-day training program.  One such pamphlet, the "Stock Success 3-Day Training Pamphlet,"

stated:

> Your STOCK SUCCESS Training Instructors are trainers in the true sense of the
> word.  We don't hand you a book and send you on your way, and we don't
> believe in teaching abstract "theory."  Instead, our trainers are able to teach you
> "reality" from their years of experience trading in the financial markets.

*Id.* ¶ 77.  Another pamphlet stated:

> Your 3-Day STOCK SUCCESS training is designed to help you effectively
> pursue the many wealth-building opportunities provided by the stock and options
> market.  You now have the entire Rich Dad education team to share their
> knowledge and experience in the markets with you.  They are here to help you
> turn your desire for more into a reality.
>> Your 3-Day Training is comprehensive.  It will cover everything from
> thinking like the rich think to developing a personal plan and executing on that
> plan.
>> WHAT YOU'LL LEARN AT THE STOCK SUCCESS TRAINING . . .
> This intensive, 3-day Training curriculum focuses on establishing you as an
> educated investor. . . . By employing numerous strategies, you'll learn how you
> can create profit potential in every type of market. . . . By raising your financial
> IQ, you'll be able to use one or several trading strategies to meet your specific
> goals and achieve your idea of financial success. . . . Regardless, you'll leave the
> STOCK SUCCESS Training Academy armed with the knowledge and confidence
> to get started in the trading business.

*Id.* ¶ 1.

Despite the fact that no training had been provided during the free workshop, Crewe

enrolled in the three-day training program.  He did so based on defendants' representations.

Crewe enrolled pursuant to a written one-page agreement with RDE (the "Agreement"), which

he executed on March 9, 2011.  *See* May Decl. Ex. 1, at p. 1.  Pursuant to the Agreement, Crewe

paid RDE $199.  *See id.*; Compl. ¶ 79.

4

The Agreement states that it incorporates "the accompanying Terms and Conditions," and directs signatories to "Read the Agreement and the accompanying Terms and Conditions in their entirety before signing."  Agreement at 1.  The Agreement adds:

> You are entitled to a copy of the Agreement and the Terms and Conditions.  Field Personnel do not have authority to change the terms of the Agreement or the Terms of Conditions, except as expressly authorized to do so herein.  THE ACCOMPANYING TERMS AND CONDITIONS CONTAIN A DISPUTE RESOLUTION CLAUSE.  PLEASE SEE SECTION ENTITLED CHOICE OF LAW/DISPUTE RESOLUTION.

*Id.*

The four-page Terms and Conditions document, in turn, contains various provisions.  *See* May Decl. Ex. 1, at pp. 4–7.  These include a warning about the risks presented by financial investing, a disclaimer of responsibility as to claims by third parties, a limitation-of-liability provision, and a disclaimer that the training program "is not designed or intended to qualify you for employment.  Our curriculum is avocational in nature and is intended for the purpose of the accumulation of wealth by, and the personal enrichment, development and enjoyment of, our students."  *Id.* at p. 5. (emphasis removed from original).

The Terms and Conditions also includes the following provision, important here:

> CHOICE OF LAW / DISPUTE RESOLUTION
> The Agreement and these Terms and Conditions shall be deemed to have been made in the State of Florida.  We agree that any Dispute (as defined below) between us *shall be resolved exclusively and finally by binding arbitration under the Federal Arbitration Act administered by the National Arbitration Forum* (NAF) under the Code of Procedure in effect when the claim is filed.  You agree that we are entering into this arbitration agreement in connection with a transaction involving interstate commerce.  The arbitration shall be held by submission of documents, by telephone, or online.  Such arbitration shall be conducted under NAF rules, except as otherwise provided below.  We will agree on another binding arbitration forum if NAF ceases operations.  The arbitration will be conducted before a single arbitrator, and will be limited solely to the Dispute between you and us.  *The arbitration, or any portion of it, will not be consolidated with any other arbitration and will not be conducted on a class-wide*

*or class-action basis.* The arbitrator's decision shall be set forth in writing and shall set forth the essential findings and conclusions upon which the decision is based. All determinations as to the scope, enforceability, and effect of this Dispute Resolution section shall be decided by the arbitrator and not by a court. Any decision rendered in such arbitration proceedings will be final and binding on the parties, and judgment may be entered thereon in any court of competent jurisdiction. In any arbitration action or court proceeding to compel arbitration to enforce the terms of this paragraph or to enforce the result of any arbitration conducted hereunder, the prevailing party shall be entitled to obtain all reasonable costs, including its reasonable attorney fees at the trial and appellate levels. Notwithstanding, the parties agree that the maximum award that the arbitrator can award in this binding arbitration shall not exceed the amount paid by you to us under the Agreement plus the fees and costs provided for in this paragraph. No party shall be entitled to recovery for any indirect and/or consequential damages, including any incidental expenses associated with attending an in-person live training or in connection with arbitrating a claim hereunder. The arbitrator shall have no authority or power to modify or alter any term or condition of the Agreement or these Terms and Conditions or to render any award that by its terms has the effect of altering or modifying any express term or condition of the Agreement or these Terms and Conditions. The parties further agree that all proceedings and documents prepared in connection with any Dispute shall be confidential and, unless otherwise required by law or legal process, the subject matter of the same shall not be disclosed to any person other than the parties to the proceedings, their counsel, witnesses and experts, and the arbitrator. *You understand that, in the absence of this provision, you would have had a right to litigate disputes through a court, including the right to litigate claims before a jury and on a class-wide or class-action basis, and that you have expressly and knowingly waived those rights and agreed to resolve any Disputes through binding arbitration in accordance with the provisions of this paragraph.* For the purposes of this provision, the term "Dispute" means any dispute, controversy, or claim arising out of or relating to (i) the Agreement or these Terms and Conditions, their interpretation, or the breach, termination, applicability, or validity thereof, (ii) the related order for, purchase, delivery, receipt or use of any product or service from us, or (iii) any other dispute arising out of or relating to the relationship between you and us. Information may be obtained from the NAF online at www.arbforum.com, by calling 800-474-2371, or writing to P.O. Box 50191, Minneapolis, MN 55405. The terms "Company," "we," "us," "our," or "ours" as used only in this paragraph shall include our parent entity, subsidiaries, affiliates, officers, directors, shareholders, employees, agents, licensees, successors, and assigns.

*Id.* at pp. 4–5 (first and second emphasis added, third emphasis in original).

Between March 31, 2011, and April 2, 2011, Crewe attended the three-day training program, at the Marriott Downtown Hotel in New York City.  The program was led by a trainer named Scott Stewart.  Stewart held himself out as a "former financial advisor who is currently a professional, full-time trader and a market expert."  Compl. ¶ 79.  Stewart did not elaborate on his credentials during the program; Crewe alleges that Stewart lacks any relevant qualifications.

Crewe alleges that the three-day program did not provide him with either the training or "financial education" it had promised.  *Id.* ¶ 1.  Instead, "the sole purpose of the workshop was to up-sell 'students' into additional useless but more expensive coursework and mentoring, which can cost up to $64,899 per enrollee."  *Id.* ¶ 2.  Crewe did not sign up for the coursework and mentoring program.

### C.  Maurice's Experience

On February 28, 2008, Maurice attended a free training workshop sponsored by defendants in Nashville, Tennessee.  Compl. ¶ 13.  The workshop was led by a Mr. Huffman, who introduced himself as an "experienced real estate investor."  *Id.* ¶ 76.[2]  However, Huffman did not elaborate on his credentials during the program; Maurice alleges that Huffman lacks any relevant qualifications.  *Id.* ¶ 76.  Maurice further alleges that the free training workshop did not impart any useful financial strategies or tools.  Instead, Huffman told attendees that they would obtain "the promised real estate investing education" during a three-day "Learn to be Rich™ Training Academy."  *Id.* ¶ 91.

Based on defendants' representations about the workshop, Maurice, on the day of the workshop, February 28, 2008, paid $495 to enroll in that training academy.  Maurice executed a

---

[2] Plaintiffs allege that "Plaintiff Maurice attended the February 28, 2008 free Learn to be Rich™ Training which was instructed by Defendant Huffman."  Compl. ¶ 76.  The Amended Complaint, however, names no such defendant.

7

written contract with RDE with respect to that academy.  *See* May Decl. Ex. 3.  Unlike the

agreement that Crewe entered into with respect to his three-day training program, Maurice's

agreement did not contain an arbitration clause.  It did, however, contain jurisdiction, venue, and

choice of law clauses, as follows:

> CHOICE OF LAW
> This Agreement shall be deemed to have been made in the State of Florida and
> shall be governed by the laws of this State.  In any litigation arising out of this
> Agreement, the prevailing party shall be entitled to reasonable attorneys' fees and
> costs.
> JURISDICTION
> All actions brought hereunder, whether at law or in equity, shall be brought in
> Florida state courts or federal courts located in the state of Florida.  Student
> consents to jurisdiction in the state of Florida and expressly waives any
> jurisdiction privileges which may be asserted in connection with this Agreement.
> VENUE
> Except where prohibited by law (i.e., California), venue shall be recognized only
> in the state or federal courts serving Lee, Palm Beach or Broward Counties in the
> state of Florida.  Student hereby expressly waives any venue privileges that may
> be asserted in connection with this Agreement.

*Id.* at p. 3.  The three-day training session that Maurice attended was held March 28, 2008,

through March 30, 2008, in Nashville, Tennessee.  Compl. ¶ 113; May Decl. ¶ 7.  Like Crewe,

Maurice alleges that it did not provide him "with a financial education as promised."  Compl. ¶¶

13, 141–42.

On March 30, 2008, the last day of the three-day training session, Maurice paid

$34,097.08 to purchase a series of "advanced classes and mentor services."  *Id.* ¶¶ 4, 13.  He did

so pursuant to a written contract with RDE, which he signed on March 30, 2008.  May Decl. Ex.

4.  That contract did not have an arbitration clause.  It contained the following clause as to choice

of law, jurisdiction, and venue:

> CHOICE OF LAW / JURISDICTION / VENUE
> This Agreement shall be deemed to have been made in the State of Florida.
> Except where prohibited by law (i.e., California), student consents to jurisdiction

8

> in the state of Florida and expressly waives any jurisdiction and venue privileges which may be asserted in connection with this Agreement so that all actions brought hereunder whether at law or in equity, shall be brought in the state or federal courts serving Lee, Palm Beach or Broward Counties in the state of Florida. In any litigation arising out of this Agreement, the prevailing party shall be entitled to reasonable attorney's fees and costs.

*Id.* at p. 3.

Maurice, joined by his fiancée, attended these advanced classes, on April 26 and 27, 2008, in Nashville, Tennessee. Compl. ¶ 141. However, these advanced training classes "did not provide . . . Maurice with a financial education as promised." *Id.* ¶¶ 4, 142. On April 30, 2012, Maurice paid defendants an additional $7,699 for "coaching services." *Id.* ¶ 145. In total, Maurice paid defendants $42,291.08.[3]

### D. Plaintiffs' Allegations

Plaintiffs sue on behalf of a putative class comprised of all U.S. residents who paid to attend any of defendants' training seminars or mentoring or coaching services. Compl. ¶ 148.

Synthesizing Crewe's and Maurice's experiences, the Amended Complaint alleges that the defendants have engaged in a scheme to defraud unwitting customers, via a "three-tiered

---

[3] Defendants have supplied the Court with the written evaluation that Maurice completed on April 27, 2008, at the close of the advanced training classes. Of the 17 course components which he was asked to evaluate on a scale of 1 ("not useful at all") through 5 ("very useful/effective"), Maurice gave 16 of them a 5. These included "marketing techniques and strategies for the real estate entrepreneur"; "course objectives to get me thinking like an investor and taking action were met"; "I would take another course taught by this instructor"; "This Advanced training course was at the level I expected"; and "I now feel more prepared to move forward." May Decl. Ex. 5. He also checked the "yes" box alongside the following propositions: "I would recommend Rich U™ training to others"; "All the topics I expected to learn about were covered in this training"; and "By attending this training, I have learned strategies and techniques I can immediately put into action." *Id.* He also handwrote, about the experience, "It was fun and empowering," and identified "lease options" as his favorite part of the course. *Id.* However, because this evaluation is not clearly cognizable on a motion to dismiss, and because it is not germane to the bases on which the Court has ruled, the Court has not relied on this evaluation in rendering this decision.

sales pitch" in which customers are duped, via common misrepresentations, to enroll in a series of fictitious financial training programs with escalating costs.  *Id.* ¶ 8.  These programs begin with a free workshop, continue with a three-day training program, and culminate with an advanced coursework and mentoring program.  Plaintiffs allege that defendants have made misrepresentations to the effect that students will receive a bona fide financial education, and have done so by email, *id.* ¶¶ 68–71, 111–15, in standardized statements by trainers and instructors, *id.* ¶¶ 80–95, 116–37, in written agreements with students, *id.* ¶¶ 96–98, and in written promotional materials, *id.* ¶¶ 99–110.  In fact, plaintiffs allege, although customers are promised "financial education to achieve long term financial independence," including in the areas of stock trading, real estate investment, business development, and individual investment strategies, no education is actually ever delivered; rather, each stage of defendants' "laddered sales pitch" is aimed to persuade customers to enroll in the next, and progressively more costly, stage.  *Id.* ¶¶ 5–8, 63–64.  Plaintiffs allege that this "up-sell" on false pretenses is enabled by defendants' "training instructors," who falsely hold themselves out as experts in their investment field, but have "no discernible investing experience or successful track record."  *Id.* ¶ 9.

Plaintiffs allege that the effect of this "aggressive sales scam" is to cost attendees "thousands of dollars and encumber themselves with crippling debt to buy useless additional courses."  *Id.* ¶ 7.  Citing critical comments posted on complaint forums on the Internet from three attendees about the Rich Dad training program, plaintiffs allege that the training program was "a sales pitch disguised as an education seminar," an "infomercial" for the advanced program, and an attempt to "brow beat [attendees] into signing up for training."  *Id.* ¶ 10.

As to the particular defendants' roles, the Amended Complaint alleges that defendant Kiyosaki is the "mastermind" behind "the Rich Dad™ empire," *id.* ¶ 51, and controls all of

defendants' business operations. *Id.* ¶¶ 51–62. It alleges that the other four individual

defendants (Briggs, Hrisko, Morgan, and Stewart) acted as trainers or instructors. *Id.* ¶¶ 21–23,

25. As to the corporate defendants, the Amended Complaint alleges that TI is the parent of

defendants RDE and TLI, *id.* ¶ 28; that in 2006, TI entered into an agreement with defendant RG

to provide Rich Dad™ Education training courses, *id.* ¶ 28; and that RDE and TLI were at all

times affiliates of the other corporate defendants and Kiyosaki, *id.* ¶ 30.

      Plaintiffs bring six state-law claims for money damages. These are for (1) breach of

contract (Count 2), (2) breach of the implied covenant of good faith and fair dealing (Count 3),

(3) violation of FDUTPA (Count 4), (4) unjust enrichment (Count 5), (5) negligent

misrepresentation (Count 6), and (6) fraud (Count 7). Plaintiffs also bring a claim (Count 8)

against Kiyosaki for "alter ego/veil piercing," alleging that he is liable for the conduct of the

corporate defendants. Finally, plaintiffs seek a declaratory judgment, pursuant to 28 U.S.C. §§

2201–2202, to the effect that the arbitration provision in Crewe's Agreement with RDE is

unenforceable (Count 1), including because the arbitral forum specified in the Agreement, NAF,

no longer conducts consumer arbitrations.

### E.   Defendants' Motion to Dismiss

      On April 2, 2012, defendants filed motions to dismiss.[4] They argue that (1) Crewe's

claims must be dismissed in favor of arbitration, based on the arbitration clause in his Agreement

---

[4] The motions were filed by two distinct groups of defendants: one, calling itself the "Rich Dad"
defendants, consists of RG, RDO, CF, and Kiyosaki; the other, which for simplicity the Court
will refer to as the "Tigrent" defendants, consists of RDE, TI, TLI, TBI, Briggs, and Stewart.
Because the groups join each others' motions on the issues discussed herein, the Court refers to
the defendants collectively herein as "defendants." The opening and reply memoranda submitted
by the Rich Dad defendants, *see* Dkts. 31 and 45, are cited as "RD Mem." and "RD Reply
Mem."; the memoranda submitted by the Tigrent defendants, *see* Dkts. 32 and 46, are cited as

with RDE, (2) Maurice's claims must be dismissed for improper venue, based on the forum selection clause in his contract with RDE, (3) personal jurisdiction is lacking over any defendant in New York, (4) Maurice's claims, except as brought under FDUTPA, are barred by the statute of limitations, and (5) for various reasons, the Amended Complaint fails to state a claim.

Oral argument on the motion to dismiss was held on May 24, 2012. Before argument, the Court issued an order directing the parties to meet and confer and attempt to agree on an alternative arbitral forum to NAF, as the Agreement provides, so as to permit arbitration to commence expeditiously in the event the Court compelled it. *See* Dkt. 47. The Court also directed each party, in the event the parties could not agree, to set out the procedure by which an alternative forum was to be chosen, and to identify two binding arbitral fora that were acceptable to it. *See id.* At argument, however, Crewe stated that he did not consent to arbitration and refused to propose an alternative forum to NAF. *See* Hr'g Tr. 9, 26–29. He specifically rejected JAMS, the forum defendants proposed when the parties met and conferred. Argument focused predominantly on the arbitration clause in Crewe's Agreement and on the venue provision in Maurice's.

Following argument, the Court solicited supplemental briefing on discrete issues relating to Crewe's arbitration clause and Maurice's forum selection clause. *See* Dkt. 50. Supplemental briefing was completed on June 6, 2012.[5]

---

"Tigent Mem." and "Tigent Reply Mem." Plaintiffs submitted a single memorandum opposing both motions, which is cited as "Pls. Mem."

[5] The supplemental brief submitted by plaintiffs (Dkt. 53) is cited as "Pls. Supp."; the supplemental brief submitted by the Tigent defendants (Dkt. 57) is cited as "Tigent Supp."; and the supplemental brief submitted by the RD defendants (Dkt. 60) is cited as "RD Supp."

**II.     Discussion**

**A.   Crewe's Arbitration Clause**

Defendants argue that the arbitration clause in Crewe's Agreement is binding and requires dismissal of Crewe's claims in favor of arbitration.  Crewe counters that: (1) he did not assent to the arbitration provision, because it was contained in a separate document, the Terms and Conditions, which he did not see until after signing the Agreement; (2) even if the clause binds Crewe, it mandates arbitration only of his claims against RDE, not those against non-signatory defendants; (3) NAF has ceased to arbitrate consumer disputes and Crewe did not agree to an alternative arbitral forum; (4) the Agreement is inconsistent with the Federal Arbitration Act because the requirement that he arbitrate his claims burdens his federal statutory rights; and (5) the Agreement is unconscionable under state law for a variety of reasons, including because the Agreement contains a class-action waiver, and it is prohibitively expensive to bring an action to recoup the $195 paid by an individual customer.

Defendants dispute these arguments.  They further counter that, under Crewe's Agreement, his claims of unenforceability or unconscionability must be resolved by an arbitrator, not the Court.  The Court, after reviewing the relevant background principles in this area, addresses these arguments in turn.

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, creates a body of federal substantive law establishing and governing the duty to honor agreements to arbitrate disputes. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 625 (1985).  The FAA was enacted to reverse "centuries of judicial hostility to arbitration agreements" and "to place arbitration agreements 'upon the same footing as other contracts.'"  *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 510–11 (1974) (citations omitted).  The Act accordingly provides that an

13

arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 3. The "interpretation of an arbitration agreement is generally a matter of state law." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 130 S. Ct. 1758, 1773 (2010).

Where an agreement to arbitrate exists, the FAA creates a presumption of arbitrability, meaning that doubts as to its scope—whether the agreement encompasses the claims at issue— "should be resolved in favor of coverage." *See Paramedics Electromedicina Comercial, Ltd. v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 653 (2d Cir. 2004). However, that presumption does not apply to the threshold issue of whether the parties agreed to arbitrate at all, which is "strictly a matter of consent," and determined based on principles of contract law. *Glencore Ltd. v. Degussa Engineered Carbons, Ltd.*, No. 11-cv-7153, 2012 WL 223240, at *8–9 (S.D.N.Y. 2012) (quoting *Granite Rock Co. v. Int'l Brotherhood of Teamsters*, 130 S. Ct. 2847, 2857 n.6 (2010)) (additional citations omitted).

In this case, Crewe's claims all clearly fall within the scope of the broadly worded arbitration clause, and Crewe does not contend otherwise. That clause applies to "any dispute, controversy, or claim arising out of or relating to (i) the Agreement or these Terms and Conditions, their interpretation, or the breach, termination, applicability, or validity thereof, (ii) the related order for, purchase, delivery, receipt or use of any product or service from us, or (iii) any other dispute arising out of or relating to the relationship between you and us." May Decl. Ex. 1, at p. 5.

### 1.  Crewe's Assent to the Arbitration Clause

Crewe first argues that he "never assented to [the] terms" of the arbitration provision. Pls. Mem. 4. The basis for this argument is that the arbitration provision appears in the Terms

14

and Conditions addendum to the Agreement.  This addendum, Crewe alleges, "was never offered for signature," and Crewe "did not know the addendum even existed" at the time he signed the Agreement.  *Id.*  Crewe further attests in a declaration that he signed the Agreement under rushed circumstances:  At the end of the free training workshop, he waited on line with 30 to 40 others to enroll in the paid three-day training class, was rushed through the sign-up process by an RDE staffer who stated "[p]lease keep the lines moving," and was handed the one-page contract to sign and initial, which Crewe did without reading it.  Crewe attests that the staffer did not alert him that he was signing a contract, or to the existence of the Terms and Conditions document or its arbitration provision.  Crewe also alleges that the staffer accepted his initialed representation that he had received the Terms and Conditions document, even though, Crewe alleges, he was furnished the Terms and Conditions addendum, along with many other documents, immediately after signing the Agreement.  *See* Declaration of Robert Crewe ("Crewe Decl.") ¶¶ 8, 11–22.  Crewe also asserts that he knew that if he waited until the following day to enroll in the three-day class, it would have cost him nearly $400 more—$595 rather than $199.  *Id.* at ¶ 8.  Crewe states:  "I would not have signed the [] Agreement if I knew about the arbitration provision beforehand."  *Id.* at ¶ 23.

Crewe's attempts to avoid the binding arbitration provision on these grounds are quite unpersuasive.  It is undisputed that Crewe signed and executed the one-page Agreement.  The Agreement prominently states, in bold lettering:  "This is a legally binding Agreement between the undersigned . . . the signatory, and[] Rich Dad Education LLC."  May Decl. Ex. 1, at p. 2.  The intimation in the Amended Complaint that Crewe was unaware that he was entering into a contract is belied by the explicit and prominent terms that appear on the same page that he

signed.  Crewe, a college graduate, does not allege that he was illiterate, blind, incapacitated, or otherwise incapable of reading plain English.

It is also undisputed that Crewe initialed alongside the representation, "YES, I received the Terms and Conditions of this agreement," and alongside a "disclosure and acknowledgment" in the Agreement that "THE ACCOMPANYING TERMS AND CONDITIONS CONTAIN A DISPUTE RESOLUTION CLAUSE.  PLEASE SEE SECTION ENTITLED CHOICE OF LAW/DISPUTE RESOLUTION."  May Decl. Ex. 1, at p. 2.  Crewe thus was on notice that he was binding himself to a dispute resolution clause.

In any event, under both Florida and New York law, a customer does not have the right to avoid a contract on the ground that he did not read it.  "Florida adheres to the principle that a party has a duty to learn and know the contents of a proposed contract before he signs it."  *See Wexler v. Rich*, 80 So. 3d 1097, 1100–01 (Fla. 4th Dist. Ct. App. 2012) (internal quotation marks omitted).  Therefore, "'[o]ne who signs a contract is presumed to know its contents.'"  *Id.* (quoting *Addison v. Carballosa*, 48 So. 3d 951, 954 (Fla. 3d Dist. Ct. App. 2010)).  Without a demonstration of fraud or mental incompetence, a signatory to a contract "cannot avoid his obligation under the contract simply by showing he did not read what he signed."  *Collins v. Countrywide Home Loans, Inc.*, 680 F. Supp. 2d 1287, 1294 (M.D. Fla. 2010) (citing *Coleman v. Prudential Bache Sec. Inc.*, 802 F.2d 1350, 1352 (11th Cir. 1986)); *see also MCC–Marble Ceramic Ctr. Inc. v. Ceramica Nuova d'Agostino*, 144 F.3d 1384, 1387 n.9 (11th Cir. 1998) ("[P]arties who sign contracts will be bound by them regardless of whether they have read them or understood them.").  Therefore, "any claims that [he] is not bound by the terms of the [agreement] or was deceived by terms fully disclosed but not explained to [him], fail as a matter of law."  *Silver v. Countrywide Home Loans, Inc.*, 760 F. Supp. 2d 1330, 1341 (S.D. Fla. 2011).

The same holds true under New York law.  *See Patterson v. Somerset Investors Corp.*, 946 N.Y.S.2d 217, 218 (2d Dep't 2012) (internal quotations omitted) ("The plaintiff's claim that he did not read the documents before executing them is unavailing, since a party who signs a document without any valid excuse for having failed to read it is conclusively bound by its terms."); *Johnson v. Chase Manhattan Bank USA, N.A.*, 784 N.Y.S.2d 921 (Table), 2004 WL 413213, at *5 (Sup. Ct. N.Y. Cnty. Feb. 27, 2004) (the fact that "'a consumer does not read the agreement or thereafter claims he or she failed to understand or appreciate some term therein does not invalidate the contract'") (quoting *Brower v. Gateway 2000, Inc.*, 246 A.D.2d 246, 252 (1st Dep't 1998)).  Thus, even if one credits Crewe's declaration, he and he alone is accountable for his decision to sign the Agreement without reading it and without first requesting a copy of the Terms and Conditions that it expressly incorporated.

In addition, and highly significant to the extent he claims a lack of meaningful assent, Crewe had the right during the three ensuing days to *cancel* the transaction:  The Agreement expressly provided on its face that Crewe could "cancel this transaction at any time prior to midnight of the third business day after . . . this transaction."  May Decl. ¶ 5 & Ex. 1 ("You, the buyer, may cancel this transaction at any time prior to midnight of the third business day after the date of this transaction.  See the attached notice of cancellation form for an explanation of this right.").  Crewe was also given a Notice of Cancellation form to facilitate this cancellation.  May Decl. Ex. 1, at p. 7.  Thus, even crediting Crewe's claim that the circumstances under which he signed the Agreement and initiated his representation inhibited thoughtful assent, during the ensuing three days, he had every opportunity to back out.  If Crewe genuinely balked at the arbitration provision, as he now claims he did, *see* Crewe Decl. ¶ 23, he had three days after

signing in which to read the Agreement he had signed, and the Terms and Conditions that it

incorporated, and to decide to cancel it on account of that provision.

Finally, Crewe here brings a claim for breach of contract.  It is axiomatic that a plaintiff

cannot claim lack of mutual assent when he alleges breach of contract.  *Johnson*, 2004 WL

413213, at *5; *see also Heiko Law Offices, P.C. v. AT&T Wireless Servs., Inc.*, 800 N.Y.S.2d 347

(Table), 2005 WL 670778, at *1 (Sup. Ct. N.Y. Cnty. Feb. 22, 2005); *cf. Ranieri v. Bell Atl.

Mobile*, 759 N.Y.S.2d 448, 449 (1st Dep't 2003) ("[P]laintiff's claim that the non-signatory

defendants are not entitled to the benefit of the arbitration provision contained in the Agreements

is inconsistent with his claim that they are liable to him under those Agreements for breaches of

contract.").

### 2.   The Parties Covered by the Arbitration Clause

The arbitration provision applies, by its terms, not only to RDE, the contracting company,

but also, broadly, to "our parent entity, subsidiaries, affiliates, officers, directors, shareholders,

employees, agents, licensees, successors, and assigns."  May Decl. Ex. 1 at p. 5.  Crewe argues

that these terms do not encompass the defendants, whether corporate or individual.  Pls. Mem. 9–

10 (arguing that arbitration agreement cannot be enforced by nonsignatories).

The Court disagrees.  As to the Agreement term "affiliates," Crewe himself pleads that

RDE is "an affiliate of the other Defendants."  Compl. ¶ 29.  In addition, RDE has submitted a

declaration that TI is RDE's "parent entity," and that TI, TLI, and TBI are "affiliates of RDE."

May Decl. ¶ 3 ("RDE is wholly owned by TI, a Colorado corporation and the sole member of

RDE."; TLI and TBI "are subsidiaries of TI and affiliates of RDE and TI"); *see* Black's Law

Dictionary 63 (8th ed. 2004) (an "affiliate" is "[a] corporation that is related to another

corporation by shareholdings or other means of control; a subsidiary, parent or sibling corporation").

Further, as to the term "agents," Crewe broadly pleads that all defendants acted as one another's agents. *See* Compl. ¶ 31 ("[a]t all relevant times, each Defendant . . . acted in concern and association with, with the knowledge and approval of, and/or as the agent of each other within the scope of the agency, regarding the acts and omissions alleged").

Finally, as to the individual defendants, the Amended Complaint alleges that Kiyosaki had "ownership or membership interests" in each corporate defendant, and was the "guiding force" behind all aspects of the defendants' courses, marketing, advertising, and promotion. *Id.* ¶¶ 24, 51. These allegations comfortably support the finding that Kiyosaki functioned as an "officer" and "shareholder" of the corporate defendants. And, as to the individual trainers named as defendants, RDE represents that they were independent contractors. *See* May Decl. ¶ 13. Based on Crewe's allegations, which depict the trainers as executing a fraudulent scheme developed by Kiyosaki and the corporate defendants, these individuals are properly viewed as agents of the defendants. *See, e.g.*, Compl. ¶ 9 (referring to "Defendants' training instructors").[6]

---

[6] Defendants alternatively argue that, even if the language of the arbitration provision did not reach a particular defendant, under principles of equitable estoppel, Crewe would be estopped from avoiding arbitration against them. *See* RD Mem. 15–17 (citing *Ragone v. Atl. Video at the Manhattan Ctr.*, 595 F.3d 115, 126–27 (2d Cir. 2010) (holding that "a non-signatory to an arbitration agreement may compel a signatory to that agreement to arbitrate a dispute where a careful review of 'the relationship among the parties, the contracts they signed . . . , and the issues that had arisen' among them discloses that 'the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed'") (quoting *Choctaw Generation Ltd. P'ship v. Am. Home Assurance Co.*, 271 F.3d 403, 406 (2d Cir. 2001))); Tigrent Mem. 16; RD Reply Mem. 2–4. The Court agrees that, even if a defendant herein was held to fall outside the broad language of the Agreement's arbitration provision, equitable estoppel would oblige Crewe to include that defendant in arbitration here, given the Amended Complaint's pervasive allegations of interdependent and coordinated misconduct between the nonsignatories and signatory RDE. *See Alghanim v. Alghanim*, No. 09-cv-8098,

### 3.   Issues With Respect to NAF's Unavailability

Crewe's next argument is based on the unavailability of NAF, the arbitral forum named in the Agreement.  The Agreement provides:  "We will agree on another binding arbitration forum if NAF ceases operations."  May Decl. Ex. 1.  NAF has ceased arbitrating consumer disputes, pursuant to a consent judgment with the Attorney General of Minnesota.  Compl. ¶ 40; Pls. Mem. 15–16.  NAF does, however, continue to operate in other areas of dispute resolution.  Compl. ¶ 41.

Crewe argues that, under the Agreement, he is not obliged to "agree on another binding arbitration forum," because NAF has not literally "ceased operations," but instead has taken the more limited step of ceasing to conduct consumer arbitrations.  *Id.*; Pls. Mem. 16.  He further argues that there is, therefore, no charter for the Court to compel the parties to agree on an alternative arbitral forum, or, absent agreement, to select an alternative forum.  Crewe likens this case to those in which, where the exclusive arbitral tribunal to which the parties had agreed ceased to be viable, courts have declined to compel arbitration.  Pls. Mem. 16 (citing *In re Salomon Inc. S'holders Derivative Litig.*, 68 F.3d 554, 561 (2d Cir. 1995) ("*In re Salomon Brothers*"), and *Dover Ltd. v. A.B. Whatley, Inc.*, No. 04-cv-7366, 2006 WL 2987054, at *1 (S.D.N.Y. Oct. 18, 2006)).

This issue turns on the intent of the parties.  Crewe is correct that, where a designated arbitral forum is integral to the parties' agreement, a court may not impose a different arbitral forum on a party.  Thus, in *In re Salomon Brothers*, the Second Circuit upheld a district court's order declining to impose arbitration where, under the arbitration agreements, "all disputes were

2011 WL 5978350, at *1 (S.D.N.Y. Nov. 29, 2011); *Mims v. Global Credit & Collection Corp.*, 803 F. Supp. 2d 1349, 1357–58 (S.D. Fla. 2011); *Kolsky v. Jackson Square, LLC*, 28 So. 3d 965, 970 (Fla. 3d Dist. Ct. App. 2010).

to be arbitrated by the NYSE and only the NYSE."  68 F.3d at 557.  The court explained:

"Because the parties had contractually agreed that *only* the NYSE could arbitrate any disputes

between them, [the district court] properly declined to appoint substitute arbitrators and compel

arbitration in another forum."  *Id.* at 559 (emphasis in original).  Similarly, in *Dover Ltd.*, the

parties had agreed to arbitrate exclusively before the NASD, but, as a result of the termination of

the defendant's membership in NASD, that forum became unavailable.  Citing *In re Salomon*

*Brothers*, the court declined to name a substitute arbitrator, because "the NASD was the

exclusive arbitral forum in which the parties' dispute could be heard."  2006 WL 2987054, at *7.

*See also Paine Webber, Inc. v. Rutherford*, 903 F.2d 106, 107–09 (2d Cir. 1990) (where parties'

agreement called for arbitration to be conducted in accordance with the rules of one of a handful

of specifically named self-regulatory organizations, holding that this language required the

arbitration be held before one of these entities, rather than another arbitral forum).

Where, however, the parties' agreement reflects a broader intention to arbitrate even if

the designated forum or fora prove unavailable, there is no such barrier to the appointment of an

alternative forum.  *See In re Salomon Brothers*, 68 F.3d at 560–61 (collecting cases involving

appointments of substitute arbitrators where "the named arbitrator could not or would not

proceed" and the failed forum was not "central to the parties' agreement to arbitrate"); *see also*

*Jones v. GGNSC Pierre LLC*, 684 F. Supp. 2d 1161, 1168 (D.S.D. 2010) (granting motion to

compel arbitration upon finding that the failed arbitral forum was not integral to the parties'

agreement, and collecting cases).  Section 5 of the FAA authorizes a court to designate a

substitute arbitrator "if for any reason there shall be a lapse in the naming of an arbitrator."  9

U.S.C. § 5.  Consistent with FAA § 5, Florida and New York law each authorize courts to

appoint substitute arbitrators.  *See, e.g.*, F{\sc LA}. S{\sc TAT}. § 682.04 (2012); N.Y. C.P.L.R. § 7504 (2012).

The language of the arbitration provision in this case emphatically indicates that the NAF is *not* integral to the agreement to arbitrate.  Rather, the Agreement provides that, were the NAF to cease to exist, the parties "will agree on another binding arbitration forum."  May Decl. Ex. 1, at p. 4; *compare In re Salomon Brothers*, 68 F.3d at 561 (recognizing authority to appoint substitute arbitrator where the failed arbitral forum was ancillary and not "as important a consideration as the agreement to arbitrate itself").  It is difficult to imagine language that could more clearly indicate the parties' willingness and intention to arbitrate in a forum other than the designated forum.  A federal district court in the Central District of California recently came to the same conclusion applying identical language, also involving NAF.  At issue in *In re Gateway LX6810 Computer Products Litigation*, No. SACV 10–1563, 2011 WL 3099862 (C.D. Cal. July 21, 2011), was an arbitration provision stating:  "You and Gateway will agree on another arbitration forum if NAF ceases operations."  *Id.* at *1.  The court held that this language clearly rebutted plaintiffs' argument that the choice of NAF was "integral" to the parties; agreement. Rather, the court held, NAF was "*not* an 'essential element[]' of the [arbitration clause]."  *Id.* at *2 (citing *Reddam v. KPMG, LLP*, 457 F.3d 1054, 1060 (9th Cir. 2006)) (emphasis in original).[7]

---

[7] The other cases cited by Crewe are inapposite.  In *Carideo v. Dell, Inc.,* No. C06–1772, 2009 WL 3485933 (W.D. Wash. Oct. 26, 2009), the court declined to appoint an arbitrator because it found that the parties' selection of the NAF was integral to the arbitration agreement.  *See id.* at *6 (holding that "unavailability of NAF as arbitrator presents compounding problems that threaten to eviscerate the core of the parties' agreement," and that "appoint[ing] a substitute arbitrator would constitute a wholesale revision of the arbitration clause").  However, unlike Crewe's Agreement, the contract at issue in *Carideo* did not contemplate a different arbitrator if NAF proved to be unavailable.  *See id.* ("Any claim, dispute, or controversy . . . shall be resolved exclusively and finally by binding arbitration administered by the National Arbitration Forum (NAF) under its Code of Procedure then in effect.") (emphasis omitted).  Crewe also relies on

The Court, finally, rejects Crewe's argument that because other aspects of NAF's dispute resolution business other than its consumer-arbitration arm remain intact, mandating arbitration in another forum would be inconsistent with the parties' intention to arbitrate elsewhere only if NAF "cease[d] operations."  Pls. Mem. 20.  The clear purpose of this provision was to provide for an alternative arbitral mechanism in the event NAF was unavailable to resolve the parties' dispute, not to make arbitrability turn on the happenstance of whether NAF disappeared outright or merely narrowed its operations to no longer encompass consumer disputes.  Crewe does not offer any credible reason why the parties to the Agreement would have cared whether unrelated aspects of NAF's business remained open.  More relevant is the Agreement's express provision that arbitration was to be held in accordance with the FAA.  As noted, under the FAA, a presumption of arbitrability applies once an agreement to arbitrate is found.  *See Glencore*, 2012 WL 223240, at *8 ("The presumption of arbitrability under the Act supplies a background principle of interpretation once it has been established that the parties have entered into an agreement to arbitrate.").  Particularly in light of that presumption, the Court comfortably finds that the language of the Agreement encompassed use of a non-NAF arbitral forum under the circumstances presented here.

### 4.  Crewe's Claim of Interference With His Federal Statutory Rights

Crewe next argues that the arbitration clause is inconsistent with "the federal substantive law of arbitrability," citing *Green Tree Financial Corp. v. Randolph*, 531 U.S. 79, 90 (2000). Pls. Supp. 3.  *Green Tree* recognizes that under the FAA, an agreement that requires mandatory

---

*New Port Richey Med. Investors v. Stern*, 14 So. 3d 1084, 1087 (Fla. 2d Dist. Ct. App. 2009), *see* Pls. Mem. 18 n.4, but that decision does not assist him.  It holds that "the parties' arbitration agreement is not rendered invalid or unenforceable simply because the [chosen arbitral forum] is unavailable to conduct the arbitration"; the court held that it "must appoint another arbitrator or arbitrators."  *New Port Richey Med. Investors*, 14 So. 3d at 1087.

arbitration is enforceable only "so long as the prospective litigant effectively may vindicate [his or her] statutory cause of action in the arbitral forum." *Green Tree*, 531 U.S. at 90. Here, Crewe argues that the clause prevents him from effectively arbitrating his claims, because (1) the clause forbids suing on a class basis, (2) the maximum recovery on his individual claim ($199) might be offset by his arbitration filing fee, depending on the arbitral forum,[8] and (3) although Crewe, if successful, could recoup his legal fees, he would, if unsuccessful, be exposed to a risk of paying substantial costs by the loser-pays fee-shifting provision in the arbitration agreement. Pls. Supp. 4.

Crewe is incorrect. Crewe's damages claims are all brought under state law. And, the case law on which he relies uniformly involves situations in which it was argued or held that the arbitration forum or rules impermissibly burdened the plaintiff's *federal statutory* rights. *See, e.g.*, *Green Tree*, 539 U.S. at 90 (plaintiff failed to establish that arbitral costs would be prohibitively high so as to prevent her from "effectively vindicating her federal statutory rights" under the Truth in Lending Act; court reverses Eleventh Circuit's contrary holding); *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 28 (1991) (enforcing agreement to arbitrate claim under Age Discrimination in Employment Act); *Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220, 239 (1987) (enforcing agreement to arbitrate claim under the Securities Exchange Act, based on finding that arbitration would be "adequate to vindicate Exchange Act rights"); *Mitsubishi Motors Corp.*, 473 U.S. at 637 (enforcing agreement to arbitrate claims under Sherman Antitrust Act). Crewe does not cite any authority, nor is the Court aware of any,

---

[8] Crewe argues that the filing fee would be $250, because that is the filing fee for JAMS, the alternative arbitral forum proposed by defendants. *Id.* at 4. However, with Crewe having refused to identify an alternative forum despite the Court's order that he do so, the record is silent as to what the filing fee, if any, would be for other potential fora.

declining to enforce an arbitration clause as a matter of federal law on the ground that the arbitral

rules burden the plaintiff's ability to vindicate his or her state-law claims.  Any such claim is,

instead, brought under a state-law theory of unconscionability—and Crewe makes such a claim

here.  *See infra* § II.A.5.

The decision in *In re American Express Merchants Litigation*, 554 F.3d 300 (2d Cir.

2009) ("*Amex I*"), on which Crewe primarily relies, in fact closely turned on the federal statutory

claims at issue.  In *Amex I*, the court held that, viewed in the light of the high cost of litigating

federal antitrust claims, the restrictions in an arbitration agreement, including a class-action

waiver, presented "more than a speculative risk" that the plaintiff would be "deprived . . . of

substantive rights under the federal antitrust statutes," including the Clayton Act.  *Id.* at 315–16.

Among other things, the court noted, even the "trebling of a small individual damages award"

would not come close to covering the hefty expert fees which the plaintiff's economist had

testified would be required.  These fees were high given the need to prove antitrust liability and

damages, including defining the relevant geographic and product markets, and to address

complex issues including anti-competitive impact.  The court noted that the $40 per diem cap on

expert fee-shifting was inadequate to offset these fees.  *Id.* at 317–18.  As a review of that

decision reveals, the court's analysis was based centrally on the mechanics of proving plaintiffs'

federal antitrust claims.  *Id.* at 319–20.  The court pointedly distinguished cases involving state-

law findings of unconscionability.  It stated: "We do not follow these cases because they all rely

on findings of unconscionability under state law, while we have relied here on a vindication of

statutory rights analysis, which is part of the federal substantive law of arbitrability."  *Id.* at 320.

The Second Circuit's ensuing decisions in the *Amex* case reinforce that its "vindication of

statutory rights" analysis is limited to analyzing whether plaintiffs' rights under federal statutes

are effectively incapable of vindication given the limitations imposed by the arbitral format and rules.  *See In re Am. Express Merchs. Litig.*, 634 F.3d 187, 196-200 (2d Cir. 2011) ("*Amex II*") (affirming *Amex I* on remand, based on analysis of interplay between limitations presented by arbitration clause and federal antitrust laws); *In re Am. Express Merchs. Litig.*, 667 F.3d 204, 214–17 (2d Cir. 2012) ("*Amex III*") (affirming *Amex I* in light of intervening decision in *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740 (2011); court's decision canvasses solely cases involving federal statutory rights); *id.* at 219 (emphasizing that the basis of the ruling is that "it is financially impossible for the plaintiffs to seek to vindicate their federal statutory rights").

The most recent statement from the Second Circuit on this issue, by Judge Rosemary Pooler in *Amex IV* concurring in the denial of a petition seeking en banc rehearing, makes clear that this doctrine applies only where a party's federal statutory rights are at issue.  *See In re Am. Express Merchs. Litig.*, 681 F.3d 139, 140 (2d Cir. 2012) ("*Amex IV*") (Pooler, J., concurring). In her concurrence, Judge Pooler emphasized the limited scope of the court's holding, pointedly distinguishing claims based on state law:  Although arbitration clauses in cases involving state-law claims might raise state-law questions of unconscionability, she noted, the issue presented in *Amex* was whether the FAA "always trumps rights created by a competing federal statute."  *Id.* at 140 (Pooler, J., concurring).  She wrote:

> At issue here is . . . the ability to effectively vindicate a federal statutory right that predates the FAA.  Vindication of statutory rights analysis is the mode of analysis proposed by the Supreme Court in *Mitsubishi* for addressing whether an arbitration clause will be enforced where the dispute implicates a federal statute.

*Id.*; *see also id.* at 143 ("*Amex III* gives full effect to a line of Supreme Court precedent preserving plaintiffs' ability to vindicate federal statutory rights").[9]

This line of doctrine is inapposite here, because Crewe's substantive claims are all based on state law. The arbitration clause to which Crewe bound himself therefore does not pose any potential conflict with his substantive federal statutory rights; to the extent Crewe theoretically has any claim along these lines, it sounds in state law of unconscionability.

Crewe's final argument on this point is to note that his Amended Complaint includes a claim (Count 1) under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, seeking a declaration that the arbitration clause is not enforceable. Pls. Supp. 5. But the Declaratory Judgment Act is not a source of federal substantive rights, because it does not "provide an independent cause of action. Its operation is procedural—to provide a form of relief previously unavailable." *In re Joint E. & S. Dist. Asbestos Litig.*, 14 F.3d 726, 731 (2d Cir. 1993). Put differently, Crewe cannot manufacture a claim of interference with a federal right by proactively attacking the arbitration clause via a declaratory judgment action, rather than waiting to defend against a motion to dismiss in favor of, or to compel, arbitration. Crewe does not furnish any case support for his thesis that a claim brought under the Declaratory Judgment Act, where a

---

[9] *In re Electronic Books Antitrust Litigation*, No. 11-md-2293, 2012 WL 2478462 (S.D.N.Y. June 27, 2012) (Cote, J.), which Crewe drew to the Court's attention in a post-argument letter, does not assist Crewe. Citing *Amex III* and noting that the issue at hand was whether an arbitral agreement containing a class action waiver "would prevent [plaintiffs] from 'effectively vindicating' their federal statutory rights," *id.* at *3 (quoting *Amex III,* 667 F.3d at 216), the district court there denied a defense motion to compel arbitration of a Sherman Act claim on the grounds that plaintiffs could "expect at most a median recovery of $540 in treble damages," but the costs of arbitration would greatly exceed any potential recovery. *Id.* at *3. However, the district court so ruled only as to the federal statutory antitrust claim, on the grounds that that claim "falls squarely within the ambit of the Second Circuit's recent decision in *Amex III.*" *Id.* Notable in light of Crewe's claim here, the district court declined to rule on plaintiffs' parallel attempt to avoid arbitration on their state law claims. *Id.* at *4.

plaintiff's substantive claims are all based on state law, implicates the federal statutory rights analysis doctrine.

### 5.   Unconscionability Under State Law

Crewe, finally, argues that the arbitration clause is substantively unconscionable under Florida state law, which the parties agree is controlling.  Of Crewe's various bases for seeking relief from his arbitration agreement, this claim merits the most substantial attention.  However, measured against Florida law, the Court concludes that the agreement is not unconscionable.

To begin with, contrary to Crewe's portrait of the law, there is no freestanding claim of substantive unconscionability under Florida law.  Rather, a party may claim that a commercial agreement is unconscionable so as to render it unenforceable.  To prevail on such a claim, a party must show *both* procedural *and* substantive unconscionability.  *See, e.g.*, *Pendergast v. Sprint Nextel Corp.*, 592 F.3d 1119, 1134 (11th Cir. 2010) ("*both* procedural and substantive unconscionability" are required) (emphasis in original); *Rivera v. AT&T Corp.*, 420 F. Supp. 2d 1312, 1321 (S.D. Fla. 2006); *Hialeah Auto. LLC v. Basulto*, 22 So. 3d 586, 590 (Fla. 3d Dist. Ct. App. 2009) ("to invalidate a contract for unconscionability under Florida law, a court must find that the contract is both procedurally and substantively unconscionable") (internal quotation marks omitted); *see also Bland ex rel. Coker v. Health Care & Ret. Corp. of Am.*, 927 So. 2d 252, 256 (Fla. 2d Dist. Ct. App. 2006), *abrogated on other grounds by Shotts v. OP Winter Haven, Inc.*, 86 So. 3d 456 (Fla. 2011); *Fonte v. AT&T Wireless Servs. Inc.*, 903 So. 2d 1019, 1025 (Fla. 4th Dist. Ct. App. 2005); *Avid Eng'g, Inc. v. Orlando Marketplace Ltd.*, 809 So. 2d 1,

4 (Fla. 5th Dist. Ct. App. 2001); *Powertel, Inc. v. Bexley*, 743 So. 2d 570, 574 (Fla. 1st Dist. Ct. App. 1999); *Complete Interiors, Inc. v. Behan*, 558 So. 2d 48, 52 (Fla. 5th Dist. Ct. App. 1990).[10]

To determine procedural unconscionability, "'a court must look to the circumstances surrounding the transaction to determine whether the complaining party had a meaningful choice at the time the contract was entered.'" *Rivera*, 420 F. Supp. 2d at 1321 (quoting *Gainesville Health Care Ctr., Inc. v. Weston*, 857 So. 2d 278, 285 (Fla. 1st Dist. Ct. App. 2003)). Courts examine the "totality of the circumstances," *Bland*, 927 So. 2d at 256, including factors such as the manner in which the agreement was made, the ability of the parties to understand the terms in dispute, the relative bargaining power of the parties, and the absence of a meaningful choice about whether to accept the contract. *See Powertel, Inc.*, 743 So. 2d at 574 (finding unconscionable a new arbitration clause inserted into existing customers' monthly bill).

For much the same reasons that Crewe fails to show a lack of assent to the agreement, he cannot show any procedural unconscionability whatsoever. He does not make any claim that he

---

[10] At the time of briefing, defendants noted, *see* Tigrent Supp. 8 n.4, that there was an unresolved question under Florida law that had been certified to the Florida Supreme Court and was pending there, namely, whether Florida courts should "consider either procedural or substantively unconscionability independently and conclude their [unconscionability] analysis if either one is lacking" or whether courts should instead "evaluate both procedural and substantive unconscionability simultaneously in a balancing or sliding scale approach." *See Pendergast v. Sprint Nextel Corp.*, 592 F.3d 1119, 1143–44 (11th Cir. 2010). On July 17, 2012, the Florida Supreme Court declined to exercise jurisdiction in *Pendergast*, citing *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740 (2011), and a post-*Concepcion* statement by the Eleventh Circuit that, had *Concepcion* been decided, it would not have certified that question. *Pendergast v. Sprint Nextel Corp.*, No. SC10-cv-19, 2012 WL 2948594, at *1 (Fla. July 17, 2012). Thus, the question remains unanswered. However, the doctrinal ambiguity recognized by the *Pendergast* court has no bearing on the ultimate resolution of defendants' motion for two reasons: first, under either approach identified in *Pendergast*, it is necessary that some degree of procedural unconscionability be found, and there is none here; and second, even if unconscionability could be found based solely on substantive considerations, the Court would not find it here, for the reasons it sets out. *See, e.g.*, *Tranchant v. Ritz Carlton Hotel Co. LLC*, No. 10-cv-233, 2011 WL 1230734, at *5 n.3 (M.D. Fla. Mar. 31, 2011) (finding no unconscionability regardless of resolution of doctrinal conflict recognized by the *Pendergast* court).

was unable to understand the terms of the Agreement; the language of the Agreement was short, plain, and easy to understand; he was under no compulsion either to sign the Agreement or to initial his representation that he had received the Terms and Conditions; and the nature of the service that he was contracting to receive (the right to attend a class to enhance his stock-trading skills and "wealth building opportunities," Compl. ¶ 1) was quintessentially elective.

Simply put, nothing compelled Crewe to sign the Agreement or initial the documents put in front of him, read or unread, other than his own internal impulsion to enroll in the stock-trading course at the lowest available price. At the risk of stating the obvious, the setting in which Crewe enrolled for the Rich Dad training course is a far cry from the paradigmatically coercive one in which harsh terms are foisted on a consumer, in connection with the purchase of a necessity, with little practical ability to resist. *See, e.g.*, *Powertel*, 743 So. 2d at 575 ("Here, the customers had no choice but to agree to the new arbitration clause if they wished to continue to use the cellular telephone plans they had purchased from Powertel."); *Belcher v. Kier*, 558 So. 2d 1039, 1041 (Fla. 2d Dist. Ct. App. 1990) ("The appellees had no choice but to pay the rental increases or bear the burden of attempting to relocate their mobile home or sell the home with the possibility of a large loss."); *Romano ex rel. Romano v. Manor Care, Inc.*, 861 So. 2d 59, 63 (Fla. 4th Dist. Ct. App. 2003) ("[Plaintiff's husband] was being asked to sign these documents after [plaintiff] was already admitted to the nursing home without being told that his failure to sign them would not affect her care or her ability to stay in the home."); *cf.* 8 Williston on Contracts § 19:25 (4th ed. 1993) ("[T]he courts tend to be less sympathetic to parties who enter

into releases so they may engage in voluntary recreational activities than to parties who agree to exculpatory provisions in other settings.").[11]

Furthermore, even crediting Crewe's claim that he was rushed through a line and asked to sign and initial documents he had not read in order to secure a favorable price that would soon expire, Crewe was given three days to cancel his Agreement.  He was also given a cancellation form instructing him how to effect a cancellation.  Crewe thus had every opportunity to read the Agreement and Terms and Conditions after leaving the workshop, to reflect on the arbitration clause, and to decide to back out.  He did not do so.

The opportunity Crewe was given to withdraw over the next three days gave him an amply "meaningful choice" whether to bind himself to the Agreement, *Belcher*, 558 So. 2d at 1042, and vitiates any conceivable claim that the circumstances under which he initially signed the Agreement were procedurally unfair.  *See, e.g.*, *Pendergast*, 592 F.3d at 1138 ("Although Plaintiff arguably had no bargaining power as to the class action waiver in the 2005 Advantage Agreement, Sprint provided a mechanism through which Plaintiff could have avoided the contract entirely.  Thereafter, each time Sprint amended its terms and conditions, Plaintiff had 30 days to cancel his service without payment of any penalty fees."); *Dorward v. Macy's Inc.*, No. 2:10-cv-669, 2011 WL 2893118, at *5 (M.D. Fla. July 20, 2011) (finding no procedural

---

[11] For examples of cases distinguishing between contracts for essentials and contracts for non-essentials, *see In re iPhone Application Litig.*, No. 11-cv-02250, 2011 WL 4403963, at *8 (N.D. Cal. Sept. 20, 2011) (citations omitted) ("when the challenged term is in a contract concerning a nonessential recreational activity, the consumer always has the option of simply forgoing the activity"); *Pokrass v. The DirecTV Grp., Inc.*, No. EDCV 07–423, 2008 WL 2897084, at *6 (C.D. Cal. July 14, 2008) ("When the challenged contract, however, concerns a nonessential activity, the contract is not procedurally unconscionable because the consumer always has the option of simply forgoing the activity.")  (internal quotations omitted); *Enderlin v. XM Satellite Radio Holdings, Inc.*, No. 4:06-cv-0032, 2008 WL 830262, at *16 (E.D. Ark. Mar. 25, 2008) (finding agreement not unconscionable where the arbitration provision concerns a product that is a non-essential luxury entertainment item, rather than a person's employment or a necessity).

unconscionability where plaintiff indicated "she understood that she had thirty days to opt-out of mandatory arbitration"); *Bland*, 927 So. 2d at 256 (plaintiff cannot claim procedural unconscionability after failing to "obtain further guidance about or reconsider [his] decision during the revocation period"); *Fonte*, 903 So. 2d at 1027 ("If Fonte was unsatisfied with the terms, she did not have to sign the contract.  Likewise, Fonte had a period of time to cancel the contract after its execution if, upon further review, she was not satisfied with the Terms and Conditions.").

Crewe therefore cannot establish any procedural unconscionability.  And, under the circumstances presented, any such claim would be risible.  Crewe's failure to make this showing, under Florida law, precludes any finding of unconscionability.

Although substantive unconscionability does not alone, without a finding of some procedural unconscionability, provide a basis for relief, the Court, in the interest of completeness, addresses this claim.  Under Florida law, substantive unconscionability arises only when contract terms are "so outrageously unfair as to shock the judicial conscience," and the agreement is one that "no man in his senses and not under delusion would make . . . and . . . no honest and fair man would accept."  *Gainesville Health Care Ctr.*, 857 So. 2d at 284–85; *see also Belcher*, 558 So. 2d at 1044.

In seeking to meet this high standard, Crewe principally argues that the class action waiver in the agreement makes it economically irrational for any consumer to sue, given the small potential recovery ($199) in any individual case.  Pls. Supp. 10.  To the extent Crewe thereby argues that a class waiver is inherently unconscionable under Florida law, that claim is foreclosed by the Supreme Court's decision in *Concepcion*, which approved of such waivers as advancing legitimate goals, including facilitating lower costs, faster resolution, and eliminating

procedural complexity.  *See* 131 S. Ct. at 1748–51; *see also Cruz v. Cingular Wireless, LLC*, 648

F.3d 1205, 1207 (11th Cir. 2011) (citing *Concepcion* and holding that, to the extent Florida has

held class action waivers void against public policy, such holdings are preempted by the FAA).

To the extent that Crewe's claim purports to be keyed to the specific facts of his case, it is

surely true that the small potential recovery ($199) in an individual action itself reduces the

incentive counsel might otherwise have to bring the case.  But that factor does not differentiate

this case; as the Eleventh Circuit noted in *Cruz*, such is true of many cases involving arbitration

clauses containing class action waivers.  And *Cruz* squarely holds that a state decisional rule

invalidating arbitration clauses on such grounds is preempted by the FAA.  *See* 648 F.3d at

1212–13 (holding that plaintiffs cannot argue that Florida law "invalidate[s] the class waiver

simply because the claims are of small value, the potential claims are numerous, and many

consumers might not . . . pursue their potential claims absent class procedures," because such a

policy would "stand[] as an obstacle to the FAA's objective of enforcing arbitration agreements

according to their terms, and is preempted").[12]  Further, the fee- and cost-shifting provision of

the Agreement here gives counsel a substantial incentive to bring a genuinely meritorious claim:

It provides that "the prevailing party shall be entitled to obtain all reasonable costs, including its

reasonable attorney fees at the trial and appellate levels."  May Decl. Ex. 1; *cf. Amex IV*, 681

F.3d at 141 (Pooler, J., concurring in denial of rehearing en banc) (noting that in *Concepcion*,

even though individual damages awards were small, a "fee-shifting provision[] ensured that a

damaged plaintiff could be made whole").

Alternatively, Crewe argues that the Agreement, by limiting his recovery to "the amount

paid by you to us under the Agreement," improperly limits the remedies he could receive under

---

[12] Strikingly, Crewe nowhere cites or acknowledges the highly apposite decision in *Cruz.*

FDUTPA.  May Decl. Ex. 1, at p. 4.  It is true that, in some cases, Florida courts have invalidated

arbitration clauses because they precluded remedies afforded by statute.[13]  But Crewe does not

identify any concrete remedy available under FDUTPA that is unavailable to him under the

Agreement.  On the contrary, FDUTPA itself provides only for "actual damages, plus attorney's

fees and court costs."  FLA. STAT. § 501.211.  "[A]ctual damages," in turn, has been narrowly

defined by the Florida courts.  *See, e.g.*, *Orkin Exterminating Co. v. Petsch*, 872 So. 2d 259, 263

(Fla. 2d Dist. Ct. App. 2004) ("special, consequential, and incidental damages" are "not available

under FDUTPA"); *Dorestin v. Hollywood Imports, Inc.*, 45 So. 3d 819, 825–26 (Fla. 4th Dist. Ct.

App. 2010) (Gross, C.J., concurring) ("To define recoverable 'actual damages' within the

meaning of [§ 501.211], Florida case law . . . limits 'actual damages' to 'benefit of the bargain'

damages."); *Beale v. Biomet, Inc.*, 492 F. Supp. 2d 1360, 1374 (S.D. Fla. 2007) (internal

quotations omitted) ("The standard for determining the actual damages recoverable under

FDUTPA is well-defined in the case law: [T]he measure of actual damages is the difference in

the market value of the product or service in the condition in which it was delivered and its

market value in the condition in which it should have been delivered according to the contract of

the parties.").  Thus, Crewe's complaint—that he is unable to recover unspecified "indirect

and/or consequential damages"—is actually a function of FDUTPA.  Crewe's Agreement with

RDE does not limit any remedy available under FDUTPA.

---

[13] *See, e.g.*, *Blankfeld v. Richmond Health Care, Inc.*, 902 So. 2d 296, 298 (Fla. 4th Dist. Ct.
App. 2005) ("If nursing home residents had to arbitrate . . . some of the remedies provided in the
legislation would be substantially affected and, for all intents and purposes, eliminated."); *Holt v.
O'Brien Imps. of Fort Myers Inc.*, 862 So. 2d 87 (Fla. 2d Dist. Ct. App. 2003) (automobile
purchase contract providing for arbitration which limited remedies provided by FDUTPA held
void as contrary to public policy); *Powertel*, 743 So. 2d at 576 ("[T]he arbitration clause forces
the plaintiff and other cellular telephone customers to waive important statutory remedies.").

For the above reasons, the Court does not find the Agreement unconscionable, either procedurally or substantively.

### 6.   Delegation of the Unconscionability Decision to Arbitrator

Defendants, finally, argue that the arbitration clause here delegates to the arbitrator, not this Court, the decision whether the arbitration agreement is unconscionable.  The Supreme Court has indeed recognized that, through a "delegation provision," "parties can agree to arbitrate 'gateway' questions of arbitrability," including whether the arbitration agreement is unconscionable.  The agreement must, however, demonstrate "clearly and unmistakably" that "the parties agreed to arbitrate arbitrability."  *Rent-A-Center, West, Inc. v. Jackson*, 130 S. Ct. 2772, 2777 & n.1 (2010) (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).

The arbitration provision in this case contains such a clear and unmistakable statement. In mandatory and explicit prose, the Agreement to which Crewe bound himself requires that "[a]ll determinations as to the scope, enforceability, and effect of this Dispute Resolution section shall be decided by the arbitrator and not by a court."  May Decl. Ex. 1.  In addition, NAF's rules, expressly incorporated by the arbitration clause, contain a similar provision.  *See id.* Ex. 2 (NAF rules, providing that the "Arbitrator shall have the power to rule on all . . . objections relating to jurisdiction, unconscionability, contract law and enforceability of the Arbitration Agreement"); *see also Washington v. William Morris Endeavor Entm't, LLC*, No. 10-cv-9647, 2011 WL 3251504, at *1 (S.D.N.Y. July 20, 2011) (enforcing incorporated rule of arbitration association empowering arbitrator to rule on arbitrability issues).

In the Court's judgment, this provision is binding, such that, under *Rent-A-Center,* Crewe was contractually bound to raise his claim of unconscionability with an arbitrator, not this Court.

For two reasons, however, the Court has undertaken this inquiry itself.  One is practical:  With NAF unavailable, the Court had no assurance that the parties could agree upon a suitable arbitrator.  The Court asked the parties before oral argument each to identify two arbitral fora in which they were prepared to arbitrate:  Defendants identified one and Crewe, disappointingly, refused to identify any.  Second, and more important, Crewe's claim of unconscionability, based in part on the notion that the arbitral fee and other costs of arbitration might exceed his potential recovery, if valid potentially also called into question the use of an arbitrator to decide the "gateway" issue of arbitrability.  To avoid this circular feedback loop, the Court intervened to resolve this question.

The Court now has determined under the governing case law that Crewe's arbitration agreement is enforceable, and that the decision as to enforceability of the arbitration provision was properly delegated to an arbitrator.  In dismissing Crewe's claim in favor of arbitration, the Court, therefore, does so on two independent grounds:  First, that the arbitration clause is enforceable; and second, that Crewe was obliged to bring any challenge to that clause, in the first instance, to an agreed-upon arbitrator, not to this Court.[14]

---

[14]  Where the parties have agreed to arbitrate but cannot agree on a substitute arbitrator, both the FAA and New York law provide mechanisms for filling this void.  *See* 9 U.S.C. § 5 ("If in the agreement provision be made for a method of naming or appointing an arbitrator or arbitrators or an umpire, such method shall be followed; but if no method be provided therein, or if a method be provided and any party thereto shall fail to avail himself of such method, . . .  then upon the application of either party to the controversy the court shall designate and appoint an arbitrator or arbitrators."); N.Y. C.P.L.R. § 7504 (2012) ("If the arbitration agreement does not provide for a method of appointment of an arbitrator, or if the agreed method fails or  for  any  reason  is  not followed,  or  if  an arbitrator  fails  to  act and his successor has not been appointed, the court, on application of a party, shall appoint an arbitrator."); *Stop & Shop Supermarket Co. LLC v. United Food and Commercial Workers Union Local 342, AFL-CIO*, 246 F. App'x 7, 11 (2d Cir. 2007) ("Notwithstanding the existence of such a provision [providing a method for appointing an arbitrator], a district court has the duty under FAA § 5 to step in and appoint an arbitrator if either of the following conditions pertains: (1) one party fails to avail itself of the contractual

### 7.   Remedy

Crewe's claims will therefore be dismissed, based on his binding arbitration agreement. At argument, Crewe asked that, in the event of dismissal, the case not be stayed pending the resolution of arbitration, but instead be dismissed outright, to permit him to appeal this decision. Defendants did not object to that course.  Inasmuch as neither party affirmatively seeks arbitration at this point, the Court will honor Crewe's request and dismiss his claims outright, so as to permit him to take an appeal.

### B.  Maurice's Forum Selection Clause

Defendants also move to dismiss Maurice's claims on grounds including that (1) his lawsuit in this Court is barred by the mandatory forum selection clauses in his contracts with RDE; and (2) all except his FDUTPA claim are barred by the statute of limitations.  For the reasons that follow, the Court grants the motion to dismiss.

### 1.   Forum Selection Clause

Maurice's claims arise out of two separate contracts with RDE: the February 28, 2008 agreement to enroll in the three-day training session held March 28–30, 2008, *see* May Decl. Ex. 3; and the March 30, 2008 contract to purchase a series of "advanced classes and mentor services" held on April 26–27, 2008, *see* May Decl. Ex. 4.  Compl. ¶¶ 13, 113; May Decl. ¶ 7. Both contained a forum selection clause.  The February 28 agreement provided:

> Except where prohibited by law (i.e., California), venue shall be recognized only in the state or federal courts serving Lee, Palm Beach or Broward Counties in the state of Florida.  Student hereby expressly waives any venue privileges that may be asserted in connection with this Agreement.

May Decl. Ex. 3, at p. 3.  The March 30 agreement similarly provided:

---

selection method, or (2) there is a lapse in the naming of the arbitrator.").  *See also supra*, § II.A.3.

> Except where prohibited by law (i.e., California), student consents to jurisdiction in the state of Florida and expressly waives any jurisdiction and venue privileges which may be asserted in connection with this Agreement so that all actions brought hereunder whether at law or in equity, shall be brought in the state or federal courts serving Lee, Palm Beach or Broward Counties in the state of Florida.

May Decl. Ex. 4, at p. 3.[15]

"Forum selection clauses 'are prima facie valid and should be enforced unless enforcement is shown by the resisting party to be "unreasonable" under the circumstances.'" *TradeComet.com LLC v. Google, Inc.*, 647 F.3d 472, 475 (2d Cir. 2011) (quoting *M/S Bremen v. Zapata Off–Shore Co.,* 407 U.S. 1, 10 (1972)). Where parties have entered into a binding contract whereby they explicitly chose a venue for resolution of disputes arising out of that contract, claims brought in forums other than those explicitly chosen may be dismissed under Rule 12(b)(6). *See, e.g.*, *Phillips v. Audio Active Ltd.*, 494 F.3d 378, 383–84 (2d Cir. 2007); *New Moon Shipping Co., Ltd. v. MAN B & W Diesel AG*, 121 F.3d 24, 28 (2d Cir. 1997) (collecting cases); *Klotz v. Xerox Corp.*, 519 F. Supp. 2d 430, 435 (S.D.N.Y. 2007) (Lynch, J.) (noting that the Second Circuit "has repeatedly enforced forum selection clauses through motions to dismiss for improper venue").

The Second Circuit has established a four-part test to determine whether dismissing a claim based on failure to adhere to a forum selection clause is merited: (1) "whether the clause was reasonably communicated to the party resisting enforcement"; (2) whether the clause was "mandatory or permissive," *i.e.*, "whether the parties are *required* to bring any dispute to the designated forum or simply *permitted* to do so"; (3) "whether the claims and parties involved in

---

[15] The Court takes judicial notice that Lee County is within the jurisdiction of the United States District Court for the Middle District of Florida, while Palm Beach County and Broward County are within the jurisdiction of the United States District Court for the Southern District of Florida.

the suit are subject to the forum selection clause"; and (4) "whether the resisting party has rebutted the presumption of enforceability by making a sufficiently strong showing that 'enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching.'" *Phillips*, 494 F.3d at 383–84 (quoting *M/S Bremen*, 407 U.S. at 10) (additional citations omitted); *see also Am. Steamship Owners Mutual Protection and Indem. Ass'n v. Am. Boat Co.*, No. 11-cv-6804, 2012 WL 527209, at *3 (S.D.N.Y. Feb. 17, 2012).

As to the first prong, the forum selection clauses were reasonably communicated to Maurice:  He knowingly and voluntarily entered into the contracts that contained both provisions. *See, e.g.*, *TradeComet.com LLC*, 647 F.3d at 475.  Indeed, Maurice himself alleges that the February 28 and March 30 contracts were each "a legally binding form contract." Compl. ¶¶ 47, 49.  The forum selection clauses in both contracts are written in plain language; each is preceded by headers in bold and capital letters. *See* May Decl. Ex. 3, at p. 3; *id.* Ex. 4, at p. 3.  Maurice does not claim to have misunderstood these provisions.  Nor does he claim that the relevant provisions are, somehow, unconscionable under Florida law.

As to the second prong, the forum selection clauses in both contracts are mandatory.  "A so-called permissive forum clause only confers jurisdiction in the designated forum, but does not deny plaintiff his choice of forum, if jurisdiction there is otherwise appropriate." *Phillips*, 494 F.3d at 384.  By contrast, a mandatory forum clause exists where parties "agree in advance on a forum where any and all of their disputes must be brought." *Id.*  The clause provides that "venue shall be recognized *only* in the state or federal courts serving Lee, Palm Beach or Broward Counties."  May Decl. Ex. 3, at p. 3 (emphasis added).  The use of the word "shall" makes the clause classically mandatory.

39

As to the third prong, this suit is clearly within the very broad scope of the two forum selection clauses.  The February 28 contract did not limit the scope of the forum selection clause at all, and the March 30 contract similarly provided that "all actions brought hereunder whether at law or in equity" must be brought in federal or state courts in either "Lee, Palm Beach or Broward Counties in the state of Florida."  May Decl. Ex. 3, at p. 3; *id.* Ex. 4, at p. 3.

Finally, Maurice has failed to rebut the presumption of enforceability.  His only justification for breaching his commitment to sue only in Florida is to enable him to join his case with Crewe's, and the related argument that the "first-filed" doctrine justifies his suing here.  *See* Pls. Mem. 39 ("Had Maurice brought his claims in a separate, subsequently filed lawsuit in Florida, his competing action would have been subject to transfer under the first-filed rule.").  These arguments fail.  Maurice's interest in joining forces with another plaintiff does not override his contractual duties.  And the first-filed rule, that "where there are two competing lawsuits, the first suit should have priority," has nothing to do with this situation.  *Emp'rs Ins. of Wausau v. Fox Entm't Grp., Inc.*, 522 F.3d 271, 274–75 (2d Cir. 2008) (citation omitted).  Unlike in the situation to which the first-filed rule applies, Crewe's and Maurice's claims arise out of different disputes involving different contracts; there is no legal authority that presumes that all parties that sue a common defendant are entitled to sue in the venue chosen by the first plaintiff to file suit.  In any event, with Crewe's claims dismissed in favor of arbitration, there is no longer any New York lawsuit to which Maurice may cling.  If he wishes to bring suit, he must do so, consistent with his contract, in the Florida courts (state or federal) identified in his forum selection clauses.

Because all of Maurice's claims arise out of the two contracts with RDE, the Court dismisses Maurice's claims as to all defendants.  *See* RD Mem. 19 (noting that "any alleged

40

liability on the part of the RD Defendants is derivative of and predicated on Maurice's dealings with Rich Dad Education and Tigrent Learning," and that the claims "are substantially identical with respect to each defendant"); *see also Weingrad v. Telepathy, Inc.*, No. 05-cv-2024, 2005 WL 2990645, at *6 (S.D.N.Y. Nov. 7, 2005) (permitting enforcement of forum selection clause by nonsignatory defendants where plaintiff alleged that defendants "acted in concert" and where claims were "substantially identical with respect to each defendant" and "all arise out of the defendants' relationships with each other").

### 2.  Other Claims

Because the Court dismisses Maurice's claims based on the forum selection clauses, the Court does not have occasion to reach defendants' alternative arguments for dismissal, including based on the lack of personal jurisdiction and/or the statute of limitations.  Should Maurice file suit in a Florida venue consistent with his binding agreements, defendants will be at liberty to present such arguments at the appropriate time to the court assigned to the case.[16]

---

[16] Neither Maurice nor defendants requested that, if the Court were to enforce the forum selection clauses, it transfer the case to a federal court consistent with that provision.  Instead, both parties asked the Court, in that circumstance, to dismiss Maurice's claims outright.  In the absence of a motion or request to transfer, the Court will heed the parties' request and dismiss outright.

## CONCLUSION

Defendants' motion to dismiss the claims brought by plaintiff Crewe is hereby GRANTED with prejudice, in light of the binding arbitration clause in his Agreement. Defendants' motion to dismiss the claims brought by plaintiff Maurice is hereby GRANTED, without prejudice to his right to refile in a venue consistent with the forum selection clauses in his agreements. The Clerk of Court is directed to terminate the motions at docket items 29, 30, and 43, and to close this case.

SO ORDERED.

Paul A. Engelmayer

Paul A. Engelmayer
United States District Judge

Dated: August 3, 2012
New York, New York

42